**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA**
(Alexandria Division)

| | |
|---|---|
| **ZENAIDA PEREZ**, | |
| Plaintiff, | |
| v. | Case No. 1:25-cv-02126-AJT-IDD |
| **FAIRFAX COUNTY SCHOOL BOARD**, et al., | **JURY TRIAL DEMANDED** |
| Defendants. | |

Serve: **Fairfax County School Board**
8115 Gatehouse Road
Falls Church, VA 22042

## SECOND AMENDED COMPLAINT

COMES NOW Plaintiff, Zenaida Perez ("Plaintiff"), by and through her undersigned counsel, and hereby files this First Amended Complaint for Damages against Defendants Fairfax County School Board ("FCPS" or "the Company" or "Defendant"), Montell Brown, Chad Lehman, Erik Healey, and Michelle Reid (collectively, "Defendants") to recover damages for retaliation in violation of the Virginia Whistleblower Protection Law ("VWPL") and Fraud and Abuse Whistle Blower Protection Act ("FAWBPA"), for defamation *per se*, and for retaliation in violation of the First Amendment to the United States and Commonwealth of Virginia constitutions. In support thereof, Plaintiff respectfully alleges and states as follows:

## THE PARTIES

1. Plaintiff Zenaida Perez ("Perez") is a resident of Clifton, Virginia within Fairfax County. Perez has worked as an English for Speakers of Other Languages ("ESOL") teacher for FCPS since 2008.

1

2.  Defendant FCPS was and is, at all times relevant to this matter, the public school system for Fairfax County.  The School Board is charged with supervision of public school divisions, and is the corporate entity vested with the power to sue and to be sued.

3.  Defendant Montell Brown ("Brown"), individually and as Assistant Principal at Centreville High School is, and at all times relevant to this Complaint, was Assistant Principal at Centreville High School within FCPS acting within the course and scope of his employment at FCPS.

4.  Defendant Chad Lehman ("Lehman"), individually and as a Former Principal at Centreville High School is, and at all times relevant to this Complaint, was a Former Principal of Centreville High School within FCPS who acted within the course and scope of his employment at FCPS, and who now serves as Executive Principal of Region 5 for FCPS.

5.  Defendant Erik Healey ("Healey"), individually and as the Principal of Centreville High School is, and at all times relevant to this Complaint, was the Principal of Centreville High School within FCPS who acted within the course and scope of his employment at FCPS.

6.  Defendant Michelle Reid ("Reid"), individually and as Superintendent of FCPS is Superintendent of FCPS who acted within the course and scope of her employment at FCPS.

## JURISDICTION AND VENUE

7.  This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331 because one of the claims in this action raises allegations under the First Amendment to the United States Constitution.  The amount in controversy exceeds the jurisdictional minimum amount for this Court.

8.  Venue is proper in this district under 28 U.S.C. § 1391(b)(2), as all of the actions complained of herein took place within the jurisdiction of this Court. Defendants removed this case to

this judicial district on November 21, 2025, [ECF No. 1], so they have sufficient contacts for personal jurisdiction.

9. This Court has supplemental subject matter jurisdiction over Perez's VWPL, FAWBPA defamation, and Virginia Constitution (Article 1, Sec. 12) free speech and retaliation claims pursuant to 28 U.S.C. § 1367, as they arise from a common nucleus of facts as her federal law claims.

## **FACTUAL BACKGROUND**

10. Perez is a Cuban-American educator who has devoted her career to teaching ESOL in public schools in Florida and Virginia. Born in Cuba, Perez immigrated to the United States in 1990 after earning a master's degree in ESOL. She taught in the Sarasota, Florida public school system for seven years, then moved to Virginia, teaching first in Hampton Roads and then, since 2008, in Fairfax County Public Schools. Her work as an ESOL teacher is critical for educating migrant students in challenging and unfamiliar settings, particularly at majority-minority schools like Centreville High School ("CHS"), where 20% of the student body must learn to speak English, and about one in four students live in low-income homes and qualify for free or reduced-fee meals.

11. Perez's standing with other CHS administration began to deteriorate late in the 2021-2022 school year, after she reported to Lehman and Parker her concern about CHS (and perhaps others) being implicated due to its social worker, Carolina Diaz, arranging for and perhaps paying for students' abortions without their parents' knowledge and consent, in violation of Virginia law. Since then, *Perez has reiterated her complaint of unlawful abortion trafficking on an ongoing basis*.

3

12.    Perez made the first report verbally on May 5, 2022, to Parker and Assistant Principal

Alexis Wenzel in Parker's office. In response to false allegations that she had provided a

pregnancy test to a student, Perez advised Parker and Wenzel that CHS's social worker, Diaz[1],

had provided pregnancy tests and "pregnancy solutions" to minor students. Perez confirmed

her allegations in a rebuttal memo she sent to Parker, with cc to then-CHS Principal Chad

Lehman, on May 13, 2022, wherein she stated that Diaz "has provided pregnancy tests and

even further support to other students who have had pregnancy situations," and told them "I

have the name and evidence of another student who was helped by the social worker to solve

the pregnancy issue."

13.    Perez was surprised to learn in May 2022, that Lehman and Parker had Diaz contact the

guardian of a 15 year old student who Diaz had sent to ask Perez for a pregnancy test as a "set

up". They had Diaz call the guardian given her proficiency in Spanish since the guardian did

not speak English. This was a notable conflict of interest given Diaz was the individual in

question who Perez had complained about.

14.    Likewise, in an email from Perez to Lehman dated June 9, 2022, she stated, "[W]e all

know that the social worker helps the students to solve pregnancy situations."

15.    On November 22, 2022 at 12:30 pm, Perez met with Lehman and again confronted him

with the fact that Diaz had facilitated an abortion for a minor student and did not tell her

uncle, who was her legal guardian. She told Lehman that Doe #1 actually got the abortion, and

that her legal guardian (her uncle) only found out about the abortion when he had to take her

to the hospital because the procedure caused extensive blood loss. She also stated that her

---

[1] Notably, although FCPS held her out as a "social worker", it appears based on the Virginia online record related to social worker licensure that Diaz was *not* licensed as a social worker until August 2025, long after these events occurred.

uncle had no idea that she got the abortion until that night when he rushed her to the hospital because she was excessively bleeding and had serious complications from the abortion. He was very upset that the school social worker facilitated this abortion without consulting him.

16. In the meeting on November 22nd, Lehman denied recalling Perez's report about facilitating abortions. He stated, "I don't remember the statement or the context of it, so I couldn't answer that question with you right now. I don't remember there being a conversation about that specifically." Accordingly, Perez re-forwarded to him the email and rebuttal she had sent on May 13, 2022, which stated the "pregnancy solution" allegation.

17. Very shortly after that meeting, at 1:05 pm on November 22nd, Lehman responded in an email to Perez, stating, "I have also followed up with Ms. Diaz and Ms. Villeda, and they shared what happened with [Doe #1]. They have a very different version than what you told me. I'm not sure what further information you want to share, or how you got the information." (The extremely brief period between the end of Perez's 12:30 pm meeting with Lehman and his email of 1:05 pm strongly suggests he only had time to call each employee on the phone and obtain their denials. This "One Minute Manager" response seems to have passed as an "investigation" for Lehman.) Perez responded via email, stating, "In reference to [Doe #1's] abortion, which was facilitated by Ms. Carolina Diaz, I have all the pertinent information about the case. [Doe #1] told me that [the school counselor] was not aware of that situation. Evidently, Mrs. Diaz is not going to agree and as usual, she will lie. I do have the evidence to prove that I am right."

18. The statement Perez procured from Doe #1, dated November 19, 2022 (translated from Spanish) says:

> Last year, I went to see the Social Worker Carolina Diaz. She helped me with a termination of my pregnancy [a Spanish euphemism for an abortion, literally "interruption

of pregnancy"], namely, an abortion. Mrs. Carolina Diaz set up an appointment with the abortion clinic in Fairfax. She paid for the costs of this medical procedure and kept silent without letting my family know about it. I was afraid that my family would react poorly if they knew about my pregnancy so I sought the abortion.

When the abortion was done, I only was 17 years old. My date of birth is --------, 2004, and the abortion took place on November 2021.

19. Doe #1 also reported that "an envelope" was given to her for the abortion clinic and she was told not to open it, which more than raises the presumption that the funds to cover the abortion were in the envelope. A FCPS Freedom of Information Act (FOIA) request for financial records for those receipts now suspiciously returns to a 404 dead URL address.

20. Doe #1's statement was reported by journalist Walter Curt in August 2025. Doe #1's recounting of events is supported by her uncle and legal guardian, Mr. S. In an audiotaped interview from November 2022, Mr. S stated that when Doe #1 was pregnant, no one from CHS contacted him to discuss her having an abortion. He discovered she had had an abortion when he had to transport her to the emergency room for complications from an abortion.

21. Curt also reported the statement of another CHS student, "Doe #2", who told Perez that Diaz had offered to help her get an abortion **when she was five months pregnant** - nearly at viability. The student refused to have the abortion, despite intense pressure to do so. Her infant is being raised by the former student and her family.  Her statement is to the same effect as that of Doe #1 - that the CHS social worker, Diaz, and perhaps others including the school nurse were seeking to arrange abortions for students and insisting it was their "only option":

It is really wrong to offer Young, pregnant girls, as a first option, the abortion. Even when these girls those girls are minors. That was the option that the school nurse and the social worker gave me when I was already five months pregnant. And I was only 17 years old.

22. The second student added, "If the administrators are hurting you (Perez) by using unfair reasons, instead of chasing the social workers that are telling the Minor girls to have

abortions, that is really wrong in my opinion." In an audio recording of an interview with that student, dated August 26, 2025, Doe #2 related that she had become pregnant, and her mother did not know. The social worker, Diaz, took her to the school nurse, and the nurse "offered me the abortion." "You would not be the first one, the last one, or the only one," they said to her. Only after Doe #2 refused the abortion option did they help her tell her mother. Doe #2 believes there were other girls who were "helped" to get abortions because "there were a few other girls pregnant and overnight, they were fine, not pregnant any more." There is a third student, who graduated from high school last year, who has information about the abortion done on Doe #1. We believe she is cooperating with the Virginia State Police investigation.

23. The facts alleged by Perez amount to illegal conduct by the CHS social worker, Diaz, and perhaps others.   (Jurisdiction; consent for abortion) states that a minor may seek an order from the court permitting an abortion where no "authorized person" has given consent, where "authorized person" is defined in the statute to mean "(i) a parent or duly appointed legal guardian or custodian of the minor or (ii) a person standing in loco parentis, including, but not limited to, a grandparent or adult sibling with whom the minor regularly and customarily resides and who has care and control of the minor."  "Any person who knows he is not an authorized person and who knowingly and willfully signs an authorization statement consenting to an abortion for a minor is guilty of a Class 3 misdemeanor."

**Retaliation for Perez's Ongoing Reporting of Alleged Criminal Abortion Trafficking**

24. After the 2022-2023 academic year, Perez began to experience animosity and retaliatory actions against her, first by CHS Principal Lehman, then by incoming CHS Principal Healey and incoming CHS Vice Principal Montel Brown, and others. After Perez's interview with

Lehman in November 2022, Lehman never again acknowledged her or greeted her. When he saw her in the hallways, Lehman walked in the opposite direction to avoid her.

25. During the 2023-2024 academic year, Perez was on her ordinary three-year Summative Assessment Cycle (Evaluation). CHS administrators assigned her all Team Taught classes, in three different subject areas - Active Physics, Environmental Science, and U.S.-Virginia History. This teaching load, involving teaming five classes and full time in three different subject areas, was more burdensome than any imposed on other ESOL instructors.

26. By all accounts, throughout her tenure in the Fairfax County school system, Perez has had a sterling performance record as an ESOL educator. In her last evaluation (2023-24 academic year), Perez's immediate manager, George Michael Parker ("Parker") calls Perez a "team player" who "makes her students feel welcomed and valued." Parker's other comments include the following:

> Perez provides lessons that are relevant, motivating, and likely to engage students in active learning by incorporating several resources such as technology to enforce vocabulary. Perez makes her students feel welcomed and valued. Perez is able to reach the most struggling student.

> Perez seeks and provides teaching ideas from colleagues and other professionals. She is an active [sic] when collaborating with her co-teachers. She assists the teachers with language development and background knowledge.

> Perez creates a learning environment where students feel welcomed. Perez shows respect to all of her students. She communicates with families and appreciates family cultures and values.

> Perez is extremely popular with her students and fellow educators, well known and respected in the community. She often socializes with students and families from CHS. Until the events related below, she had enjoyed a collegial and warm relationship with CHS administrators.

27. Parker treated her equitably and gave her honest and fair evaluations with extremely high marks, rating her an "effective" instructor and noting no areas for professional improvement despite her protected activity.

28. Later that year, however, other CHS administrators began to retaliate against her by asking students to ask Perez for rides in her vehicle, knowing it was against CHS policy; arbitrarily scheduling meetings and demanding responses within vacation and PTO times; again falsely accusing her of obtaining pregnancy tests for students; in spring 2025, writing her up for insubordination and disciplining her with a one day suspension in April; and placing her on her triennial "Summative Evaluation" cycle in this current academic year, a year earlier than the regulations permitted.

29. Parker shared with Perez, "**I know what they have been doing to you**." Perez  understood that by this statement, Parker communicated that since 2022, he knew that Lehman had been conspiring with Department Chair Robin Thiel and other employees in an effort to make her resign because she had engaged in protected activity relating to the unlawful abortions.

30. The following academic year, 2024-2025, CHS Principal Healey and Assistant Principal Brown began their tenures, and the retaliation only intensified.

31. On December 12, 2024, Brown defamed Perez when he falsely told Doe #3's parent that Perez **"helped his daughter acquire a pregnancy test**."

32. Then again on December 19, 2024, Brown repeated his false and defamatory statement at a meeting in his office with Perry, Bromberg, and Perez, stating that Perez **"facilitated the logistics for the student, Doe #3, to purchase a pregnancy test**." His statement was heard by Perez's colleague. Later, **Brown's statement was republished verbally by Healey**, CHS Principal, on January 22, 2025, at another meeting in his office. That same false

statement was written again by Brown on the reprimand that he wrote in January 2025, which is filed in Perez's personnel records in the Office of Human Resources for FCPS that any administrator with access can view.

33. As of December 2024, it has been reported by students to Perez that Brown tried to manipulate and pressure students to do or say things about Perez to get her in trouble, which created a hostile work environment for her, as described below.

34. Perez filed a complaint with the Equal Employment Opportunity Commission ("EEOC") on or about December 20, 2024, re: her concerns about retaliation and harassment.  The school was notified of her complaint within two weeks of her filing, in mid-January 2025.

35. Shortly thereafter, on January 14, 2025, Brown defamed Perez, stating that she "**violated Regulation 4444.1-Prevention of sexual misconduct and abuse**." He read his defamatory memo out loud at the follow up meeting that Perez, Perry, and Bromberg attended in his office.

36. On January 16, 2025, Perez learned from a work colleague that there was a false rumor going around the school that Perez had had an inappropriate illicit relationship with a male student **[Doe #4]**. Perez believes this rumor was started by Brown and Healey given that she had helped a male student get a title, registration and insurance for his car. This was in spite of the fact that it was the male student's father who reached out to Perez to get her assistance with his son getting the title, registration and insurance for his car, so his son could get to school given the distance they lived from Centreville High School.

37. On January 16, 2025, Perez forwarded to CHS Principal Healey an email that she had previously sent to a journalist, in which **she stated her belief that the reason why school officials were targeting and retaliating against her was because of her knowledge and**

**evidence regarding abortions being facilitated for minor girls**. Healey then forwarded the email to Brown the next day, January 17th, to which Brown responded, "**Now I have to add more to Ms. Perez's Reprimand**."

38. On January 18, 2025, Perez filed another complaint with the Office of Employee Relations ("OER") stating her concerns about retaliation and harassment from Healey and Brown.

39. Perez learned that on January 22, 2025, the male student [Doe #4] who she had helped upon request of his father, was pulled out of his class by a school official, and asked questions insinuating that he had a romantic relationship with Perez and that was why she had helped him get the title, registration and insurance for his car. They asked him where they met and if he was romantically involved with Perez.  He said he was not.  When Perez found out that they did this to him, she felt bad for him and felt humiliated to be the subject of such a vicious rumor. This is just yet another example of FCPS officials unrelenting attempts to tarnish her goodwill and reputation amongst her colleagues and the students after she complained about the abortions.

40. On January 22, 2025, Healey defamed Perez claiming that "**she had falsified records**" and "**had had an inappropriate relationship with a student [Doe #4].**" This defamation was heard by Bromberg, and she wrote that statement on the meeting notes. That defamatory accusation was republished by other teachers and colleagues, as well, and has also been filed in Perez' personnel records in HR that any administrator with access can view. It has affected Perez's reputation and caused her pain, suffering, and shame. It also isolated her from colleagues and friends in the building.

41. As a direct result of the retaliatory and defamatory actions taken against her by FCPS personnel, Perez consulted a medical provider on January 23, 2025. The medical provider

prescribed her medicine for anxiety and depression, which Perez has been taking consistently ever since. The depression and anxiety caused by the retaliation and defamation drove Perez to notify Healey that she intended to retire at the end of the 2024-2025 academic year. However, upon learning more about her legal rights and remedies, and continuing to receive the appreciation and support of her students and the CHS community, Perez determined to continue teaching and to press her allegations of illegal activity by CHS personnel.

42. On January 28, 2025, ten days after filing her OER complaint, she got an email response from James R. Mackie, OER investigator, stating that he would forward Perez's complaint to Healey, who was the very person she had complained about. It was no surprise that the retaliation got even worse for her after that.

43. On January 31, 2025, Perez had a phone conversation with the FCFT Union Rep Jason Roe who suggested to Perez to try to transfer to another school in a different Region because the targeting and retaliation against her for protected activity was not only coming from the CHS school administrators, *but was also coming from the FCPS executive offices*.

44. Around February 5, 2025, a male student came to Perez's classroom during his 6th period, and asked her when she would give him a ride in her car. Perez asked him who sent him to ask her that. He just smiled and laughed, but would not tell her. He walked away. Perez believes that Brown put him up to asking her for a ride in his car like he later did in April 8th with yet another male student, as described below.

45. On February 27, 2025, Healey defamed Perez when he wrote a Summary Memo stating that "**she blatantly disregarded a directive to review and correct her gradebook**." This statement was shared in writing with other administrators, and it was also sent to her local

file, as well, as personnel records in HR. Perez was damaged by this defamation because it was patently false. As background, on February 5, 2025, Perez received an email from Bromberg telling her to correct some errors from her SIS gradebook, which she did immediately on February 5, 2025, and emailed Bromberg a notification of the corrections prior to Healey publishing the false and defamatory statement weeks later. Perez told Bromberg, in that same email to Bromberg, that she had checked with other teachers about their gradebooks and none of them received a similar message from Bromberg.  Perez asked Bromberg why she was targeting her. Bromberg did not respond.

46. On March 7, 2025, Perez was interviewed via Zoom by attorneys Heidy Siegmund and Daniel Masakayan of McGuire Woods at the request of FCPS Associate General Counsel Ellen Kennedy, on an unrelated investigation. Perez told them clearly that Lehman had covered up Diaz's actions in facilitating an abortion for a minor without parental knowledge and consent. The results were conveyed to FCPS associate counsel Kennedy in Mr. Foster's office. On March 19th, Siegmund wrote to Perez and said: "**We will also make sure the Division Counsel's office is aware of your concerns**," according to a copy of the email.

47. It was reported to Perez by Doe #5 that Brown locked her in his office on March 24, 2025, and stated, "You are not leaving this room until you tell me the truth about your relationship with Ms. Perez." This is wholly inappropriate conduct for an Assistant Principal and verges on manipulation by false imprisonment.

48. On April 3, 2025, Brown defamed Perez when he said at a meeting that **"Perez hid student Doe #3 in her classroom (Room # 217) on March 12, 2025."** It was heard by Perry. This defamatory statement was also written by Brown and filed in my local file at CHS. It is false and defamatory. Perez told Doe #3 to return to her class as soon as she came to Perez's

room. Brown's defamation was repeated by AP Dr. Florio when she showed up to search for Doe #3. The statement was also written by Brown when he sent documentation to HR **unjustifiably requesting Perez's suspension for one day without pay**.

49. On April 8, 2025, an 18-year-old male student, Doe # 6, confided to Perez that Brown instructed him to ask Perez for a ride in her personal vehicle to Costco, and that once Perez gave him the ride, he was to report the incident to Brown, so that he could write Perez up.

50. On April 29, 2025, Brown sent Perez the schedule for SY-25-26 and had Perez team teach Economy and Personal Finance (two sections) and ELD 4 (three sections). He took away her English 10 classes that she had been effectively teaching all SY-24-25 and had already created lots of lessons and materials for her level 1-2 ESOL kids.

51. Perez attempted to transfer from CHS given all the retaliation she was facing.  On April 30, 2025, Perez took time off to attend an interview at Justice HS in Falls Church but only after arriving there did the AP for ESOL, Ms. Lally and the Dept. Chair inform her that they were not allowed to interview a teacher who is under contract with another HS in the County. She knew instances where that was not true given that Brown and Healey hired two new ESOL teachers at CHS, who were current teachers elsewhere in FCPS, and one of them was given Perez's 10 English classes without explanation.

52. On May 1, 2025, FCPS **unjustifiably suspended Perez for one day without pay**. They added very disgraceful documents in her HR personnel record-file, in addition to the "Reprimand" document from January 22nd, which Brown and Healey sent to her personnel records in FCPS. They also included in the suspension message agreement all the highest executives from FCPS and Gatehouse; e.g. Bill Fulton (Director of the OER in FCPS), William Solomon (Chief of Personnel in FCPS), Geovanny Ponce (Chief of Schools in

FCPS), Franklin Jones (Assistant Superintendent of HR, countywide), Pablo Resendiz (Assistant Superintendent of Region 4) and James N. Jackson (OER investigator, Region 4).

53. On Friday, May 2, 2025, Perez had a recorded interview with FCPS investigator James R. Mackie at FCPS Main in Merrifield, Virginia. In that interview, Perez gave Mackie clear details regarding the abortion allegations, including names and facts.

54. A few days later, on May 5, 2025, Brown replaced the two sections of Economy and Personal Finance, which he had assigned Perez to teach on April 29, 2025 for SY-25-26, with two sections of Environmental Science. Later, the two Science sections were removed from her schedule, and he assigned her four sections of ELD 4 and one section of AFDA (Algebra, Geometry and Statistics). This constant reshuffling of her schedule caused Perez undue stress, and she is not aware of him doing that with any other teacher's classes during that same timeframe. This was yet another example of the retaliatory harassment Perez faced due to her protected activity.

55. Sometime between May 11th and 12th, Perez was informed by two brothers who were students that Brown had pulled them out of their classes to ask them why they had been texting Perez regarding their attendance in her classes. The brothers asked Brown how he knew they had texted Perez regarding their attendance. Brown got very nervous and did not answer. Perez later realized that she had mistakenly chose to receive her personal text messages via Google Messages which were then linked to her FCPS Google drive through her personal phone, in other words Brown had unlawfully accessed her personal text messages, and she believes he was also unlawfully accessing her personal Yahoo email, which she used on her FCPS laptop, which she had connected to her FCPS Schools.net

Google account. She noted that documents she sent herself via email were disappearing from her email account.

56. On August 25, 2025, Perez was on sick leave and there was a substitute teacher covering for her. Brown defamed Perez when he falsely stated in front of her students and the substitute teacher that "**Perez didn't leave lesson plans for her classes**." One student reported this to her.

57. Perez's medical provider has increased her depression and anxiety medications at least two times January 2025 due to the heightened harassment and retaliation she has faced.

58. On October 10, 2025, Brown and Healey defamed Perez when they falsely reported to King & Spalding attorneys that "**Perez instigated bullying amongst the students**."

59. As recently as, the afternoon of October 16, 2025, Defendant Reid, and FCPS Division Counsel Lawyer, John Foster, came to CHS to meet with the entire CHS staff to discuss the illegal abortions that were taking place at CHS, as well as the government investigations due this being publicly exposed. At that all staff meeting, Reid stated, "Based on the interim findings, **these claims are likely untrue**. **It appears that the teacher who made these allegations may have falsified the evidence and intentionally refused to cooperate with the original school-based investigation of her allegations in 2022**. These interim findings are deeply concerning. In light of this new information, we are working to determine whether FCPS policies and regulations were violated. **We have an obligation to protect our staff from wrongful and unjustified accusations**."

60. Reid said that she was going to first send a letter to the CHS staff and families, then to parents and staff across the entire Fairfax County Public Schools system but wanted to read it to CHS staff first. In Reid's letter she stated, "**Based on the interim findings, which are**

**deeply concerning, these 2021 allegations are likely untrue. We have an obligation to protect our staff from wrongful and unjustified accusations**." (emphasis added).

### FCPS' "Investigations", Ongoing Threats, and Retaliation Against Perez

61. Perez has fully cooperated with FCPS throughout this process despite the persecution she has faced for her good faith reports to protect teen girls who were pregnant (and their families).

62. In 2025, FCPS retained outside counsel, Mary McGowan, Esq., formerly of Blankenship & Keith, to investigate Perez's allegations. Perez participated in an almost two hour interview and gave a recorded statement to McGowan on August 11, 2025, including details regarding the abortion allegations. For reasons unknown to Perez, McGowan resigned from representing FCPS in August 2025.

63. In the past week, FCPS, through its third set of attorneys from King & Spalding counsel, have taken to threatening Perez with termination if she does not subject herself to an **unrecorded interview**, over which she would have no control - and in spite of the fact that she has already provided extensive documentation and information about her claims to King & Spalding and two other prior FCPS' counsel's investigations into her claims. King & Spalding attorney Sean Royall, has been hounding Perez and her lawyers for an **unrecorded statement** despite the fact that two separate FCPS hired law firms have already conducted an investigation into Perez's claims; e.g. FCPS' counsel already has the statement Perez made to McGuire Woods and also the statement she made to its former counsel, Mary McGowan, as well as extensive documentation and audio recordings Perez has provided to substantiate her claims.

64. The wisdom of most recently refusing to subject Perez to an unrecorded statement, which would have been subject to King & Spalding's unknown interpretation and characterization without her ability to contradict it with a copy of her own recording, was borne out by the unnecessarily vindictive tenor of King & Spalding's recent off base "preliminary report".

65. King & Spalding's preliminary report to the Senate HELP Committee and the U.S. Department of Education Acting General Counsel, have made it clear to Perez and to her counsel that FCPS's actions against her are vindictive and retributive, and that FCPS has no intention of conducting a full and fair investigation, and belies their true intent of merely doing "damage control".

66. In particular, their claim that Perez somehow manipulated evidence or witnesses is false and was fabricated by FCPS and/or King & Spalding to absolve FCPS and in particular Superintendent Michelle Reid, in the court of public opinion.

67. Without justification, Bill Fulton, Director of the Office of Employee Relations placed Perez on administrative leave *via email* at 9:06 pm on October 20, 2025 which was just minutes after Perez made public statements on the news regarding her allegations about the abortion trafficking at CHS, a matter of "public concern".

68. Perez did not see Fulton's retaliatory administrative leave email until she reached school the next morning on October 21st. She left the school building immediately when she saw Fulton's email. Yet, FCPS, through its King & Spalding counsel, Sean Royall, accused Perez of "trespass[ing] onto FCPS property without authorization" *despite* acknowledging that the read receipt showed that Perez had not read Fulton's email until October 21st. Mr. Royall's follow on message was unnecessary, harassing, and conveyed his and FCPS' bias against Perez, only exacerbating Perez's emotional distress.

69. Needless to say, Perez is still dealing with the shock and disappointment of being separated from the students she has devoted her life to.

70. On January 9, 2026, Defendants reiterated their central defamatory assertions against Perez by disseminating to the "CHS school community" and the public a "Supplemental Report" to the Senate HELP Committee, the U.S. DOE and the Virginia State Police. This report, though designated "Supplemental", represented Defendants' final and complete findings and conclusions.

71. The final report reiterated the conclusions of the October 16, 2025 report, including the defamatory statement that "Mrs. Perez appears to have knowingly procured a false statement from the former CHS student (Student B) whom she claims obtained a school-funded abortion in 2021."

72. The final report also states again that "Mrs. Perez appears to have manipulated the content of a statement she procured from another student (Student C) whom she claims was pressured by Mrs. Diaz to obtain a late-term abortion."

73. That same day, January 9, 2026, FCPS issued a statement to "Centreville High School Staff and Families," the content of which were shared verbally to CHS staff by FCPS Superintendent Defendant Reid. The statement linked to the "interim findings" of the October 16, 2025 report, as well as the January 9, 2026 "Supplemental Report".

74. In her written and verbal statement, Defendant Reid repeated her defamatory statements that Mrs. Perez's "allegations are not only untrue but were based largely on statements that were misinterpreted, mistranslated, taken out of context, or in some cases knowingly fabricated." Reid again asserted that "[I]nnocent CHS personnel in this case were wronglyand publicly accused of criminal acts without an sound factual basis."

75. As a result of Defendants' defamatory actions, Plaintiff has been damaged in her professional reputation, has been isolated due to coworkers at school being afraid to associate with her for fear of FCPS management viewing them less favorably, as well.

76. Unbelievably, Perez has received up to 12 disciplinary memos and reprimands since December 19, 2024 up to October 10, 2025 after she engaged in the protected activity of reporting the illegal abortions on an ongoing basis. She fears continuing ongoing retaliation for engaging in protected activity.

77. Perez's once beloved work environment has become incredibly hostile for her due to Defendants' reckless and/or malicious Defamatory Statements and their unlawful retaliation against her.

78. Defendants' defamatory statements will have a lifelong impact on Plaintiff emotionally as she interacts with colleagues and professionally as she attempts to repair her professional reputation.  Plaintiff has no idea if her entire career will be ruined by Defendants' baseless and defamatory allegations, but knows that the Defendants' remarks will be a stain on her record forever and these allegations may resurface for any teaching position that she may seek in the future.

### Legal Standards Applicable to Defamation and Defamation *Per Se* Counts

79. The foregoing paragraphs are incorporated herein and made an integral part hereof.

80. Plaintiff's common law rights include the "uninterrupted entitlement to the enjoyment of [Plaintiff's] reputation." *Jordan v. Kollman*, 612 S.E.2d 203, 206 (Va. 2005) (citing *Gazette, Inc. v. Harris*, 325 S.E.2d 713, 720 (Va. 1985)).

81. The Virginia Supreme Court went on to explain, "To be actionable, the statement must be both false and defamatory." *Id*.

82. The Virginia Supreme Court provided the standard for defamation in *Jordan v. Kollman*: "In Virginia, the elements of libel are (1) publication of (2) an actionable statement with (3) the requisite intent." *Jordan,* 612 S.E.2d at 206.

83. With regard to intent, the Virginia Supreme Court held that for private individuals, "the plaintiff may recover upon proof by a preponderance of the evidence that publication was false, and that the defendant either knew it to be false, or believing it to be true, lacked reasonable grounds for such belief, or acted negligently in failing to ascertain the facts on which the publication was based." *Gazette, Inc.*, 325 S.E.2d at 724-25.

84. The foregoing negligence standard "applies only to circumstances where the defamatory statement makes substantial danger to reputation apparent, a determination to be made by the trial judge" and "[w]here no such danger is apparent from the statement, the plaintiff may recover compensatory damages only upon proof of New York Times malice." *Great Coastal Exp., Inc. v. Ellington*, 334 S.E.2d 846, 852-53 (Va. 1985).

85. The Virginia Supreme Court provided the standard for defamation per se in *Great Coastal Exp., Inc. v. Ellington*:

At common law, the following defamatory words are actionable per se:

(1) Those which impute to a person the commission of some criminal offense involving moral turpitude, for which the party, if the charge is true, may be indicted and punished.

(2) Those which impute that a person is infected with some contagious disease, where if the charge is true, it would exclude the party from society.

(3) Those which impute to a person unfitness to perform the duties of an office or employment of profit, or want of integrity in the discharge of the duties of such an office or employment.

(4) Those which prejudice such person in his or her profession or trade.

334 S.E.2d at 849 (citing *Fleming v. Moore*, 275 S.E.2d 632, 635 (Va. 1981)).

21

86. The Virginia Supreme Court further held "that in an action brought by a private individual for defamatory words involving no matters of public concern, if the published words are determined by the trial judge to be actionable per se at common law, compensatory damages for injury to reputation, humiliation, and embarrassment are presumed." *Id*. at 852.

87. Furthermore, the Supreme Court has determined that "[l]ibelous aspersions impugning honesty have long been accepted in the Commonwealth as potentially defamatory in nature. *See Adams [v. Lawson]*, 58 Va. at 255-57 (holding that a written charge advising another to 'quit lying' is actionable because it implies that he has been lying, and tends to injure the reputation of the party and to hold him as an object of contempt)." *Schaecher v. Bouffault*, 772 S.E.2d 589, 599 (Va. 2015).

88. Once words are determined to be actionable, a plaintiff must still show that the words were published and "prove negligence" for the requisite intent. *Great Coastal*, 334 S.E.2d at 853.

89. With regard to matters involving public employees, defendants who are public officials do not enjoy judicial immunity for false statements that are made concerning the reason for terminating an employee. *Viers v. Baker*, 841 S.E.2d 857, 863 (Va. 2020).

90. However, to the extent that qualified privilege exists regarding matters of public concern, such as the termination of a public employee, a plaintiff may defeat that privilege by a showing of common law malice. Common law malice also establishes a presence in defamation cases, in the context of defeating qualified privilege. "In *Great Coastal Express, Inc. v. Ellington*, . . . we approved a jury instruction on the elements of common law malice that will serve to defeat a qualified privilege that 'incorporate[d] language used in a number of our earlier cases which discuss elements of common law malice and abuse of privilege.' A non-exhaustive list of such elements included a showing that: (1) the statements were

22

made with knowledge that they were false or with reckless disregard for their truth, . . . (3) the statements were motivated by personal spite or ill will, . . . or (5) the statements were not made in good faith. . . . Today we reiterate the rule of *Great Coastal Express*. Personal spite or ill will, independent of the occasion on which it was made, is certainly one of the elements that will establish common law malice. However, it is not the only element, and any one of the elements, if pled and proved, will suffice." *Cashion v. Smith*, 749 S.E.2d 526, 533 (Va. 2013).

**COUNT I**
**RETALIATION IN VIOLATION OF THE VWPL**
**(Against FCPS)**

91. The VWPL, Virginia Code Ann. § 40.1-27.3, states, in relevant part, that an employer shall not take retaliatory action against an employee because the employee "in good faith reports a violation of any federal or state law or regulation to a supervisor or to any governmental body or law- enforcement official." *See* Va. Code Ann. § 40.1-27.3(A). To state a claim under this statute, an employee "must allege that he reported a violation of any federal or state law or regulation." *Chenault v. RBI Corp.*, No. CL21001754-00, 2021 Va. Cir. LEXIS 217, at *3 (Hanover Cty. Oct. 22, 2021). An employee "need only ... prove that he opposed an unlawful employment practice which he reasonably believed had occurred or was occurring." *Peters v. Jenney*, 327 F.3d 307,320 (4thCir. 2003).

92. An employee is not required to show that the underlying report of unlawfulness was in fact meritorious to prevail on his whistleblower retaliation claims. *Ross v. Commc'ns Satellite Corp.*, 759 F.2d 355,355 n.1 (4th Cir. 1985), overruled on other grounds by *Price Waterhouse v. Hopkins*, 490 U.S. 228 (1989). If Perez subjectively and reasonably believed that school staff paying for abortions for minors without parent or guardian consent was

unlawful when she told them, then she meets the prima facie requirements for establishing a claim for whistleblower retaliation under VWPL. *See Weeks v. Harden Mfg. Corp.*, 291 F.3d 1307, 1312 (11th Cir. 2002).

93. Perez in good faith engaged in protected activities described in ¶¶ 11 – 12, 14 - 17, 23, 34, 37 - 38, 46, 53, and 61 - 62, which were a substantial and/or motivating factor in FCPS's adverse employment actions against her described in ¶¶ 13, 24 - 25, 28 - 33, 35 – 37, 39 - 40, 42 - 43, 48 - 52, 54 - 56, 58 – 61, 63, 65 - 68, and 75-78, including but not limited to suspending her for one day without pay, placing her on administrative leave, and shutting down her access to the County's IT systems, due to the temporal proximity between those adverse acts and her reports of the illegal abortions.

94. Further, the Fourth Circuit has found that "close temporal proximity weighs heavily in favor of finding a genuine dispute as to causation." *See Foster v. University of Maryland-Eastern Shore*, 787 F.3d 243,253 (4th Cir. 2015); *Jacobs v. N.C. Admin. Off. of the Cts.*, 780 F.3d 562,575 (4th Cir. 2015), *see also King v. Rumsfeld*, 328 F.3d 145, 151 & n. 5 (4th Cir. 2003) (holding that a two-and-a-half-month gap between protected activity and adverse action was sufficient to support causation for the purposes of a prima facie case).

95. FCPS put Perez on administrative leave *immediately after* she participated in a publicly broadcast Webinar hosted by Americans United for Life, a nonprofit public advocacy organization, for parental rights and against coercion of minor girls into abortion.

**COUNT II**
**RETALIATION IN VIOLATION OF THE FAWBPA**
**(Against FCPS)**

96. The allegations of paragraphs 1-95 are realleged as if fully set forth herein.

97. Perez has been subjected to retaliatory actions for conduct as a whistle blower which is protected under Virginia Code § 2.2-3011.

98. Va. Code § 2.2-3011(A) states, "[n]o employer may discharge, threaten, or otherwise discriminate or retaliate against a whistle blower whether acting on his own or through a person acting on his behalf or under his direction." Va. Code § 2.2-3010 provides definitions for § 2.2-3011.

99. Perez in good faith engaged in protected activities described in ¶¶ 11 – 12, 14 - 17, 23, 34, 37 - 38, 46, 53, and 61 - 62, which were a substantial and/or motivating factor in FCPS's adverse employment actions against her described in ¶¶ 13, 24 - 25, 28 - 33, 35 – 37, 39 - 40, 42 - 43, 48 - 52, 54 - 56, 58 – 61, 63, 65 - 68, and 75-78, including but not limited to suspending her for one day without pay, placing her on administrative leave, and shutting down her access to the County's IT systems, due to the temporal proximity between those adverse acts and her reports of the illegal abortions.

100. FCPS put Perez on administrative leave *immediately after* she participated in a publicly broadcast Webinar hosted by Americans United for Life, a nonprofit public advocacy organization, for parental rights and against coercion of minor girls into abortion.

**101.** FCPS knew that Perez is a protected whistle blower, protected by applicable provisions of the FAWBPA, yet took these adverse acts against her in violation of FAWBPA.

**COUNT III**
**DEFAMATION PER SE**
**(Against all Defendants)**

102. The foregoing paragraphs are included herein as though fully set forth herein.

103. The statements described in ¶¶ 31 - 32, 35 - 36, 40, 45, 48, 56, 58 – 60, 66, 68, and 70-74 ("Defamatory Statements") were of and concerning Perez.

104. The Defamatory Statements were at all relevant times false.

105.    The Defamatory Statements are defamatory *per se* because they impugn the professional reputation of Perez.

106.    The Defamatory Statements impute to Perez unfitness to perform the duties of her profession, and therefore prejudice Perez in her trade, business, or profession.

107.    Given Perez's profession as a teacher, the Defamatory Statements about her professional and personal conduct are necessarily hurtful to her specific trade, occupation, and profession.

108.    At the time that Defendants published their Defamatory Statements of and concerning Perez, Defendants knew that they were false because, as just one example, they said that Mrs. Perez enabled students for inappropriate sexual misconduct.

109.    At the time that Defendants caused and directed the publication of the Defamatory Statements of and concerning Perez even though they should have known that they were false.

110.    Defendants deliberately published the Defamatory Statements to subvert Perez's credibility as a teacher and whistleblower.

111.    Defendants deliberately published the Defamatory Statements with the intention of inflicting harm upon the professional reputation of Perez.

112.    Defendants were motivated to publish the false and Defamatory Statements of and concerning Perez, because of their actual malice of spite, hatred, ill-will, and grudge against Perez.  .

113.    As a result of Defendants' publication of the false and Defamatory Statements of and concerning Perez has suffered potentially permanent impairment to her reputation and

standing in the community, embarrassment, humiliation, and mental anguish and suffering. *See Great Coastal Exp. V. Ellington*, 334 S.E.2d 846 (1985).

114. Defendants' Defamatory Statements are actionable *per se*, and therefore compensatory damages for injury to reputation, humiliation, and embarrassment are presumed.

115. Perez is entitled to compensatory damages for the mental anguish, pain and suffering that she endured, the harm done to her reputation, and for lost income, all of which damages were directly and proximately caused by the Defendants' intentionally tortious misconduct.

## COUNT IV
## <u>RIGHT TO FREE SPEECH/RETALIATION: ART. 1, SEC. 12 VA. CONST.</u>
## <u>(Against all Defendants)</u>

116. The foregoing paragraphs are included herein as though fully set forth herein.

117. The acts of Defendants, as pled hereinabove, constituted unconstitutional retaliation against Perez for speech she engaged in on matters of public interest as a private citizen. *Pickering v. Board of Ed. of Township High School Dist. 205, Will Cty*., 391 U.S. 563 (1968); *Garcetti v. Ceballos*, 126 S.Ct. 1951 (2006); *Vlaming v. West Point Sch. Bd*., 302 Va. 504, 895 S.E.2d 705 (2023). Defendants' actions amounted to conditioning Perez's public employment upon refraining from constitutionally protected speech, and thereby deprived her of rights protected under Article 1, Sec. 12 of the Virginia Constitution.

118. The individually-named Defendants took said actions against Perez despite knowing that she possessed said constitutional right or in reckless disregard thereof.

119. Perez is entitled to compensation for the deprivation of her constitutional right to speak on matters of public concern, directly and proximately caused by the Defendants' unconstitutional conduct.

## COUNT V

## <u>42 U.S.C. SEC. 1983</u> - **FIRST AMENDMENT RIGHT TO FREE SPEECH/RETALIATION**
### (Against all Defendants)

120.    The foregoing paragraphs are included herein as though fully set forth herein.

121.    The acts of Defendants, as pled hereinabove, constituted unconstitutional retaliation against Perez <u>by Defendants, acting under color of state law,</u> for speech she engaged in on matters of public interest as a private citizen.  *Pickering v. Board of Ed. of Township High School Dist. 205, Will Cty*., 391 U.S. 563 (1968); *Garcetti v. Ceballos*, 126 S.Ct. 1951 (2006); *Vlaming v. West Point Sch. Bd*., 302 Va. 504, 895 S.E.2d 705 (2023). Defendants' actions amounted to conditioning Perez's public employment upon refraining from constitutionally protected speech, and thereby deprived her of rights protected under the First Amendment to the United States Constitution.The individually-named Defendants took said actions against Perez despite knowing that Mrs. Perez possessed said First Amendment right or in reckless disregard thereof<u>, and in violation of her clearly established right to free speech secured under 42 U.S.C. Sec. 1983</u>..

122.    Perez is entitled to compensation for the deprivation of her First Amendment right to speak on matters of public concern, directly and proximately caused by the Defendants' unconstitutional conduct.

123.    <u>The actions of Defendants reflected an unconstitutional policy or custom of Defendant Fairfax County School Board to retaliate against, harass, intimidate and silence FCPS employees who report internally or who speak out publicly about unlawful conduct engaged in by other FCPS employees.</u>

*    *    *

WHEREFORE, Plaintiff, Zenaida Perez, moves this Honorable Court for judgment against Defendants, in the amount of $750,000.00 for compensatory damages related to damage to her for Counts I, II, IV and V (retaliation in violation of the VWPL, FAWBPA, First Amendment to the United States Constitution and the Commonwealth of Virginia Constitution), and $250,000.00 for compensatory damages related to pain and suffering (or such other amount as the jury finds appropriate) for Count III (defamation *per se*), for a total *ad damnum* clause of $1,000,000.00 (or such other amount as the jury finds appropriate). Perez also seeks an award of pre and post-judgment interest at the legal rate, court costs, and any such further and additional relief as appropriate.

**PLAINTIFF DEMANDS A TRIAL BY JURY ON ALL ISSUES SO TRIABLE**


Dated: January 16, 2026                    Respectfully submitted,
                                           **Zenaida Perez**

                                           By Counsel:

                                           Monique A. Miles, Esq.
                                           VSB #: 78828
                                           Old Towne Associates, P.C.
                                           201 N. Union Street, Ste. 110
                                           Alexandria, Virginia 22314
                                           Ph: 703-519-6810
                                           mmiles@oldtowneassociates.com


                                           _____
                                           Steven H. Aden, Esq.
                                           VSB #: 48036
                                           Americans United for Life
                                           1150 Connecticut Ave., N.W. Ste. 500
                                           Washington, DC 20036
                                           Ph: 202.741.4917

Steven.Aden@aul.org

*Counsel for Zenaida Perez*

## **CERTIFICATE OF SERVICE**

**I HEREBY CERTIFY** that on January 16, 2026, a true and correct copy of the foregoing

has been provided by electronic notification through the CM/ECF System, which will send notice

to the parties to this litigation.

Edward Lee Isler
VSB #:27985
Micah E. Ticatch
VSB #: 83351
IslerDare, PC
1945 Old Gallows Road, Suite 650
Vienna, Virginia 22182
Tel: (703) 748-2690
eisler@islerdare.com
mticatch@islerdare.com

M. Sean Royall, *pro hac vice forthcoming*
Lucas M. Fields, *pro hac vice forthcoming*
Zoe M. Beiner, *pro hac vice forthcoming*
KING & SPALDING LLP
1700 Pennsylvania Avenue, NW
Suite 900
Washington, D.C. 20006
(202) 626-2994
sroyall@kslaw.com
lfields@kslaw.com
zbeiner@kslaw.com

*Counsel for Defendants*

*/s/ Monique A. Miles*