# EXHIBIT C

**STATEMENT OF KNOWN FACTS IN RESPONSE TO THE RECENT CLAIMS OF CENTREVILLE HIGH SCHOOL TEACHER ZENAIDA PEREZ[1]**

### *Overview of Statement*

This August, Mrs. Zenaida Perez, an English for Speakers of Other Languages ("ESOL") teacher at Centreville High School ("CHS"), went public with allegations claiming that Mrs. Carolina Diaz, a social worker at CHS, previously encouraged, facilitated, and paid for student abortions, without parental consent or involvement. Mrs. Perez further contends that this alleged conduct was known to former CHS Principal Chad Lehman, and that Mr. Lehman engaged in a "cover up" to suppress information related to the allegations. Upon learning of these allegations, senior Division leadership for Fairfax County Public Schools ("FCPS") immediately initiated an external investigation into the matter. That investigation is ongoing. This Statement provides an overview of interim conclusions based on currently known facts.

FCPS is committed to the education, safety, health, and well-being of every student. To support these goals, FCPS employs trained professionals, including counselors and social workers, whose responsibilities include addressing students' developmental and welfare needs. Although student pregnancies are uncommon in FCPS high schools, they do occur. When staff become aware of such situations, and the student seeks support from the school, FCPS policies and regulations govern how staff are to respond. School-based social workers are trained to recognize that questions pertaining to a potential pregnancy termination are medical issues outside their scope. In such instances, standard FCPS policies and regulations provide that social workers are to refer the student to the public health nurse stationed onsite. These nurses are employed by the Fairfax County Health Department, not FCPS, and hold credentials from accredited nursing programs.

As explained below, the facts presently known to FCPS suggest the following:

- CHS social worker Carolina Diaz *did not* encourage, facilitate, or pay for any student abortion.

- Former CHS Principal Chad Lehman *did not* "cover up" any such allegations or related facts; he promptly investigated Mrs. Perez's allegations in 2022 and determined that they lacked factual support.

- Mrs. Perez's claim that Mr. Lehman "didn't do anything" to investigate her allegations is false and inconsistent with her own contemporaneous written communications with Mr. Lehman.

---

[1] This Statement responds to Questions 3-4 of the Department of Education's September 29, 2025, letter and to Questions 7-9, 12-13, and 15-16 of Chairman Cassidy's September 22, 2025, letter.

- Because Principal Lehman's 2022 investigation showed that Mrs. Perez's factual allegations lacked factual support, there was no need for him to escalate the issue to FCPS senior Division leadership.

- FCPS Superintendent Michelle Reid and other senior Division leaders did not learn of Mrs. Perez's allegations until after they were made public in August of this year.

- In 2022, Mrs. Perez knowingly withheld relevant materials then in her possession despite being asked during Principal Lehman's 2022 investigation if she had additional information to share.

- Mrs. Perez appears to have knowingly procured a false statement from the former CHS student (Student B) whom she claims obtained a school-funded abortion in 2021.

- Contemporaneous documents show that Student B was properly referred by Mrs. Diaz to the public health nurse and that Student B's legal or de facto guardian was "aware" of her pregnancy and abortion.

- Mrs. Perez also appears to have manipulated the content of a statement she procured from another student (Student C) whom she claims was pressured by Mrs. Diaz to obtain a late-term abortion.

- Student C has reported that she was never pressured by Mrs. Diaz or others to obtain an abortion, and that the public health nurse clearly communicated that parental consent would be required in the event Student C wanted to proceed with an abortion.

- Public statements by Mrs. Perez's lead attorney, Steven Aden, claiming that Mrs. Diaz provided Student B with a "white envelope" full of money to pay for her abortion are not supported by any known facts, or Mrs. Perez's own contentions.

- Mrs. Perez prepared a complaint to Virginia Attorney General Jason Miyares in March 2023 in which she specifically detailed her allegations of school-facilitated, school-funded abortions.

- Evidence discussed herein suggests that Attorney General Miyares's Office may have known of these allegations a year or more ago and declined (possibly for jurisdictional reasons) to investigate; we are not aware of any prior referral to the Virginia State Police for investigation.

- Other evidence discussed herein appears to indicate that it is possible Virginia Governor Glenn Youngkin's Office may have also known of these allegations for a year or more before calling for a State Police investigation.

***The Allegations Made by CHS Teacher Mrs. Zenaida Perez Concerning School-Facilitated Student Abortions***

Mrs. Perez, who has spent years privately developing her student-abortion allegations, chose to publicly broadcast these allegations for the first time in August 2025 through a blog posting by "W.C. Dispatch," a social media outlet operated by Mr. Walter Curt.[2]  On August 5, 2025, Mr. Curt  published a story entitled *Bolted Doors and Broken Laws: In Fairfax County, Clandestine School-Funded Abortions Bypassed Parents, Exposing A Hidden Pipeline Endangering Girls*, which featured materials purportedly substantiating this sensational headline—information compiled and shared by Mrs. Perez, who also allowed her name to be used in the story.[3]

*Screenshot of August 5, 2025, W.C. Dispatch Article*



The article alleged that CHS social worker Carolina Diaz pressured students to obtain abortions, and "bankrolled [student] abortions . . . without so much as a phone call to the [students'] parents."[4]  The story also alleged that former CHS Principal Chad Lehman "green-lighted" the use of school funds to pay for student abortions.[5]  Mr. Curt further contended that "school administrators tried to muzzle [Mrs. Perez] once she learned the truth," which only "hardened her resolve" to go public with these claims.[6]

Following the article's publication, Mrs. Perez has appeared on television and given multiple video interviews that can be found online in which she has repeated her claims of school-funded student abortions without parental consent, as well as claims that school personnel "pressured" students to undergo abortions, including late-term abortions.[7]  Mrs. Perez also provided documents and information (and leaked various FCPS documents containing confidential information) to other media outlets, including social media commentator Asra Nomani.[8]  On August 12, 2025, Mrs. Nomani posted on Fox News and X that Mrs. Perez

---

[2] FCPS_CHS_00001822.
[3] *Id.*
[4] *Id.*
[5] *Id.*
[6] *Id.*
[7] FCPS_CHS_00001814.
[8] FCPS_CHS_00001604; FCPS_CHS_00001822; FCPS_CHS_00001625.

"warned school district officials 7 times over 3 years, dating back to May 2022," of her allegations of "*coerced* [student] abortions."[9]

*Screenshot of August 12, 2025, Fox News Article*



In the same article, Mrs. Nomani referenced a "nearly 3 hour interview" Mrs. Perez gave to Mary McGowan, an outside lawyer engaged by FCPS shortly after Mr. Curt's August 5 posting to assist with collecting facts.[10]  Mrs. Perez appears to have secretly recorded the interview and shared that recording with Mrs. Nomani and others outside of FCPS.  As Mrs. Nomani's story referenced, during the McGowan interview Mrs. Perez charged that Chad Lehman and others within CHS engaged in a conscious "*cover[] up*" to suppress information about the claimed school-funded abortions[11] and "*didn't do anything*" to investigate her claims.[12]  Mr. Lehman, who left CHS in December 2024, now serves as an FCPS regional executive principal.

In addition to appearing on television, conducting other public interviews, and speaking openly to the press and social media commentators about her allegations, Mrs. Perez has agreed to be featured in a live webcast, entitled "*Abortion Coercion & the Fight for Parental Rights in Public Schools.*"[13]  The subtitle of the webcast states this question, "What can pro-lifers do and learn **about coercion happening in Fairfax County Public Schools** and across the nation?"  The webcast is scheduled to take place at 8:00 p.m. on October 20.[14]

---

[9] FCPS_CHS_00001625; FCPS_CHS_00001601 (emphasis added).
[10] FCPS_CHS_00001625.
[11] *Id.* (emphasis added).
[12] FCPS_CHS_00001830 (rough, autogenerated transcript) (emphasis added); FCPS_CHS_00001593.
[13] FCPS_CHS_00001734.
[14] *Id.*

*Screenshot of October 20, 2025, United for Life Event*



This webcast is being sponsored by Americans United for Life, and Mrs. Perez will be joined on the podcast by various other panelists, including U.S. Congressman John McGuire, who represents Virginia's 5th Congressional District.[15]  As noted below, the General Counsel of Americans United for Life, Steven Aden, is also acting as Mrs. Perez's personal legal counsel in relation to this matter.

### *FCPS's Prompt Response to Mrs. Perez's Allegations*

Upon learning of Mrs. Perez's allegations through the August 5 W.C. Dispatch article, FCPS's Division leadership immediately initiated an external review.  In an August 7, 2025, letter to the school community, FCPS Superintendent Dr. Michelle Reid stated, "I want to stress that at no time, would the situation as described in these allegations be acceptable in Fairfax County Public Schools."[16]  Dr. Reid also promised that FCPS would immediately investigate these serious claims, and with the assistance of outside counsel, FCPS has conducted a thorough investigation.[17]  Although this investigation remains ongoing, many facts are now clear.

Dr. Reid's letter to the school community suggested that FCPS's senior Division leadership did not know of these allegations prior to the first week of August 2025 when they were publicly reported.  For reasons discussed below, this appears to be accurate.

---

[15] *Id.*
[16] FCPS_CHS_00001628.
[17] *Id.*

### *Recently Announced Government Investigations*

In response to the W.C. Dispatch article and other reports, Virginia Governor Glenn Youngkin, on August 14, 2025, directed the Virginia State Police to open a criminal investigation. In a public statement, the Governor stated that he was "deeply concerned" and implied that he had been unaware of these allegations before learning of the recent "published" report.[18]

However, as discussed below, it appears that Governor Youngkin's and Virginia Attorney General Jason Miyares's Offices may have known of these allegations for a year or more before the Governor referred them to the State Police for investigation. The apparent reasons for why Attorney General Miyares, and possibly also Governor Youngkin, may have known of these allegations long before they were widely publicized and before they were known to FCPS senior Division leadership or the public are addressed below.

On September 23, 2025, Senator Cassidy issued a public letter to FCPS referencing the detailed allegations of Mr. Curt's original August 5 story and requesting information. On September 29, 2025, the United States Department of Education also issued a press release announcing that it had sent information requests to FCPS and issued a press release stating that these allegations "shock[] the conscience" and are "morally unconscionable."[19]

### *Based on Our Fact-Finding, It Appears That the Allegations Are Untrue*

These allegations are indeed shocking. Yet, based on our fact-finding to date, it also appears they are very likely untrue and lacking in factual or evidentiary support. We have found no evidence substantiating Mrs. Perez's allegations that Carolina Diaz encouraged, facilitated, or funded student abortions. Nor have we identified evidence substantiating claims that Mr. Lehman engaged in a "cover up" to suppress evidence relating to these issues. The evidence we have reviewed indicates that Mrs. Diaz and Mr. Lehman acted appropriately and consistent with FCPS policies and regulations and with applicable federal and state laws.

Mrs. Perez's allegations appear to be rooted in speculation. It also appears that in her zeal to prove her suspicions true, Mrs. Perez procured statements from students that were false. In doing so, Mrs. Perez, among other things, violated policies and regulations that require teachers to maintain professional boundaries with students. The two student statements procured by Mrs. Perez to support her claims both appear to be unreliable and are contradicted by other evidence, including Mrs. Perez's own contradictory admissions and recent statements by one of the former CHS students in question. The current whereabouts of the other former CHS student in question are unknown to FCPS. There is also evidence suggesting that Mrs. Perez manipulated both statements to convey factual assertions she knew to be untrue, and that did not reflect the students' actual knowledge or beliefs.

---

[18] FCPS_CHS_00001808.
[19] FCPS_CHS_00001805.

***Perez's Allegations Originated as a Response to Disciplinary Measures Taken Against
Her by School Administrators***

Mrs. Perez remains actively employed by FCPS as a CHS teacher.  Others whom it
appears Mrs. Perez may have falsely accused of wrongdoing—including Mrs. Diaz and Mr.
Lehman—have been placed on administrative leave pending the resolution of investigations
sparked by Mrs. Perez's claims.

Mrs. Perez has a documented history of making aggressive complaints against school
staff and administrators whom she feels wronged by in some way—in some cases, complaints
predicated upon statements she has procured, under pressure, from students.  In this case, it
appears that Mrs. Perez may have engaged again in this same behavior, although the implications
here and harm caused to other people are far more serious.

Mrs. Perez's allegations regarding school-facilitated, school-funded student abortions
originated in 2022 in the context of an investigation conducted by CHS administrators
concerning Mrs. Perez's reported conduct in purchasing pregnancy tests for a CHS student—
conduct that, if proven, would violate school policies, including policies on the appropriate roles
and boundaries for licensed educators.  Mrs. Diaz was a witness against Mrs. Perez in that
investigation.  In connection with this episode, school leaders determined that Mrs. Perez acted
unprofessionally in violation of FCPS policies and regulations.

Mrs. Perez initially began raising allegations concerning school-funded abortions against
Mrs. Diaz in this same time period, apparently as a response to Mrs. Diaz being a witness against
her in the Perez pregnancy-test controversy.  In Mrs. Perez's own words, her discovery that Mrs.
Diaz even might have some involvement in facilitating student abortions was a "*godsend*"
because it was "evidence" she could use "*against the woman who set me up with a pregnancy
test.*"[20]  Mrs. Perez blamed Diaz for Perez's pregnancy-test controversy and was seeking to prove
that Diaz had done something, in her words, "*a lot worse*" than provide pregnancy tests to
students.[21]  By her own admission, from this point forward Mrs. Perez actively conducted her
own "investigation" in an effort to compile "evidence" against Mrs. Diaz (and later also Mr.
Lehman), and her efforts in this regard included pursuing students, parents, and guardians
outside of school to obtain information or statements supporting her suspicions.[22]  Some of what
Mrs. Perez appears to have done in pursuit of her private investigation, which ranges well
outside the scope of her job responsibilities as a high school teacher, appears to have crossed
ethical, and possibly also legal, lines, in addition to violating FCPS policies and regulations.

Mrs. Perez has been subject to disciplinary scrutiny within CHS for a variety of different
issues.  As noted above, Mrs. Perez was first investigated for her reported actions in purchasing
pregnancy tests for a student (Student A) in May 2022, and Mrs. Diaz was a witness to relevant
events, including reported complaints by Student A that Mrs. Perez sought to pressure her into
providing an untruthful written statement in Mrs. Perez's defense.[23]  Mrs. Diaz was questioned

---

[20] FCPS_CHS_00001830 (rough, autogenerated transcript) (emphasis added).
[21] *Id.* (emphasis added).
[22] *Id.*
[23] FCPS_CHS_00001705; FCPS_CHS_00001659; FCPS_CHS_00001660; FCPS_CHS_00001655;
FCPS_CHS_00001666.

by CHS Principal Lehman, who investigated these issues, and in a May 11, 2022, contemporaneous note Mrs. Diaz documented what she was told by Student A about Mrs. Perez's conduct:[24]

*Screenshot of May 11, 2022, Email from Carolina Diaz*



According to Mrs. Diaz's written report, Student A told Diaz directly that she was pressured by Mrs. Perez "to say that she [Perez] did not buy her a pregnancy test," and further reported that Mrs. Perez "rais[ed] her voice," berated the student, and told the student "she [was] going to lose her job because of this," and that school staff were "out to get her."[25] The implication of this report from Mrs. Diaz was that Perez was pressuring the student "to lie about" what actually happened.

---

[24] FCPS_CHS_00001657.
[25] FCPS_CHS_00001657.

Subsequently, Mrs. Perez procured these two hand-written statements from Student A, one dated May 21, 2022,[26] and the other dated June 1, 2022:[27]

*Screenshot of May 21, 2022, and June 1, 2022, Statements by Student A*



5/21/2022

My name is ▮▮▮▮▮ one of Mrs. Perez's students she is a very good person she helps all the students a lot if she leaves we will all miss her a lot we all love and respect Mrs. Perez because she is very good teacher an friend and also a very good person, she is my best teacher of the school year she has helped me a lot in my studies, I think the other teachers are jealous of her because she has a very good relationship with the students and they love her. She call me "Minnie" because she says that I am a good little person, a good student Mrs. Perez chose me for the "SGA" class because she thinks I can do many things and because I am a very good student in her class she is a very good example to follow because she is a strong woman, a good person, loving and generous to everyone equally I would like to be like Mrs. Perez a strong woman who does not give up easily we love her very much, Mrs. Perez Strength.

06/01/2022.

I, ▮▮▮▮ all the events that happened to me here at Centreville High School from Monday, May 2▮ 2022 to friday, May 20▮ 2022. On friday, April 29▮ 2022 ▮▮▮▮▮▮▮, I went to ask the Social Worker Mrs. Carolina Díaz to help me with a pregnancy test. She told me to ask a teacher or a friend, so I went to ask Mrs. Perez for help on Monday, May 2▮, but Mrs. Perez could not help me, but I got a pregnancy test from a friend. On Tuesday, May 3▮ I was pulled out of my 7th period Class by ▮▮▮▮. She was asking me "What is your relationship with Mrs. Perez?" Many times the same question took me to Mr. Parker's office and Mrs. Carolina Diaz was there too. from that day on, Mr. Parker was always checking on me and did not

let me talk to Mrs. Perez. When Mr. Parker, ▮▮▮▮ and Mrs. Carolina Diaz were asking me questions on Tuesday, May 3▮ I missed the school bus to go home, so Mr. Parker drove me home in his car and my aunt was upset because he did not call her. He called my uncle and my uncle was busy at work, so he did not understand why Mr Parker was calling him, but he said "OK" to him. Mr. Parker did not let me attend my 5th Period English 9 class for 2 weeks and asked me to say that I felt uncomfortable in Mrs. Perez's class. He did not let me eat lunch with the students from my 5th period class, but one day, on friday, May 13▮ I tried to eat lunch with my friends in the cafeteria. When I went to the cafeteria my friends did not want to talk with me. They told me that Mrs. Perez was going to get fired and that it

was my fault. After I heard that, I went to see Mrs. Perez in the room where she eats lunch on A days room 208 B. She was having lunch with 2 other teachers. When she saw me at the door, she walked to me and asked me what was happening. I started to cry and she hugged me and said that everything was going to be OK.

We both walked to the first floor to go to the Social Worker's office, but Mr. Parker and Mr. Lehman stopped us up. Then Mr. Lehman told Mrs. Perez that she was not allowed to be near me. When they took me to the office, Mr. Lehman asked Mr. Parker why I was not allowed to be near Mrs Perez and he answered that I felt uncomfortable around her. After I heard Mr. Parker saying that I felt uncomfortable around Mrs. Perez, I realized that it was not right and I decided to tell my family

that Mr Parker and the social worker were trying to get Mrs. Perez in trouble. Finally, I decided to write a letter about Mrs. Perez. She is a very good person and teacher. I love her ▮▮ and never feel uncomfortable around her. It's all the contrary Mrs Perez makes us feel comfortable and cares a lot for all of us equally.

P.S I also remember that the social worker, Mrs. Diaz, asked me if Mrs. Perez had threatened me, so I told her "no" because Mrs. Perez loves me and she would never do anything to hurt any student.

CHS Principal Lehman and CHS Assistant Principal Mike Parker inquired into how these statements were obtained and whether Mrs. Perez used any form of coercion or manipulation to persuade Student A to provide the statements. Mrs. Perez claimed that she did not approach

---

[26] *Id.*

[27] FCPS_CHS_00001639.

Student A to obtain the statements, but rather the student's guardian had approached her.[28] However, both Student A and the student's guardian contradicted this claim.[29]

In the end, Mrs. Perez was cited by school administrators for unprofessional conduct relating to this pregnancy-test incident.[30]  Perez was also instructed by Principal Lehman "to have no further conduct with [Student A], or her family, going forward," and cautioned that "there can be no retaliatory behavior demonstrated towards students or staff."[31]

The Student A incident provides a glimpse into how Mrs. Perez has dealt with controversies involving reports of her own suspected school-related misconduct.  School administrators have observed that Mrs. Perez has a tendency to go directly to the students involved, and sometimes to their families as well, to urge or pressure them into speaking out in defense of Mrs. Perez's actions.  As explained below, this same tendency—and the lengths to which Mrs. Perez will go to secure exculpatory statements from students—features prominently in the student-abortion controversy.

The May 2022 events described above seem to have incensed Mrs. Perez.  Contrary to Mr. Lehman's directive that Mrs. Perez not engage in "retaliatory behavior,"[32] in the view of school administrators, much of what Perez has done since appears, to a large degree, to involve her efforts to exact revenge upon Mrs. Diaz and Mr. Lehman.  The extent of her animosity toward these two individuals (the same two individuals she is now accusing of criminal wrongdoing) came across during Mrs. Perez's interview with Mary McGowan.  As already noted, Mrs. Perez blames the May 2022 pregnancy test issue on Diaz, to the point of alleging that Diaz consciously "*set [her] up*."[33]  As for Mr. Lehman, during her interview with Mrs. McGowan, Mrs. Perez spewed vitriol toward him, calling Mr. Lehman "*corrupt*," "*nepotistic*," and "*evil*."[34]

As the Student A incident shows, Mrs. Perez has a demonstrated tendency of failing to respect proper boundaries with students and their families.  This has been a recurrent concern for school administrators.  In some cases, this appears to have involved purchasing pregnancy tests for students (a more recent incident involving the same issue occurred during the 2024-2025 school year).[35]  In another recent incident, Mrs. Perez, by her own admission, purchased car insurance for a student, and agreed to title the student's car in her own name.[36]  In a note to CHS Assistant Principal Montell Brown, the student's father later expressed his appreciation for Mrs. Perez's actions, which allowed the student and his family to obtain a more attractive insurance rate than they could have otherwise obtained.[37]  As Mrs. Perez told Mrs. McGowan, she prides herself on "always [doing her] best to make a difference not only in the students [sic] life but in

---

[28] FCPS_CHS_00001666.
[29] *Id.*
[30] *Id.*
[31] FCPS_CHS_00001663.
[32] FCPS_CHS_00001666.
[33] FCPS_CHS_00001830 (rough, autogenerated transcript) (emphasis added).
[34] *Id.* (emphasis added).
[35] FCPS_CHS_00001690.
[36] FCPS_CHS_00001698.
[37] FCPS_CHS_00001696; FCPS_CHS_00001697.

their families [sic] lives."[38]  But in the uniform views of CHS administrators past and present, Mrs. Perez's habit of involving herself in the private affairs of students and their families is, at times, problematic and unprofessional.[39]

### Mrs. Perez Regards Herself to Be the Victim of a Wide-Ranging Conspiracy

In Mrs. Perez's telling, she has never acted in her role as a CHS teacher in a way that warrants scrutiny or discipline.  She frequently portrays the controversies surrounding her conduct as fabricated by adversaries seeking to intimidate and harm her, and ultimately to pressure her into leaving the school.[40]  Mrs. Perez regards herself as a victim—specifically, as the victim of a multi-year conspiracy targeting her personally, a conspiracy orchestrated and led by Mr. Lehman himself.  Perez has spoken publicly about these concerns.[41]  She told Mrs. McGowan, "Mr. Chad Lehman is behind this.  He's *pulling the strings*."[42]  As for why Lehman would pursue a conspiracy to cause her harm, Mrs. Perez states, "Mr. Lehman knows that I have a big secret about him, that he covered up illegal abortions for minors, arranging all the facilitations for abortions that Carolina Diaz, the social worker, was doing in 2021-22."[43]

This claimed conspiracy against her began, according to Perez, shortly after the May 2022 pregnancy-test controversy and has continued through the present day.  Even the May 2022 pregnancy-test events Mrs. Perez attributes to conspiratorial actions by her FCPS colleagues.[44]  She has asserted that Mrs. Diaz did not act alone in allegedly *setting her up*.[45]  In January 2025, in responding to yet another issue involving her personal conduct, Mrs. Perez told school administrators, "I do not feel safe at Centreville High School due to the fact that in 2022 Carolina Diaz, the school Social Worker, *in complicity with other individuals,* set me up with a similar situation, and the same pattern of bullying and harassment was used against me."[46]

Every inquiry into Mrs. Perez's conduct that has occurred since May 2022—whether relating to purchasing pregnancy tests for students, purchasing car insurance for a student and titling that car in her own name, giving students rides in her personal vehicle, or exacerbating disputes and bullying incidents between students, etc.—is attributable in her mind to the conspiracy Mr. Lehman has orchestrated.  According to Mrs. Perez, this conspiracy continued even after Mr. Lehman's departure from CHS in December 2024.[47]  In fact, Mrs. Perez claims that Mr. Lehman's departure from the school somehow triggered an escalation in the unfair and unjustified attacks being made upon her.  In her words, it was when Lehman left CHS that her "*living hell*" began.[48]  She told McGowan, "[O]nce Mr. Lehman left, everything started to go downhill because then they started attacking me."[49]

---

[38] FCPS_CHS_00001830 (rough, autogenerated transcript).
[39] FCPS_CHS_00001666; FCPS_CHS_00001690.
[40] FCPS_CHS_00001661; FCPS_CHS_00001693.
[41] FCPS_CHS_00001822.
[42] FCPS_CHS_00001830 (rough, autogenerated transcript) (emphasis added).
[43] *Id.*
[44] FCPS_CHS_00001661.
[45] FCPS_CHS_00001830 (rough, autogenerated transcript) (emphasis added).
[46] FCPS_CHS_00001693 (emphasis added).
[47] FCPS_CHS_00001830 (rough, autogenerated transcript).
[48] *Id.* (emphasis added).
[49] *Id.*

Mrs. Perez believes that current CHS school administrators—including Lehman's successor, CHS Principal Erik Healey, and CHS Assistant Principal Montell Brown—are to this day being directed by Lehman to pursue and entrap Mrs. Perez with bogus claims and false evidence.  Mrs. Perez told Mrs. McGowan that she believes "they" (seemingly referring to Healey and Brown, as directed by Lehman) have gone as far as instructing students to ask Mrs. Perez during class for Tylenol or Advil in an attempt to "set [her] up" for violating school rules.[50]  She also believes that CHS administrators are "sabotaging [her] lessons" by surreptitiously "deleting" them from her laptop computer.[51]  According to Assistant Principal Montell Brown, a student also reported that Mrs. Perez has told her students that she believes Mr. Brown has hidden microphones in her classroom, and reported that she often yells in front of students that "Mr. Brown is listening."[52]

The following is a Facebook post by Mrs. Perez, apparently sent in or around early April 2025, and made public:[53]

*Screenshot of 2025 Facebook Post and Comment by Zenaida Perez*



As shown, Mrs. Perez here was publicly claiming that she was being "attacked" by school administrators, who were "coercing the students to lie about [her]" and "sending spies to check on [her]."[54]  There is again a reference here to a single individual (presumably Mr. Lehman) "pulling the strings" in the alleged conspiracy to "attack[]" against Mrs. Perez.[55]

---

[50] *Id.*
[51] FCPS_CHS_00001885 (rough, autogenerated transcript).
[52] FCPS_CHS_00001766 (rough, autogenerated transcript).
[53] FCPS_CHS_00001754.
[54] *Id.*
[55] *Id.*

This Facebook post, which was made public by Mrs. Perez, came to the attention of Principal Healey and Assistant Principal Brown in early April 2025.[56] It appears that since this time Mrs. Perez has deleted most (although not all) of her social media posts relating to school-related issues, including posts made on both Facebook and X.

In discussing the alleged scheme against her, Mrs. Perez has used unique phraseology. She repeatedly uses the word "***chase***" to describe the actions of those within the school administration whom she believes have conspired against her, the following being only some examples taken from her interview with Mrs. McGowan:

- "I was being *chased* by Mr. Parker, because he was forced to *chase* me by Mr. Lehman."[57]

- "I was being *chased* by the situation with the pregnancy test for [Student A]."[58]

- "[In] May 2022 . . . I was being *chased* by Mr. Lehman and Mr. Parker."[59]

- "[T]hey were *chasing* me for a pregnancy test that I didn't even purchase."[60]

- "[Mr. Lehman is] making Mr. Montell D. Brown *chase* me because Mr. Lehman knows that I have a big secret about him."[61]

- "I would never believe that Mr. Brown would start *chasing* me after Mr. Lehman left."[62]

- "It's like when a person pays their dues to society and they are still being *chased*."[63]

The significance of Perez's unique phraseology will become apparent from additional facts discussed below.

### *The Key Evidence Supporting Perez's Claim of School-Funded Abortions Is False*

The centerpiece of Mrs. Perez's student-abortion narrative is a statement that she purportedly obtained from the student whom she alleges received an abortion arranged and paid for by Mrs. Diaz in 2021 (Student B).[64] By her own account, Mrs. Perez obtained this statement by confronting Student B outside of school, at the student's place of work, a local Thai restaurant, on a Saturday in November 2022.[65] Although Mrs. Perez has never admitted this, the

---

[56] FCPS_CHS_00001711; FCPS_CHS_00001712.
[57] FCPS_CHS_00001830 (rough, autogenerated transcript).
[58] *Id.*
[59] *Id.*
[60] *Id.*
[61] *Id.*
[62] *Id.*
[63] *Id.*
[64] FCPS_CHS_00001822; FCPS_CHS_00001604.
[65] FCPS_CHS_00001830 (rough, autogenerated transcript).

evidence (as discussed further below) shows that the student herself did not write this statement. Mrs. Perez did, in Spanish. Whether Mrs. Perez falsified the student's signature or otherwise coerced the student to sign is unclear. What is clear is that Mrs. Perez's own actions—and a host of other facts—cast serious doubt on the credibility of the statement and the sincerity of Mrs. Perez's claims as a whole.

### *Perez's Claims That Lehman and Others "Did Nothing" to Investigate Are False, and His Timely Investigation Showed There Was No Support for Perez's Allegations*

One day after obtaining the purported signed statement from Student B, Mrs. Perez requested a meeting with Principal Lehman.[66] It was at this meeting, which occurred on November 21, 2022, that Mrs. Perez appears to have first raised any clear allegation of possible school-facilitated, school-funded student abortions.[67] (Prior to this time, the written record indicates that Mrs. Perez had at most made elliptical references to a social worker assisting students with "pregnancy issues" or "solutions for pregnancies"—statements Lehman and others did not understand as referring to abortions.[68]) Quite at odds with Mrs. Perez's claims of a "cover up," Mr. Lehman promptly investigated Perez's November 21 allegations.[69] Lehman spoke with the social worker, Mrs. Diaz, as well as the school counselor, and subsequently spoke with the public health nurse.[70] As contemporaneous documents show, Mr. Lehman reported in writing that the nurse informed him that she and Mrs. Diaz spoke to Student B and that the student's guardian was "aware" of the pregnancy and abortion-related issues.[71]

As reflected below, Mr. Lehman's investigation showed that Mrs. Diaz did not facilitate an abortion for Student B; she did not pay for any such abortion; she properly referred Student B to the nurse; and the nurse, as reflected in contemporaneous documents, reported that Student B's guardian was contacted.[72] This was all in turn reported by Mr. Lehman to Mrs. Perez on December 2, 2022:[73]

---

[66] FCPS_CHS_00001674.
[67] FCPS_CHS_00001649.
[68] FCPS_CHS_00001661; FCPS_CHS_00001830 (rough, autogenerated transcript).
[69] FCPS_CHS_00001674; FCPS_CHS_00001649.
[70] FCPS_CHS_00001649; FCPS_CHS_00001653.
[71] FCPS_CHS_00001649.
[72] *Id.*
[73] *Id.*

*Screenshot of December 2, 2022, Email from Chad Lehman to Zenaida Perez*

**From:** Lehman, Chad R. ▮▮▮▮▮▮▮
**Sent:** Friday, December 2, 2022 10:56 AM
**To:** Perez, Zenaida ▮▮▮▮▮▮▮
**Subject:** RE: Summary Memo - Rebuttal

Zenaida,

If you have information to share about potential wrongdoing, it is important that you do so. The holiday has nothing to do with it. Do you have any additional information to share?

As a follow-up, I talked with our public health nurse who confirmed that Ms. Diaz referred the student to her when the pregnancy concern was brought forward, which is the proper protocol. The public health nurse then provides appropriate resources to the student. Our public health nurse met with the student and Ms. Diaz to properly handle the student's concerns, and the student's guardian was aware. From what I have gathered, Ms. Diaz acted appropriately and according to procedure from her standpoint.

### The Evidence Shows That Carolina Diaz Acted Properly and According to Protocol by Referring Student B to the Nurse

Quite at odds with Mrs. Perez's claims, the evidence indicates that Mrs. Diaz followed the proper protocol by referring Student B to the nurse, as reflected in the following communications:[74]

*Screenshots of December 2-5, 2022, Email Conversation between Chad Lehman and Carolina Diaz*

**From:** Lehman, Chad R. ▮▮▮▮▮▮▮
**Sent:** Friday, December 2, 2022 3:04 PM
**To:** Diaz, Carolina B ▮▮▮▮▮
**Cc:** ▮▮▮▮▮▮▮
**Subject:** RE: Update

Hi Carolina,

I am not in the building today, but I wanted to let you know before the weekend that I talked with our public health nurse who confirmed that you referred the student to her when the pregnancy concern was brought forward last year, which is the proper protocol. The public health nurse then provided appropriate resources to the student. Our public health nurse met with the student and you to properly handle the student's concerns, and the student's guardian was aware. From what I have gathered and what she shared, you acted appropriately and according to procedure.

I also shared this information with Ms. Perez, and I told her that if she had any further information or evidence of wrongdoing that she needed to bring it forward now. She wrote me back this afternoon and stated that she had nothing further to share.

I can follow-up with you further next week but wanted to give you this update because I know you were concerned.

| | |
|---|---|
| **From:** | "Diaz, Carolina B" ▮▮▮▮▮▮▮ |
| **Sent:** | Mon, 5 Dec 2022 07:32:24 -0500 (EST) |
| **To:** | "Lehman, Chad R." ▮▮▮▮▮▮▮ |
| **Cc:** | ▮▮▮▮▮▮▮ |
| **Subject:** | RE: Update |

Thanks for the update and for taking your time to look into this matter.

Carolina

---

[74] FCPS_CHS_00001653.

***There Is No Evidence of Centreville High School or FCPS Funds Being Used to Pay for or Facilitate a Student Abortion, as Alleged by Mrs. Perez***

FCPS has robust existing governance structures that ensure school funds (including federal funds) are used only in a manner that complies with federal and state law.[75] Among other FCPS policies, Regulation 5810 (School Activity Funds Management) gives school principals responsibility for safeguarding, managing, and accounting for school activity funds.[76] Each FCPS school generally has a single credit card to facilitate purchase orders after approval has been obtained from the school principal, and schools do not have petty cash on site.[77] While the majority of school-based purchasing happens through a product order process that requires anticipatory approval from the principal, in some instances after-the-fact reimbursements may be authorized.[78]

In tandem with the responsibility of school principals to approve funding requests and expenditures, other after-the-fact evaluations ensure compliance with applicable laws and regulations. FCPS Regulation 5810 (Administration of School Activity Funds) requires that school-level funds are subject to transparent accounting practices and oversight, and other policies impose further accountability measures including regular audits for purchase orders and checks, as well as ensuring proper documentation for all expenditures.[79]

Our factual review has uncovered no evidence of any CHS or FCPS funds being used to pay for a student abortion in 2021, as alleged by Mrs. Perez. Nor, based on our review, does it appear plausible that any such payment could have occurred, given the various standards that are in place to ensure that all funds are properly disbursed.

We also note that FCPS responded to a Freedom of Information Act ("FOIA") request submitted by Mrs. Perez in December 2022, providing financial records she requested at that time seeking production of receipts for funding approved by Mr. Lehman in late 2021 and emails between Mr. Lehman and Ms. Diaz from a 14-month period that mentioned Mrs. Perez's name.[80] These records likewise showed no evidence of any payments to a Northern Virginia clinic that performed abortion procedures.

***Perez Improperly Withheld Evidence from the School's Investigation of Her Abortion-Related Claims***

Having concluded that there was no factual support for Mrs. Perez's allegations that Diaz facilitated and paid for an abortion procedure involving Student B, Principal Lehman then returned to Mrs. Perez and reported the findings of his investigation by email.[81] He also repeatedly asked Mrs. Perez whether she had additional information that might corroborate her

---

[75] Appendix B.
[76] FCPS_CHS_00000213.
[77] *Id.*; FCPS_CHS_00001755.
[78] *Id.*
[79] *Id.*
[80] FCPS_CHS_00001687; FCPS_CHS_00001688.
[81] FCPS_CHS_00001649.

allegations, and she stated in writing that she did not have anything further to provide, as shown by these November and December 2022 email exchanges between Lehman and Perez:[82]

*Screenshots of November 22, 2022-December 2, 2022, Email Conversation*
*between Chad Lehman and Zenaida Perez*[83]

**From:** Lehman, Chad R. ████████████
**Sent:** Tuesday, November 22, 2022 1:05 PM
**To:** Perez, Zenaida ████████
**Subject:** RE: Summary Memo - Rebuttal

Hi Zenaida,

I was just about to email you to let you know that you can schedule a time to review your file next week. I checked the file and all the memos and rebuttals are included. You can schedule a time with ████

I have also followed up with Ms. Diaz and Ms. Villeda, and they shared what happened with ████████ They have a very different version than what you told me. I'm not sure what further information you want to share, or how you got the information.

**From:** Perez, Zenaida ████████
**Sent:** Tuesday, November 22, 2022 1:13 PM
**To:** Lehman, Chad R. ████████
**Subject:** RE: Summary Memo - Rebuttal

I will schedule an appointment with ████████ next week.
In reference to ████████ abortion, which was facilitated by Ms. Carolina Diaz. I have all the pertinent information about the case. ████████ told me that Ms. Villeda was not aware of that situation. Evidently, Mrs. Diaz is not going to agree and as usual, she will lie. I do have the evidence to prove that I am right.

Sincerely,

Zenaida

**From:** Lehman, Chad R. ████████████
**Sent:** Friday, December 2, 2022 10:56 AM
**To:** Perez, Zenaida ████████
**Subject:** RE: Summary Memo - Rebuttal

Zenaida,

If you have information to share about potential wrongdoing, it is important that you do so. The holiday has nothing to do with it. Do you have any additional information to share?

As a follow-up, I talked with our public health nurse who confirmed that Ms. Diaz referred the student to her when the pregnancy concern was brought forward, which is the proper protocol. The public health nurse then provides appropriate resources to the student. Our public health nurse met with the student and Ms. Diaz to properly handle the student's concerns, and the student's guardian was aware. From what I have gathered, Ms. Diaz acted appropriately and according to procedure from her standpoint.

Again, if you have something further to share, please do so.

---

[82] *Id.*
[83] *Id.*

**From:** Perez, Zenaida ▮
**Sent:** Wednesday, November 30, 2022 8:24 AM
**To:** Lehman, Chad R. ▮
**Subject:** RE: Summary Memo - Rebuttal

Thank you Mr. Lehman. I will hold on the local file screening for now, and in reference to the evidence, I will also put that on hold as well.
I want everyone to have a peaceful and relaxing Holiday Season.

Best,

Zenaida

---

**From:**       "Lehman, Chad R." ▮
**Sent:**       Tue, 29 Nov 2022 17:01:09 -0500 (EST)
**To:**         "Perez, Zenaida" ▮
**Subject:**    RE: Summary Memo - Rebuttal

Zenaida,

I'm not sure if you stopped by to schedule a time to see your file. ▮ is currently out on leave.  Also, if you have evidence, please feel free to send it to me.

*Chad R. Lehman*

---

Mrs. Perez's response to Lehman's December 2 email indicating that she "*d[id]n't have anything further to share*" in support of her claims is curious.[84]  At this point in time in December 2022, Mrs. Perez, by her own account, had in hand the same statement from Student B that she later, through Walter Curt, broadcast publicly for the first time in August of this year.[85]  That same "evidence," prominently featured by Mr. Curt's story, which described it as "enough to raise the hair on the back of [any] patriotic taxpayer's neck,"[86] was in Mrs. Perez's possession at the time that Principal Lehman was conducting his 2022 investigation.[87]  But Mrs. Perez held that information back.[88]  Despite multiple communications from Principal Lehman inviting her to bring forward any other information that might corroborate her claims, Perez never once mentioned this statement from Student B.[89]  Indeed, she concealed this "evidence" for another two-and-a-half-plus years—from early November 2022 when she obtained the statement until early August 2025 when she supplied it to Walter Curt for online publication.

Failing to come forward with known information relevant to a school-related investigation is a violation of FCPS policies.  However, in this case the implications are far more serious than a failure to cooperate with an investigation.  The investigation at issue here was one prompted by Mrs. Perez's own allegations of unlawful conduct.  Thus, Mrs. Perez has not only falsely asserted that the school "didn't do anything" to investigate her allegations.[90]  She also

---

[84] *Id.* (emphasis added).
[85] FCPS_CHS_00001822; FCPS_CHS_00001830 (rough, autogenerated transcript).
[86] FCPS_CHS_00001822.
[87] FCPS_CHS_00001830 (rough, autogenerated transcript).
[88] *Id.*
[89] FCPS_CHS_00001649.
[90] FCPS_CHS_00001593.

kept secret from Mr. Lehman that she had a statement from the student in question purporting to represent the student's first-hand knowledge that her abortion procedure was arranged and paid for by Mrs. Diaz.

### It Is Not Accurate That Perez "Warned" School Officials of Her Abortion Allegations "7 Times"

As explained in detail below, it does not appear to be true that Zenaida Perez "warned school district officials 7 times over 3 years" of her allegations, as Asra Nomani has claimed.[91] Mrs. Perez did raise these allegations at least *once*, in November 2022.[92] And, as explained above, when her allegations were promptly investigated by school officials, Mrs. Perez refused to fully cooperate.[93] In violation of her duties as an FCPS teacher, she withheld evidence from an investigation prompted by her own serious allegations.[94] And she suppressed that same evidence—the purported statement from Student B—for almost three years, never calling it to the attention of school officials.[95] Indeed, Lehman and others within the school administration would not learn of the existence of that statement until they read about it in Walter Curt's August 7, 2025, story and the other stories that soon followed.

As described above, having found no evidence to substantiate Mrs. Perez's student-abortion allegations, Mr. Lehman closed his investigation into these claims in early December 2022, after confirming with Mrs. Perez that she had no additional information to share.[96] The evidence does show that she referenced the same allegations on several later occasions in conversations with school officials,[97] but just as she withheld from Mr. Lehman the statement she procured from Student B, in the subsequent conversations with school officials Mrs. Perez likewise failed to identify any new or different information that might have given her claims more credence. On the limited occasions in which Mrs. Perez repeated her allegations to school representatives, she was merely alluding to claims that had been timely investigated by CHS administrators in 2022 and determined to lack merit.

### Mr. Lehman, After Closing His 2022 Investigation, Did Not Report It to School Division Leadership, Nor Was He Required to Do So

As explained above, after learning of Mrs. Perez's allegations on November 21, 2022, Mr. Lehman promptly investigated her claims and discovered facts that appeared to directly contradict Mrs. Perez's contentions.[98] After hearing from Mrs. Perez that she "didn't have anything further to share" in support of her claims, Mr. Lehman closed his investigation.[99] He did not at this time report Perez's unsubstantiated claims to more senior FCPS leaders, nor would he have been expected or required to do so in these circumstances, considering that the claims were shown by his investigation to lack factual support. At that point in time, Mrs. Perez's

---

[91] FCPS_CHS_00001601.
[92] FCPS_CHS_00001645; FCPS_CHS_00001647.
[93] FCPS_CHS_00001649.
[94] *Id.*; FCPS_CHS_00001830 (rough, autogenerated transcript).
[95] FCPS_CHS_00001830 (rough, autogenerated transcript).
[96] FCPS_CHS_00001649 FCPS_CHS_00001653.
[97] FCPS_CHS_00001630; FCPS_CHS_00001885 (rough, autogenerated transcript).
[98] FCPS_CHS_00001649; FCPS_CHS_00001653.
[99] *Id.*

claims appeared to have involved mistaken beliefs and inferences, and there was no need for further escalation, which explains why FCPS's senior Division leaders did not learn of Mrs. Perez's allegations before August 2025.

### *Perez's Actions in Concealing the Purported Statement from Student B (for Almost 3 Years) Seriously Call into Question the Sincerity and Credibility of Her Claims*

Mrs. Perez has charged FCPS and Chad Lehman with engaging in a "*cover up*,"[100] but the evidence shows it was Mrs. Perez who chose to conceal (for nearly three years) evidence of the same claims she is now zealously advancing. Walter Curt's story, which Mrs. Perez collaborated in producing, referred in its title to "*A Hidden Pipeline Endangering Teenage Girls*."[101] Mrs. Perez too has publicly suggested that teenage girls attending CHS are potentially at risk.[102] Her lawyers have been promoting the same "at risk" messaging.[103] Mrs. Perez's lead attorney, Steven Aden, the General Counsel of Americans United for Life, was quoted in a September 5, 2025, Arlington Catholic Herald article as saying, "These allegations are detailed and alarming, and they point to an apparent systematic program for enabling young girls, especially vulnerable immigrants, to unlawfully obtain abortions by evading their parents and their guardians."[104] Aden praised his client for "her perseverance on behalf of these girls."[105] Asked about that, Perez in the same article was quoted as saying, "I guess this fortitude has come to me from God."[106]

But if Mrs. Perez sincerely believed that young women attending CHS were at risk of (using Nomani's terminology) "coerced abortions,"[107] why did she conceal the signed statement she claims to have obtained from Student B in November 2022? Why did she decline to even mention the student statement to Mr. Lehman, knowing this would likely lead to the closure of his investigation? Did she herself even believe that statement to be credible? And did she have any reason to genuinely be concerned about the well-being of female high school students? Or was her focus more on using this "evidence" to support highly charged attacks against her perceived enemies within the school community—namely, Diaz, a social worker whom Perez claims "set [her] up"[108] for improperly supplying students with pregnancy tests; and Lehman, a principal who performed his role by ensuring that this reported pregnancy-test conduct by Mrs. Perez was scrutinized and addressed? The facts discussed herein suggest answers to these and other important questions.

### *Student B Did Not Write Her Purported Statement, and the Statement Was Seemingly Falsified by Perez*

On close evaluation of the evidence received to date, it seems clear that Student B did not write the Spanish-language statement Perez shared with Walter Curt for publication; Perez did.

---

[100] FCPS_CHS_00001604.
[101] FCPS_CHS_00001822.
[102] *Id.*
[103] *Id.*
[104] *Id.*
[105] *Id.*
[106] *Id.*
[107] FCPS_CHS_00001601.
[108] FCPS_CHS_00001830 (rough, autogenerated transcript).

A comparison of the statement with documents handwritten by Mrs. Perez reveals that the handwriting appears identical.[109]  The distinctive formation of upper- and lower-case letters like "d," "e," "f," and "r" as well as the number "2," is consistent across both documents.  A notable example is the word "ESOL," which appears in several of Mrs. Perez's handwritten documents as well as the statement purportedly authored by Student B.  The formation of the word in each document is nearly identical, suggesting a high degree of similarity in handwriting style, and a consistent author.

*Comparison of Mrs. Perez's Handwriting with Purported Statement from Student B[110]*



| Perez Handwritten Document | Student B Statement |
| --- | --- |



---

[109] *Compare* FCPS_CHS_00001669 *with,* FCPS_CHS_00001804 (document received from Z. Perez).
[110] FCPS_CHS_00001669; FCPS_CHS_00001804 (document received from Z. Perez).

Why does it matter that Perez, not Student B, wrote the signed student statement?  It matters because the statement was false, and likely knowingly false.  The handwritten Spanish-language statement that Mrs. Perez herself wrote and supplied to Walter Curt for publication states (in translation), "Mrs. Carolina Diaz scheduled the appointment for me at the abortion clinic in Fairfax, **paid the costs of that medical procedure**, and kept everything quiet without informing my family."[111]  This is what Perez wrote and presented to Student B to sign, yet knew was untrue.  At the very minimum, Perez at that time knew Student B had no personal knowledge to support these claims.

Mrs. Perez has openly *admitted* she has no direct proof of Carolina Diaz or anyone else at CHS contributing funds to support any student abortion.  She has *admitted* that her claims of Carolina Diaz paying for Student B's alleged abortion are based on conjecture.  Perez admitted this as recently as August 12, 2025, in a video interview she taped and provided to Asra Nomani for posting.[112]  In that interview, Perez states that when she allegedly heard from Student B that the abortion procedure "*was free*," this triggered a realization on her part.[113]  In Perez's words, "That is when I *realized* that Carolina Diaz has been using resources from the community, donations, taxpayers' money to cover for abortions." [114]  Perez's *realization* was not based on facts; it was her attempt to fill in the blanks.  If Student B did not pay for the alleged abortion, Perez surmised this must mean that Carolina Diaz paid for it.

In a March 7, 2025, interview probing unrelated employment-related complaints, Perez said essentially the same thing.  She told the attorneys investigating those complaints that Student B "*guess[ed]*" that "the social worker" must have "paid" for the abortion, because "the abortion was free."

Sadly, for all concerned, Mrs. Perez has not allowed the limits of her factual knowledge to hold her back.  Based on assumptions and guesses, she has falsely and very publicly accused Carolina Diaz of criminal acts, causing Mrs. Diaz great emotional distress, interrupting her career, forcing her to incur significant personal legal expenses, subjecting Diaz and her family to threats, and harming many others in the process.

Mrs. Perez's contemporaneous written thoughts reveal the actual truth.  On December 9, 2022, in a document she titled "*Abuse of Power and Civil Rights Violations at Centreville High School from 2021-2022*"—sent from her FCPS email account to her own private email account—Mrs. Perez wrote this:

---

[111] FCPS_CHS_00001822 (emphasis added).
[112] FCPS_CHS_00001601.
[113] *Id.*
[114] *Id.* (emphasis added).

*Excerpt of December 9, 2022, Document Authored by Zenaida Perez titled "Abuse of Power and Civil Rights Violations at Centreville High School from 2021-2022"*[115]

> 7-  They break those rules and regulations that have been established by FCPS for everyone to follow and respect, however, it seems that they are above the law. Lehman lets his favorites get away with any kind of wrongdoing, that is why he ignored the concern that I brought to his attention via email first, on Friday, May 13th and then once again on Monday, May 16th, 2022, when we had a meeting at his office. On that morning, I brought to their attention that Carolina Diaz, The School Social Worker, facilitated an appointment for a minor, who was a student at our school, to have an abortion without notifying her legal guardian, and the victim confessed to me that she did not pay for the abortion, so evidently, the social worker might have paid for the abortion using the funds that she received to support the students with other needs. After

This document outlined a host of claims and grievances Mrs. Perez had against the school and school staff and administrators, specifically including Principal Lehman. It claimed that Lehman had engaged in favoritism, "nepotism," "civil rights violations," and other wrongdoing.[116] Mrs. Perez in this document was venting her anger and frustration and holding little back. Yet, when it came to describing the facts surrounding her student-abortion allegations, the most Perez could say was that Carolina Diaz "***evidently . . . might have paid*** for the abortion."[117]

This again was written in December 2022. But a month earlier, in November 2022, Perez reportedly confronted Student B in a restaurant where she was working, pressed her to sign a statement Perez herself had written, and in that statement Perez had Student B declare, as if it were true and within Student B's personal knowledge, that "Mrs. Carolina Diaz . . . ***paid the costs***" of her abortion.[118] It was not true. Student B had no such personal knowledge. If Perez's own story is to be believed, the most Student B knew was that the abortion procedure "was free."[119] Perez elicited a signed statement from Student B declaring that she *knew* for a fact that Carolina Diaz "paid the costs" of her abortion, but it appears that this was all a fabrication and a lie.

### Compliance with Social Worker Protocols

Putting aside for a moment the details relating to Student B's apparent abortion in late 2021, our fact review shows that it is very well understood by Mrs. Diaz and others that school counselors and social workers are not in a position to provide medical advice or options to pregnant student may be considering an abortion. Rather, the proper protocol is for the social worker to refer pregnant students to the Fairfax County Health Department nurse in these situations, and it appears from the contemporaneous documents that this is what Mrs. Diaz did

---

[115] FCPS_CHS_00001684.
[116] *Id.*
[117] *Id.* (emphasis added).
[118] FCPS_CHS_00001822; FCPS_CHS_00001830 (rough, autogenerated transcript) (emphasis added).
[119] FCPS_CHS_00001830 (rough, autogenerated transcript).

with Student B.[120]  It also appears from our fact review that Mrs. Diaz has followed the same protocol with other students in similar circumstances.

### *Mrs. Perez to Date Has Only Partially Cooperated with FCPS's Investigation*

Mrs. Perez has cooperated in part with FCPS's recent and ongoing investigation of her allegations.  As noted, she agreed to sit for a lengthy interview with Mary McGowan conducted shortly after the Walter Curt story was made public.[121]  In the interview with Mrs. McGowan, Perez mentioned having compiled various forms of evidence she believed supported her claims, including recordings of conversations with certain individuals.[122]  Mrs. McGowan asked to receive this information from Mrs. Perez, and Perez responded that she would first need to consult with her legal counsel.[123]

Following up on that exchange, King & Spalding, after being retained as counsel by FCPS, later requested to meet with Mrs. Perez and her counsel.  Mrs. Perez through counsel agreed to such a meeting, and an in-person meeting had been scheduled to take place on October 10, but Mrs. Perez's counsel cancelled that meeting hours before it was to have occurred.  Since that time, Mrs. Perez's counsel has provided some additional documents, but to date none of the requested recordings, to King & Spalding.  Mrs. Perez's counsel also offered to respond on Mrs. Perez's behalf to written questions.  King & Spalding subsequently shared written questions with Mrs. Perez's counsel, but no responses have yet been provided.

One of the recordings that Mrs. Perez claimed to have in her possession involved a call with the uncle of Student B who may have served as her de facto guardian in the 2021-22 time period.[124]  (We note, however, that internal CHS documents reveal that Student B's uncle represented that "he isn't her legal guardian" but rather "her cousin is.")[125]  Mrs. Perez has claimed that this recorded conversation shows that the uncle was not contacted by the school regarding any abortion procedure in 2021.[126]  This claim does not necessarily surprise us, considering that the protocol, as indicated above, provides that school-employed personnel— such as social workers—are not authorized on their own to engage with students or their families on abortion-related issues and therefore would not be in a position to individually reach out to parents or guardians on this type of sensitive medical subject.[127]  The documentary record indicates that the public health nurse, not a school division employee, was in contact with Student B's guardian.[128]  Whether the recording Mrs. Perez claims to possess suggests otherwise is unclear to us, given that Mrs. Perez has thus far declined to share any recordings she claims to have.  We also note, again, that the whereabouts of Student B are unknown.  Our efforts to reach the uncle have also been unsuccessful.

---

[120] FCPS_CHS_00000088; FCPS_CHS_00001653.
[121] FCPS_CHS_00001830 (rough, autogenerated transcript).
[122] *Id.*
[123] *Id.*
[124] *Id.*
[125] FCPS_CHS_00001719.
[126] FCPS_CHS_00001830 (rough, autogenerated transcript).
[127] FCPS_CHS_00000088.
[128] FCPS_CHS_00001680.

As this report was being finalized, King & Spalding received notice from Mrs. Perez's counsel, Steven Aden, that he and his colleagues are "preparing to produce the audio recordings" that FCPS, through Mrs. McGowan, initially requested from Mrs. Perez in mid-August. Why these recordings are only now being prepared for production to FCPS is unclear. We note that Mrs. Perez appears to have shared the same recordings previously with Asra Nomani, Walter Curt, and the Virginia State Police.[129]

While Mrs. Perez is entitled to independent legal representation, at her own expense, she is not at liberty to decline to cooperate in a timely fashion with reasonable investigative requests made by or on behalf of her employer, FCPS, focusing on the serious charges she herself has made. As noted, our investigation is ongoing, and FCPS will consider whatever audio recordings are provided through Mrs. Perez's counsel. But we have no reason to expect that the audio recordings she plans to now share with FCPS will alter the preliminary findings summarized in this Statement.

Given the ambiguities surrounding whether Student B's uncle was in fact her legal guardian in late 2021 when the abortion is claimed to have occurred, it is unclear whether he was in fact the "student's guardian" who was reportedly made "aware" of the abortion issues,[130] or whether Student B's cousin (reportedly the actual legal guardian) is the relative who was contacted. In other words, if there is evidence that the uncle claims not to have been contacted, such evidence does not necessarily contradict what was reported to Principal Lehman by the public health nurse in late November or early December 2022.

### *Aid and Attention Given to Student B by CHS and Carolina Diaz*

As explained above, it appears that Mrs. Perez has falsely accused CHS social worker Carolina Diaz of facilitating and paying for an abortion for Student B in 2021 without the involvement or consent of the student's guardian. But her allegations do not stop there. Mrs. Perez has further alleged that Student B "could have died" due to complications from this 2021 abortion.[131] Recent social media posts have repeated this claim:

*Screenshot of August 8, 2025, Post on X by The Virginia Project*[132]



---

[129] FCPS_CHS_00001625; FCPS_CHS_00001822.
[130] FCPS_CHS_00001653.
[131] FCPS_CHS_00001814.
[132] FCPS_CHS_00001817.

These claims appear to be an attempt to further sensationalize the already extremely serious allegations being advanced by Mrs. Perez. Such claims also seem designed to suggest that CHS personnel were less than attentive to the health and well-being of Student B, which is far from true.

On the contrary, well-documented facts show that Carolina Diaz in particular, but others at CHS as well, showed great empathy and concern for Student B's holistic health needs. As of 2022, Student B's parents continued to reside in Central America.[133] Prior to her enrollment at FCPS schools, Student B was discovered by police to be homeless and was ultimately placed with her uncle in the Centreville area.[134] The uncle reported to FCPS that he did not have legal guardianship over Student B, but it appears that he sought to function as her de facto guardian in many instances.[135] Student B's uncle additionally communicated to FCPS that Student B apparently used this lack of legal authority to her advantage, including by telling him that he had no legal power over her and therefore, not being her true guardian, lacked authority to control her behavior or comings and goings.[136] Notably, Student B was also enrolled at CHS with homeless unaccompanied youth status.[137]

Against this very challenging backdrop, Mrs. Diaz and others endeavored to provide various types of support to Student B. During the 2021-2022 school year, Mrs. Diaz helped Student B access a number of health resources and did so in close coordination with Student B's uncle. In September 2021, Mrs. Diaz worked with the CHS school counselor to help support Student B at a time when Student B's uncle reported that she was abusing drugs and alcohol.[138] That same month, the CHS school counselor also provided Student B's uncle with information to access healthcare at a free community medical center.[139] Also in September 2021, Student B's uncle reported to CHS staff that he was unable to secure medical treatment for Student B because he did not have legal custody of her.[140] In October 2021, Mrs. Diaz helped refer Student B to a local Northern Virginia charity to receive food assistance.[141] Thereafter, in early February 2022 Mrs. Diaz helped Student B enroll in Medicaid for Pregnant Women through the Inova Partnership for Healthier Communities when Student B reported a pregnancy to Mrs. Diaz.[142] Approximately a week later in February 2022, after Student B experienced a loss of the reported pregnancy, Mrs. Diaz helped Student B obtain access to critical behavioral health support, and worked with Student B's uncle to refer Student B to the appropriate community resources.[143] In connection with that February 2022 referral, Student B's uncle had expressed to Mrs. Diaz that he suspected two prior abortions may have been performed on Student B.[144] It is

---

[133] FCPS_CHS_00001731.
[134] FCPS_CHS_00001714.
[135] FCPS_CHS_00001716.
[136] *Id.*
[137] FCPS_CHS_00001721.
[138] FCPS_CHS_00001716.
[139] FCPS_CHS_00001722.
[140] FCPS_CHS_00001725.
[141] FCPS_CHS_00001726.
[142] FCPS_CHS_00001728.
[143] FCPS_CHS_00001729.
[144] *Id.*

unclear whether one of these two prior suspected abortions referenced by the uncle was the abortion Mrs. Perez alleges to have taken place in November 2021.

Student B was automatically withdrawn from CHS for lack of attendance beginning in the fall semester of the 2022-2023 school year.[145] Student B appears to have re-enrolled on November 10, 2022, at which point she did not indicate a guardian or other responsible adult on her registration.[146] She attended school for one day following her re-enrollment and did not subsequently return to CHS.[147] As of 2022, Student B's parents continued to reside outside the United States.[148] In January 2023, Student B was again withdrawn after missing more than 15 consecutive days of instruction and never re-enrolled after that point in time.[149]

As these documented facts show, it is untrue to suggest that Student B's health needs were not given high priority by CHS staff. It appears, to the contrary, that very significant efforts were made to be attentive to her physical health as well as her mental and emotional well-being amidst very difficult life circumstances.

### *Perez's Allegation That CHS Students Were "Pressured" by Mrs. Diaz to Get Abortions Also Appears to Be False and Predicated Upon Partially Fabricated Evidence*

Mrs. Perez has alleged that another CHS student (Student C), who allegedly approached social worker Carolina Diaz after learning she was pregnant, was pressured by Mrs. Diaz to get an abortion, even though at the time of these alleged conversations the student was already five months pregnant.[150] Perez does not claim that this student had an abortion; she acknowledges that the student proceeded to give birth to her child.[151] Yet Perez maintains that the student in question was subjected to pressure by Mrs. Diaz to proceed with a late-term abortion.[152]

These are the same allegations that gave rise to Asra Nomani's reports of alleged "coerced abortions."[153] Walter Curt's August 5 story, referring to these same allegations, stated, "[A] second Centreville minor, five months pregnant and wavering, was allegedly told by the same social worker that she 'had no other choice.' The girl, terrified, ultimately bolted from the clinic rather than go through with the procedure."[154] Reporting on the same allegations, the Arlington Catholic Herald, on September 5, 2025, wrote, "[T]his past May, a former Centreville High School student . . . was offered an abortion by FCPS staff when she was five months pregnant."[155] And Asra Nomani, writing for Fox News on August 12, 2025, similarly wrote, "In May, Perez says she learned more shocking news: A teen told her that the social worker had offered to help her get an abortion when she was five months pregnant."[156]

---

[145] FCPS_CHS_00001643.
[146] FCPS_CHS_00001724.
[147] FCPS_CHS_00001713.
[148] FCPS_CHS_00001731.
[149] FCPS_CHS_00001907.
[150] FCPS_CHS_00001830 (rough, autogenerated transcript).
[151] *Id.*
[152] *Id.*
[153] FCPS_CHS_00001601.
[154] FCPS_CHS_00001822.
[155] FCPS_CHS_00001593.
[156] FCPS_CHS_00001625.

We were able to locate Student C and speak with her by phone, on October 9, 2025.  The conversation occurred entirely in Spanish between Student C and one of our legal team members who is fluent in Spanish.  During this recent conversation, Student C told us that she was never pressured by anyone at CHS to consider an abortion.  She also explained that she never spoke to Carolina Diaz at all about pregnancy-related options or, specifically, about the possibility of an abortion.  Rather, Student C recalled speaking with the Fairfax County Health Department nurse, and it was the nurse who spoke with her about her options, although again she was never pressured to consider, much less pressured to obtain, an abortion.  Student C also relayed that the nurse made clear that parental consent would be required if she decided to pursue an abortion.  Finally, Student C expressed her appreciation to the staff at CHS for the kind support they extended to her and her family, including assistance with clothing, food, and other needs for her newborn child.

We have offered to provide Student C's contact information to the Virginia State Police.

Two days after this conversation took place, we received for the first time from Mrs. Perez, through her counsel, the written statement from Student C shown below, which Mrs. Perez points to as evidence corroborating her allegations.  The original Spanish version purports to be signed by the student, and appears to be in the student's own handwriting.[157]  The accompanying English translation appears to be in Mrs. Perez's distinctive handwriting.[158]

---

[157] FCPS_CHS_00001812 (document received from Z. Perez).
[158] FCPS_CHS_00001810 (document received from Z. Perez).

Page **28** of **40**

*Student C's Spanish-language Statement and Mrs. Perez's English Translation*[159]



Hola miss Perez  05/22/25
el motivo de esta carta
es porque me entere atraves
de alumnos de la escuela
Centreville Highschool que
los principales estan ciendo
muy injustos con usted
por varios motivos uno
de los motivos por querer
ayudar a una alumna
con una prueba de
embarazo, no veo lo malo
de querer ayudar con una
prueva de embarazo lo
que si esta mal, es ofrecerle
a las alumnas embarazadas
la primera opcion del aborto
eso si esta mal, cuando son
menores de edad.
hací como ami la enterm
de la escuela me dio esa
opcion de abortar esta
mal, no tienen que
ser injustos con una



buena maestra que lo
unico que hace es apoyar
a sus alumnos
le mando esta carta
Dandole animos y fuerzas
usted a sido una de las
maestras que me a
ayudado y aconsejado
bien, que los principales
esten queriendo Perjudecarla
por razones tan injustas,
deverian estar detras
de las trabajadoras que
les hablan del aborto
a las niñas eso si Perez
mi esta mal.

la quiero mucho
animos que Dios
la bendiga.

AHH?
Para ██████████
Miss Perez.



05/22/2005

Hello Miss Perez,
  The reason why I am writing this
letter is because I heard from some
students from CVHS, that the school
administrators are being unfair with
you using various reasons, and one of
these motives was your desire to help
a girl at school.
  They said it was with a pregnancy test.
I don't see anything bad to help with a
pregnancy test, while it is really wrong
to offer young pregnant girls, as a first
option, the abortion. Even when those girls
are minors.
     That was the option that the school
nurse and the social worker gave me,
when I was already five months pregnant
and I was only 17 years old.
  They shouldn't be unfair with a good teacher
who only supports her students.
     I'm writing this letter to you to instill
strength and courage, since you have been
one of the teachers who has helped and advised
me well.



     If the administrators are hurting you
by using unfair reasons, instead of chasing the
social workers that are telling the minor girls to
have abortions, that is really wrong in my
opinion.
     I care about you very much
        stay strong and God bless you.

     Signed by: ██████████

Several things are notable about these two documents.

One is that Student C's statement reflects the same unique word choice that Mrs. Perez has herself repeatedly used—namely, her idiosyncratic use of the term "*chase*."[160]  Translated into English by Mrs. Perez, Student C's statement provides in part, "If the administrators are hurting you by using unfair reasons instead of ***chasing*** the social workers that are telling the minor girls to have abortions, that is really wrong in my opinion."[161]

A second notable observation about these documents is that Mrs. Perez's English translation refers to "offer[ing] young pregnant girls" an "abortion" as "a first option," and then states, "That was the option that the school nurse ***and the social worker*** gave me when I was already five months pregnant."[162]  However, the original Spanish version of Student C's statement says something different.[163]  A more faithful translation of this portion of Student C's statement is as follows:

" . . . what is bad is offering as the first option to pregnant students an abortion, this yes is bad when they are under age.  This is what, to me, ***the school nurse*** gave me the option of . . ."[164]

In other words, the statement in Spanish made no reference to the social worker, only "the school nurse."[165]  Yet Mrs. Perez wrote into her translation "*and the social worker*."[166]  In fact, Student C's statement, in Spanish, makes no reference anywhere to any social worker.[167]  Even Mrs. Perez's English translation's reference to "chasing the social workers"[168] is inaccurate; the original Spanish only refers to "chasing the workers."[169]

This appears to be another instance of Mrs. Perez fabricating evidence against FCPS employees in an attempt to support her otherwise baseless allegations.

Because we did not receive these statements until after speaking with Student C, we were not able to ask her about the circumstances leading to her providing this statement, including whether Mrs. Perez told her what to say, or whether she felt pressured to write and sign the statement.  However, Mrs. Perez's past documented behavior in similar circumstances—combined with her apparent effort to manipulate the content and substance of the translated statement to add new words and allegations favoring her positions and claims—raises serious doubts about the credibility of this student statement, similar to the serious concerns arising from the fabricated statement purportedly signed by Student B.

---

[159] FCPS_CHS_00001810 (document received from Z. Perez); FCPS_CHS_00001812 (document received from Z. Perez).
[160] FCPS_CHS_00001810 (document received from Z. Perez).
[161] *Id.*
[162] *Id.*
[163] FCPS_CHS_00001812.
[164] *Id.*
[165] *Id.*
[166] FCPS_CHS_00001810 (document received from Z. Perez).
[167] FCPS_CHS_00001812 (document received from Z. Perez).
[168] FCPS_CHS_00001810 (document received from Z. Perez).
[169] FCPS_CHS_00001812 (document received from Z. Perez).

*Mrs. Perez and Others Quietly Sought to Leverage Her Student-Abortion Allegations for Several Years Before These Allegations Became Widely Known in August 2025*

In the fall of 2022, Mrs. Perez befriended another CHS school teacher, Julie Perry.[170] Perry later became actively involved with Perez's private "investigation" of suspected school-funded abortions. Mrs. Perez in November 2022 forwarded to Perry various documentation relating to Perez's May 2022 student pregnancy-test controversy, including communications from CHS administrators reprimanding Perez for having acted unprofessionally in relation to this incident.[171] In May 2025, Mrs. Perry accompanied Perez on an outing in which they together sought to identify which Northern Virginia abortion clinic may have been involved in the student abortion Mrs. Perez was alleging had been facilitated and paid for by Carolina Diaz.[172] Perez over a period of years has followed the practice of forwarding to Perry various information and communications relating to her abortion-related allegations and her ongoing tensions with CHS school administrators.[173] Mrs. Perez also has copied Mrs. Perry on various communications with CHS administrators, treating Mrs. Perry as her "witness" to such communications.[174] It is apparent from the factual record that Mrs. Perry was kept very closely informed by Mrs. Perez concerning her allegations, her ongoing private "investigation," her efforts to compile additional "evidence" against Carolina Diaz and Chad Lehman, and her ongoing interactions with school administrators whom Mrs. Perez, as explained above, believes to have conspired against her.[175]

In August of this year, when Mrs. Perez received a communication from FCPS's Division Counsel's Office regarding a recent FOIA request and was asked to provide any responsive documents she may have concerning the specified topics, which concerned her own student-abortion allegations, Mrs. Perez within 30 minutes forwarded that communication to Julie Perry.[176] As shown below, Mrs. Perry responded, "*You don't have anything,*" even though Mrs. Perez clearly did possess responsive information and had been actively compiling related materials.[177]

---

[170] FCPS_CHS_00001625.
[171] FCPS_CHS_00001672; FCPS_CHS_00001670; FCPS_CHS_00001678; FCPS_CHS_00001673; FCPS_CHS_00001676.
[172] FCPS_CHS_00001830 (rough, autogenerated transcript).
[173] FCPS_CHS_00001696; FCPS_CHS_00001702.
[174] FCPS_CHS_00001689.
[175] FCPS_CHS_00001732; FCPS_CHS_00001830 (rough, autogenerated transcript).
[176] FCPS_CHS_00001702.
[177] *Id*.

*Screenshot of August 21, 2025, Email sent from Zenaida Perez to Julie Perry*[178]



Mrs. Perry is active in Republican politics in Virginia and has twice run for elected office, for the Virginia State Senate in 2023[179] and for the Virginia House of Delegates in 2021.[180] As shown from the social media post below, Mrs. Perry also had close ties to the Virginia Project,[181] a now-defunct political action committee previously overseen by her "good friend" Dave Gordon.[182]

*Screenshot of May 17, 2022, Post on X by Julie Perry*[183]



---

[178] FCPS_CHS_00001702.
[179] FCPS_CHS_00001821.
[180] FCPS_CHS_00001625.
[181] FCPS_CHS_00001764.
[182] FCPS_CHS_00001765.
[183] FCPS_CHS_00001764.

*Screenshot of November 12, 2023, Post on X by Julie Perry*[184]



On New Year's Day, January 1, 2023—only weeks after Mr. Lehman concluded his investigation of Mrs. Perez's student-abortion allegations—the Virginia Project posted the following "tweet" on the organization's Twitter feed:[185]

*Screenshot of January 1, 2023, Post on X by the Virginia Project*[186]



Because this was posted on the Virginia Project's organization feed, it is unclear whether Dave Gordon himself authored this message or possibly someone else. What is fairly clear is that this was a targeted political message to "Fairfax Democrats" that the same student-abortion allegations that, weeks earlier, had been confidentially investigated by CHS administrators and determined not to be factually supported were going to be leveraged for political purposes by Republicans with knowledge of such allegations.

---

[184] FCPS_CHS_00001765.
[185] FCPS_CHS_00001819.
[186] FCPS_CHS_00001819.

Mrs. Perez herself responded to the January 1, 2023, Virginia Project post, saying this six days later, on January 7, 2023:

*Screenshot of January 7, 2023, Post on X by Zenaida Perez*[187]



Two days earlier, in a different social media exchange on January 5, 2023, Mrs. Perez said this:

*Screenshot of January 5, 2023, Post on X by Zenaida Perez*[188]



Through our investigation, we have discovered that Mrs. Perez prepared this complaint to the Virginia Attorney General, dated March 16, 2023:

---

[187] FCPS_CHS_00001898.
[188] FCPS_CHS_00001897.

*Screenshot of Perez Complaint to Attorney General – Office of Civil Rights*[189]



This unsigned complaint alleged civil rights violations against FCPS, CHS, and Chad Lehman.[190]  It also alleged that "the School Social Worker facilitated an abortion of a 17-year-old student" and that Mr. Lehman "covered [it] up."[191]  Mrs. Perez's AG complaint further alleged that CHS administrators "coerced the student and her legal guardian to refrain from speaking" about these issues and "not to participate in any legal action to seek justice against the Social Worker Carolina Diaz."[192]  FCPS was never contacted by the Virginia Attorney General's Office about this complaint and has no knowledge of any investigation being conducted in response to this complaint.[193]  As already noted, FCPS senior Division leaders were not even aware of these allegations until after Mr. Curt's August 5, 2025, article was published.[194]

Elicia Brand is a politically active Northern Virginia resident and Founder and President of the non-profit Army of Parents.[195]  Our investigation identified the following social media posts by Mrs. Brand dated August 14 and 15, 2025, in which she appears to assert from personal

---

[189] FCPS_CHS_00001707.
[190] *Id.*
[191] *Id.*
[192] *Id.*
[193] *Id.*
[194] FCPS_CHS_00001826.
[195] FCPS_CHS_00001597.

Page **35** of 40

knowledge that Mrs. Perez's student-abortion allegations were "*alerted to [Governor Youngkin] a year ago*,"[196] and that Governor Youngkin "*knew a year ago about this*":[197]

*Screenshot of August 14 and 15, 2025, Posts on X*[198]





In these additional X posts, from August 8 and 21, 2025, Mrs. Brand purports to have been told by one of Attorney General Miyares's Deputy AGs that the AG's Office, while learning of these allegations through a "Fairfax County teacher"[199] "*a year ago*,"[200] did not investigate due to jurisdictional concerns:

---

[196] FCPS_CHS_00001752.
[197] FCPS_CHS_00001751.
[198] FCPS_CHS_00001752; FCPS_CHS_00001753.
[199] FCPS_CHS_00001750.
[200] *Id.*

*Screenshot of August 8 and 21, 2025, Posts on X by Elicia Brand*[201]



.@GovernorVa should have acted on this a year ago when Miyares's office was notified by a Fairfax County teacher. According to the Deputy AG of Criminal and Public Safety, the AG's office did not have jurisdiction with this matter.

6:33 PM · Aug 21, 2025 · **90** Views



.@JasonMiyaresVA's office was informed last year about this. They said they do not have the jurisdiction to pursue. It has to come from @GovernorVA @GlennYoungkin.  And by the way, it was TWO girls. One didn't want an abortion but was pushed into it by the government workers. Parents were not notified. School was a part of the process. They haven't covered anything up yet because there has not been an investigation. @GovernorVA has not addressed this.

3:01 PM · Aug 8, 2025 · **39** Views

   We have not made contact with Mrs. Brand and do not know on what basis she made these assertions.  We do note, however, that if it is correct that Attorney General Miyares and/or Governor Youngkin or members of their Offices knew of these allegations a year or more ago (in the case of the Attorney General, perhaps as early as March 2023, the date entered on Mrs. Perez's unsigned civil rights complaint),[202] a referral to the Virginia State Police presumably could have been made at that time.

---

[201] FCPS_CHS_00001751; FCPS_CHS_00001750.
[202] FCPS_CHS_00001707.

Note also that on June 26, 2024, Julie Perry posted this on X, referring to allegations of "secret" student abortions:

*Screenshot of June 26, 2025, Post on X by Julie Perry*[203]



Mrs. Perry's statement that she was at that time "familiar with" such a "situation" but unable to "discuss [it] at the moment" is consistent with statements by Elicia Brand suggesting that in 2024 (Brand, in 2025, said "a year ago") some person or group was attempting to spur the Attorney General and/or Governor to take action on these allegations.[204] The implication is that Perry and Brand may have both been involved in, or at least privy to, that effort. And as shown above, Mrs. Brand appears to have been frustrated by the lack of action, saying, "@GovernorVA should have acted on this a year ago when Miyares's office was notified by a Fairfax County teacher."[205]

The facts discussed above suggest that a variety individuals actively involved in Virginia politics, possibly including the Governor and Attorney General themselves, may have known of these same allegations for a year or more but did not disclose them publicly in any widespread manner prior to the publication of Walter Curt's August 5, 2025, article and the Governor's subsequent public statement, and did not take action before now to investigate, or to call for investigations by the State Police. The social media posts above allude to FCPS having a "cover up" problem,[206] but again it appears that FCPS senior Division leaders did not even know of

---

[203] FCPS_CHS_00001763.
[204] FCPS_CHS_00001750.
[205] FCPS_CHS_00001750.
[206] FCPS_CHS_00001898.

these allegations before August 2025. CHS school administrators did know of Mrs. Perez's allegations, but those allegations were promptly investigated in late 2022 and determined not to have factual support.[207] If there was any "cover up" of these allegations, these facts suggest it was not by FCPS but by others who knew of these claims for years but took no action.[208]

Asra Nomani has now admitted that she too has known about these allegations for years, but nonetheless failed to call public attention to them until very recently. On August 12, 2025, Nomani posted this on X:[209]

*Screenshot of August 12, 2025, Post on X by Asra Nomani*



Thus, Mrs. Nomani by her own admission has known of the allegations concerning Student B since December 2022. However, Mrs. Nomani's first reporting concerning these

---

[207] *See supra* pp. 13-19.
[208] FCPS_CHS_00001750.
[209] FCPS_CHS_00001601.

alleged events was on August 11, 2025.[210]  In the above post, Nomani appears to defend her failure to call public attention to these concerns, saying that she "didn't write about them at the time" out of concern for the privacy of the student and her legal guardian.[211]  But Nomani could have addressed that through a story shielding their names.

       FCPS finds it very disturbing that so many of the individuals who are now (in the weeks leading up to a hotly contested election) shining a spotlight on these dated (and, our investigation shows, likely false) allegations have known about these same allegations for years.  If those individuals believed these serious allegations had merit and thus believed that CHS students were truly at risk to what Mrs. Nomani has referred to as "coerced abortions,"[212] presumably they would have taken action sooner to call public attention to this issue or to refer the matter to appropriate law enforcement agencies for investigation.

---

[210] FCPS_CHS_00001899.
[211] FCPS_CHS_00001902.
[212] FCPS_CHS_00001601.

**INFORMATION CONCERNING FCPS POLICIES, REGULATIONS, AND PRACTICES[1]**

## I.    OVERVIEW OF FCPS OPERATIONS, FUNDING, AND BUDGET

### *Overview of Fairfax County Public Schools*

FCPS is the largest school district in the Commonwealth of Virginia and among the ten largest school divisions in the United States.[2]  With approximately 200 schools and related facilities, FCPS serves a diverse student population of nearly 181,000 students from pre-kindergarten through grade twelve, representing more than 200 languages.[3]  Approximately 37 percent of students served by FCPS are economically disadvantaged (eligible for free or reduced-price meals); 17 percent receive special education services, and approximately 21 percent are multilingual learners.[4]

FCPS is also one of Virginia's largest employers, with a workforce exceeding 40,000 employees, including part-time and hourly personnel.[5]  The Division manages more than 28 million square feet of school buildings and office space, including 187 Energy Star-certified buildings—more than any other school system in the country.[6]

### *Demographic Trends*

Fairfax County's population has grown steadily over the last three decades, from approximately 818,600 residents in 1990 to an estimated 1,171,800 in 2020, and has become increasingly more diverse.  FCPS enrollment trends reflect these demographic shifts.  As reported by FCPS for the 2023-2024 school year, 36 percent of FCPS students identified as White; 29 percent identified as Hispanic; 19 percent as Asian; 10 percent as African American; and 6 percent identified as multi-racial or other.[7]  As of September 30, 2024, nearly half of FCPS students reported speaking a language other than English at home.  Of those, Spanish is the language most common, with 33,317 students—nearly 20 percent of the total school population—coming from primarily Spanish-speaking households, and FCPS communicates with these families primarily in Spanish.[8]

---

[1] This statement responds to Questions 1-2, and 5 of the Department of Education's September 29, 2025, letter and to Questions 1-6, 10-11, and 14 of Chairman Cassidy's September 22, 2025, letter.
[2] FCPS_CHS_00000332.
[3] FCPS_CHS_00000332; FCPS_CHS_00000996.
[4] FCPS_CHS_00000996.
[5] FCPS_CHS_00000332.
[6] *Id.*
[7] *Id.*
[8] FCPS_CHS_00000996.

*Budget and Funding*

The scale of FCPS's operations is reflected in its operations budget.  For Fiscal Year ("FY") 2026, FCPS has adopted an operating budget of approximately $3.9 billion.[9]  The majority of this funding is budgeted to come from Fairfax County Government transfers, including $2.7 billion for FY 2026.  The Commonwealth of Virginia is budgeted to provide an additional $1.05 billion in funding to FCPS for FY 2026, while approximately 1.3% of the FCPS's FY 2026 budget, or about $50.1 million, is expected to come in the form of federal aid.[10]  Federal revenue contributions have fluctuated in recent years, reflecting both regular and pandemic-related funding streams: $46,507,792 in FY 2020; $93,211,831 in FY 2021;[11] $167,082,179 in FY 2022; $169,727,802 in FY 2023; $109,476,945 in FY 2024; and approximately $63,293,379 for FY 2025.[12]

## II.    CENTREVILLE HIGH SCHOOL

Centreville High School ("CHS") is one of Fairfax County's most diverse secondary schools, serving a student body of roughly 2,200 students in grades nine through twelve.  The school reflects the demographic richness of the Centreville area, drawing students from more than 60 countries and representing over 65 home languages.[13]  This multilingual environment is central to CHS's identity, with over 13 percent of students classified as English learners in the 2024–25 school year.[14]  The school's population includes approximately 31 percent Asian and 24 percent Hispanic or Latino students, alongside White, Black, and multiracial student communities, contributing to a vibrant and inclusive school culture.[15]

Socioeconomic diversity is another defining feature of the CHS community.  More than a quarter of students—about 27 percent—qualify for free or reduced-price meals,[16] reflecting a range of family income levels and lived experiences across the community.  Many students come from immigrant and first-generation households, and the school plays an active role in providing language access, academic support, and community resources to ensure equitable participation in school life.[17]

CHS has maintained a record of strong academic performance and high graduation rates.  Approximately 96 percent of students graduate on time, and the vast majority pursue postsecondary education or vocational training.[18]  Over 60 percent of graduates earn advanced diplomas, and CHS offers an expansive curriculum that includes more than thirty Advanced Placement and dual enrollment courses.[19]  These academic outcomes reflect both the resilience

---

[9] *Id.*
[10] These funding streams include Federal Grants, Federal revenue, Federal Impact Aid, Junior ROTC funds, and Special Education funds.
[11] FCPS_CHS_00000464.
[12] FCPS_CHS_00000996.
[13] FCPS_CHS_00000270.
[14] FCPS_CHS_00000288.
[15] *Id.*
[16] *Id.*
[17] FCPS_CHS_00000270.
[18] FCPS_CHS_00000269; FCPS_CHS_00000270.
[19] *Id.*

of the student community and the school's commitment to providing individualized academic and emotional support for its diverse population.

## III.    OVERVIEW OF FCPS STUDENT HEALTH & MEDICAL CARE

FCPS incorporates student wellness as an integral part of its educational framework, ensuring that physical, emotional, and mental health are addressed throughout the learning experience.  The FCPS School Health Program operates through a partnership between FCPS and the Fairfax County Health Department, with both entities maintaining clearly defined roles and responsibilities related to program delivery, medical oversight, and compliance with applicable state and federal laws.[20]

The School Health Services Program, administered by the Fairfax County Health Department, extends its work into FCPS schools to provide a comprehensive range of health services that support students and the broader community.  Through this program, School Health Services staff and other Health Department employees monitor communicable diseases, facilitate access to health care, and participate in community initiatives aimed at promoting public health beyond the school environment.[21]

There are eight elements to the School Health Services program:[22]

- **Health Education** provides a sequential grades pre-K-12 instructional program addressing the physical, mental, emotional, and social dimensions of health.

- **Physical Education** serves as a means for students to develop strength, coordination, and cardiovascular and respiratory efficiency, as well as for social development, stress reduction, and movement appreciation.

- **Health Services** promotes the health of students and school staff members through prevention, early intervention, and remediation of specific health problems.

- **Counseling** provides broad-based prevention and intervention programs to promote the physical and psychological health of students and faculty.

- **School Environment** creates and maintains facilities that enhance the physical and psychological well-being of students.  It also provides school clinics to manage injuries and illnesses of students and staff members.

- **School Nutrition** promotes good nutritional practices both within and outside the school settings (breakfast and lunch programs and nutrition education in the classroom).

- **Employee Assistance Program (Staff Wellness)** provides school staff members with the opportunity to take active roles in maintaining and achieving optimal physical and psychological health.

---

[20] FCPS_CHS_00000368; FCPS_CHS_00000452.
[21] FCPS_CHS_00000452.
[22] FCPS_CHS_00000368.

- **School and Community Agencies** integrate health and education professionals in the school and community to provide and support improved school health programs.[23]

School Health Aides ("SHA") and Public Health Nurses ("PHN"), employed by the Fairfax County Health Department, play a central role in implementing these services in FCPS schools.[24] SHAs are trained professionals assigned to school health rooms during school hours, where they provide first aid, care for students who become ill, and administer medication as directed.[25] They are also available to discuss a range of health topics with students, including reproductive health, access to free or low-cost health care, and mental health concerns such as anxiety or sadness.[26] PHNs, who are licensed registered nurses with credentials from accredited nursing programs, assess individual student health needs, develop care plans, help students access medication which they require and have been prescribed for them, and provide training to teachers, administrators, and other school staff to ensure that student health needs are appropriately supported.[27] They also supervise SHAs, lead school-wide health and disease prevention programs, and investigate communicable disease reports to protect the broader school community.[28]

Within this partnership framework, FCPS is responsible for establishing policies and guidelines that align the School Health Program with federal, state, and local requirements.[29] The school division supports student health by facilitating staff participation in training and education led by PHNs and by promoting a culture of wellness across the school community.[30] FCPS also ensures that parents and staff have access to information about community health resources, including low-cost health services provided through the Fairfax County Government,[31] community health centers, federally qualified health centers,[32] and resources offered by the Fairfax County Department of Family Services[33] and the Fairfax County Health Department.[34]

## IV. STUDENT PREGNANCY AND RELATED SUPPORT SERVICES

### *Incidents of Student Pregnancies at FCPS and CHS*

FCPS recognizes that pregnancy and reproductive health are deeply sensitive subjects governed by a combination of state and federal legal requirements, as well as ethical obligations to support student welfare, privacy, and educational access. Instances of student pregnancy within FCPS are relatively rare, including at CHS. Available public health data suggests that its prevalence is relatively uncommon in Fairfax County compared with statewide levels, which

---

[23] *Id.*
[24] FCPS_CHS_00000452.
[25] *Id.*
[26] *Id.*
[27] *Id.*
[28] *Id.*
[29] *Id.*
[30] *Id.*
[31] FCPS_CHS_00000341.
[32] FCPS_CHS_00000318.
[33] FCPS_CHS_00000315.
[34] FCPS_CHS_00000328.

provides context for the school's experience that only a small number of student pregnancies arise in a typical year.  For example, county dashboards and Virginia Department of Health vital statistics show lower teen pregnancy rates in Fairfax County than the Virginia average—8.6 per 1,000 females aged 15–19, compared to 15.6 statewide—in recent years.[35]  Yet, with over 300 teen pregnancies annually,[36] the issue continues to pose important public health and social challenges, particularly among vulnerable populations.

These pregnancies can have lasting effects on educational attainment, economic stability, and health outcomes for both mother and child.  When they occur, they are managed in close coordination with the student, their family, and county health resources.  This collaborative approach ensures that students receive appropriate academic, medical, and emotional support while maintaining compliance with applicable law and FCPS policy and procedures.  When pregnancies do occur, families typically work directly with health-care providers rather than through the school.  This is consistent with the structure of School Health Services program, noted above—schools are not clinical abortion providers and rely on county public-health personnel for health guidance—and with Virginia's legal framework for minors, which requires adult involvement or judicial authorization for abortion care.

### *Applicable Legal and Regulatory Framework Governing Student Pregnancies*

Under Virginia law, several provisions directly inform how FCPS schools and related agencies approach issues involving pregnancy and reproductive health among students.  Pursuant to Va. Code § 16.1-241(V) and § 16.1-241.2, a minor cannot obtain an abortion in the Commonwealth without the written, in-person consent of an authorized adult, defined as a parent, grandparent, adult sibling, or legal guardian with whom the minor resides.  In limited circumstances, a court may authorize a judicial bypass of parental consent when it determines that such authorization is in the minor's best interests or that the minor is sufficiently mature to make the decision independently.  Health care providers are also subject to mandatory reporting obligations in cases where abuse or neglect is suspected, in accordance with Va. Code § 63.2-1509, and must maintain confidentiality consistent with both state privacy laws and federal requirements under HIPAA and the FERPA, depending on the nature of the record and agency involved.  Federal law also shapes the landscape of reproductive health services available to minors.  Under the Hyde Amendment, federal funds—including Medicaid and Title X family planning funds—may not be used to pay for abortion services except in limited cases of rape, incest, or where the life of the pregnant individual is endangered.

Virginia law further prohibits discrimination against pregnant and parenting students in educational settings.  Pursuant to Va. Code § 22.1-207.3:1 and federal protections under Title IX of the Education Amendments of 1972 (20 U.S.C. § 1681 et seq.), public schools must ensure that such students are provided equal access to educational opportunities and are not excluded from participation in or denied the benefits of any school program or activity on the basis of pregnancy, childbirth, or related conditions.  Schools are also required to make reasonable accommodations, including allowing medically necessary absences and providing opportunities to make up work missed due to pregnancy-related conditions.  Among other student resources,

---

[35] FCPS_CHS_00000458; FCPS_CHS_00001563.
[36] FCPS_CHS_00000458; FCPS_CHS_00001563.

FCPS operates Mountain View High School in Centreville, Virginia.  Mountain View High School offers an educational program designed to help students whose life circumstances often result in interrupted schooling, including students who may be pregnant or parenting, English Language Learners, older school-aged students who are returning to finish their high school graduation requirements and students who need a flexible or extended program to accommodate their work or family situations.[37]

### *Services for Pregnant Students in Northern Virginia*

In Northern Virginia, several private and non-profit organizations provide confidential reproductive health services for individuals—including minors and members of immigrant or undocumented communities—who may face barriers to care.  The Blue Ridge Abortion Fund, based in Virginia, offers financial and logistical assistance statewide, including to young people and those without insurance or legal status.[38]  As two examples, the Falls Church Healthcare Center[39] and Whole Woman's Health of Fairfax[40] are licensed providers offering comprehensive reproductive health care, counseling, and referral services in a confidential setting.  In addition, organizations such as La Clínica del Pueblo[41] and the Neighborhood Health network,[42] which have offices serving Northern Virginia residents, provide culturally competent, multilingual reproductive and sexual health services regardless of immigration status or ability to pay.  These community-based providers and support networks help ensure that all individuals—including minors and those from immigrant and undocumented families—have access to safe and confidential reproductive health care within Virginia's legal framework.

### *FCPS Support Framework for Pregnant and Parenting Students*

Consistent with these legal obligations, FCPS's Regulation 2137 (Instructional Services for Pregnant, Parenting, and Lactating Students)[43] and Regulation 2504 (Counseling Pregnant Students),[44]  discussed further below, establish procedures for supporting pregnant and parenting students while balancing confidentiality and compliance with parental notification and consent requirements.  These regulations set forth the responsibilities of school staff in maintaining student privacy, facilitating communication with families, and coordinating with health and social service agencies.  Together, they ensure that students navigating pregnancy or parenting responsibilities receive appropriate academic, emotional, and health-related support within the bounds of Virginia law and FCPS policy.

As a general matter, when FCPS staff become aware that a student may be pregnant, they are trained to recognize that pregnancy-related issues are medical in nature and therefore outside

---

[37] FCPS_CHS_00001565.
[38] FCPS_CHS_00000267.
[39] FCPS_CHS_00000462.
[40] FCPS_CHS_00001575.
[41] FCPS_CHS_00001560.
[42] FCPS_CHS_00001569.
[43] FCPS_CHS_00000085.
[44] FCPS_CHS_00000088.

the professional scope of teachers, counselors, or social workers.  In such instances, staff are directed to involve the school's PHN.[45]

When a student presents to the school public health nurse with a possible pregnancy, the public health nurse does not conduct or possess pregnancy tests on-site.  Instead, the public health nurse refers the student to the Fairfax County Health Department for confirmatory testing. The results of such testing are not returned to FCPS staff, including the school public health nurse.  The Health Department assigns trained family assistance workers—county employees specializing in adolescent and maternal health—to assist the student and family in accessing appropriate community resources.  These family assistance workers can connect the student to programs such as the Virginia Women, Infants, and Children ("WIC") Program administered by the Virginia Department of Health, which offers nutritional assistance, counseling, and health screenings for eligible pregnant and parenting individuals.[46]  As part of Fairfax County's coordinated public health network, students may also be referred to INOVA Health System, a regional nonprofit hospital network that provides prenatal care, family support programs, and assistance with enrollment in healthcare coverage and related benefits.[47]  The Health Department and its family assistance staff may facilitate a referral to INOVA clinics, where students can sign up for medical care and access additional services such as prenatal counseling, parenting education, and links to community-based support organizations.

If a student requests information regarding pregnancy options, the school public health nurse is trained to explain that neither local, state, nor federal funds may be used to pay for abortion services and that FCPS personnel do not provide referrals or lists of abortion providers. Instead, the public health nurse may provide general information about publicly available health and social services as curated by the Virginia Department of Health.  This approach aligns with FCPS's commitment to ensuring that students receive medically appropriate guidance from licensed professionals while maintaining compliance with state law and respecting parental involvement requirements.

### *Use of Federal Funds in Connection with Sensitive Medical Services*

FCPS has not used any U.S. Department of Education funds, in whole or in part, for the provision, facilitation, or referral of abortion-related or other sensitive medical services.

All federal funds received by FCPS, including but not limited to Title I, Title II, Title III, IDEA, and other federal grant programs, are used exclusively for authorized educational purposes in accordance with the grant terms and the Uniform Administrative Requirements, Cost Principles, and Audit Requirements for Federal Awards (2 C.F.R. Part 200).

FCPS's internal budget and accounting procedures are designed to ensure that expenditures are aligned with programmatic purposes and funding restrictions.  Each federal program is subject to annual audit under the Single Audit Act and in accordance with the standards applicable to financial audits contained in the *Government Auditing Standards* issued by the Comptroller General of the United States, and the *Specifications for Audits of Counties,*

---

[45] *Id.*
[46] FCPS_CHS_00001572.
[47] FCPS_CHS_00001557.

*Cities, and Towns*, issued by the Auditor of Public Accounts of the Commonwealth of Viginia.[48] FCPS's use of funds is also reviewed by the Virginia Department of Education as the state pass-through entity.[49]

## V.    FCPS POLICIES AND REGULATIONS

FCPS operates under a comprehensive system of policies and regulations designed to ensure the safety, welfare, and rights of all students while holding staff to the highest standards of professional conduct and legal compliance.  These safeguards extend across child protection, student support, nondiscrimination, financial accountability, and mechanisms for reporting misconduct or retaliation.

### A.  CHILD PROTECTION AND STUDENT WELFARE

#### *Mandatory Reporting of Abuse and Neglect*

Virginia law imposes mandatory reporting requirements on all FCPS employees "who have reason to suspect that a child is an abused or neglected child."[50]  This mandatory reporting requirement reflects the Commonwealth's broader public policy commitment to child safety and imposes both a legal and ethical obligation on school personnel to ensure that potential harm is neither overlooked nor minimized.

To operationalize this statutory duty, FCPS Regulation 2115 (Procedures for Reporting Cases of Suspected Child Abuse or Neglect) codifies these obligations within the Division's internal framework.  The policy mandates that any employee who suspects abuse or neglect immediately report their concern to both internal supervisory channels (such as principals or designated administrators) and external authorities, including Child Protective Services ("CPS") or law enforcement.[51]  The policy mandates that any employee who suspects abuse or neglect immediately report their concern to both internal supervisory channels (such as principals or designated administrators) and external authorities, including Child Protective Services ("CPS") or law enforcement.[52]  This dual-reporting structure ensures that concerns are escalated swiftly through multiple pathways—preventing internal bottlenecks and reinforcing a culture of vigilance and accountability.

In parallel, Regulation 7001 (Reporting Serious and Unusual Incidents) complements these safeguards by requiring FCPS employees to promptly document and report any "serious or unusual incident."[53]  The regulation defines such incidents broadly to include any occurrence that threatens the safety or security of students, employees, or property, or that disrupts the instructional program or school activity."[54]  Together, these provisions create an integrated

---

[48] FCPS_CHS_00000290.
[49] FCPS_CHS_00000348.
[50] FCPS_CHS_00000080.
[51] *Id.*
[52] *Id.*
[53] FCPS_CHS_00000235.
[54] *Id.*

system of mandatory action—one that prioritizes immediate documentation, internal notification, and external reporting to protect student welfare and maintain a safe learning environment.

### *Support for Pregnant and Parenting Students*

Regulation 2504 provides the central framework for staff conduct in these matters.  The regulation expressly prohibits FCPS staff from promising pregnant students that their disclosures about being pregnant will remain confidential.[55]  Instead, it directs staff to make "every effort" to encourage a pregnant student to discuss her situation with her parents or guardians.[56]  At the same time, the regulation strictly cautions staff against attempting to influence the student's decisions regarding her pregnancy.[57]  This balanced approach underscores the Division's commitment to safeguarding student welfare while ensuring that parental rights and responsibilities are appropriately recognized.

Under Regulation 2504, FCPS staff are also instructed to refer any student who believes she is pregnant and requests counseling services—or who appears to be in need of such services—to the public health nurse or the Fairfax County Department of Health.[58]  This referral mechanism ensures that students receive access to qualified health professionals and evidence-based guidance, while also relieving school personnel from assuming advisory or clinical roles beyond their expertise.

Complementing this framework, Regulation 2137 (Instructional Services for Pregnant, Parenting, and Lactating Students) establishes the division's policy for ensuring equitable access to educational opportunities for students who are pregnant or parenting.[59]  Together, these two regulations provide a comprehensive approach to supporting affected students—one that integrates counseling, academic continuity, and legal compliance.  They also serve as essential guidance for teachers, counselors, and administrators, who must navigate these sensitive issues with compassion, professionalism, and strict adherence to both state and federal legal requirements.

### *Non-Emergency, Invasive Physical Examinations or Screenings*

FCPS does not require or conduct non-emergency, invasive physical examinations or screenings as a condition of enrollment, attendance, or participation in any educational activity. This practice aligns with both Virginia law and federal protections under Protection of Pupil Rights Amendment (20 U.S.C. § 1232h; 34 C.F.R. Part 98) ("PPRA"), which limit the circumstances under which students may be subjected to physical examinations without parental consent.

The applicable standards are articulated across several key FCPS policies and regulations, including Policy 2101 (Physical Examinations, Immunizations, Contagious Diseases, Treatment

---

[55] FCPS_CHS_00000088.
[56] *Id.*
[57] *Id.*
[58] *Id.*
[59] FCPS_CHS_00000085.

of Injuries),[60] Regulation 2101 (Physical Examinations, Immunization of Students, and
Tuberculosis Screening Requirements),[61]  Regulation 2102 (First Aid, Emergency Treatment,
and Administration of Medication for Students),[62] and Regulation 2103 (Scoliosis Screening).[63]
Collectively, these policies are designed to ensure that health-related requirements and
interventions are conducted in accordance with Virginia Code § 22.1-270, Virginia Code § 32.1-
46, and the Virginia Department of Health's guidance.  Under these provisions:

- Middle and high school students are not required to undergo a comprehensive physical
  examination before enrollment, but must provide documentation of required
  immunizations prior to school entry, consistent with state law.[64]

- Administration of medication during school hours requires written authorization from a
  parent or guardian and, when appropriate, the student's licensed healthcare provider.[65]

- First aid may be provided by school personnel for minor, non-emergency conditions,
  while emergency medical procedures are followed immediately in urgent situations.[66]

- Teachers and staff who suspect a student has a spinal abnormality must refer the student
  to the PHN, who then notifies the parent or guardian in writing and assists medically
  indigent families in accessing appropriate health care services.[67]

    In addition, FCPS encourages collaboration between families and school health personnel
to support students with ongoing or specific health needs.  Parents and guardians may work with
the public health nurse to develop an individualized health care plan—either preventive or
responsive—which is implemented in coordination with the Fairfax County Health Department,
FCPS staff, the student's health care provider, and the family.[68]

    Together, these standards reflect FCPS's commitment to safeguarding student health
through lawful, transparent, and family-centered practices, ensuring that all medical interactions
within the school environment respect student privacy, parental rights, and applicable legal and
ethical obligations.

### B.  STUDENT RIGHTS, RECORDS, AND PRIVACY

#### *FERPA and Student Data Protections*

    FCPS has adopted a comprehensive framework of policies and regulations to protect the
confidentiality, integrity, and lawful handling of student information.  Specifically, Policy 2701

---

[60] FCPS_CHS_00000015.
[61] FCPS_CHS_00000034.
[62] FCPS_CHS_00000052.
[63] FCPS_CHS_00000068.
[64] FCPS_CHS_00000034.
[65] FCPS_CHS_00000052.
[66] FCPS_CHS_00000015; FCPS_CHS_00000052.
[67] FCPS_CHS_00000068.
[68] FCPS_CHS_00000070.

(Student Personal Data),[69] Policy 2730 (Confidentiality of Student Information),[70] and Regulation 2701 (Student Personal Data),[71] establish detailed standards governing the access, disclosure, and management of sensitive student data in compliance with both federal and state privacy laws. Collectively, these measures ensure that student records are maintained with the highest degree of care and that all disclosures occur only under legally authorized circumstances.

Under Regulation 2701, all data maintained on an individual student constitutes the student's official "scholastic record," which serves as the central repository of the student's educational history.[72] This regulation explicitly incorporates the requirements of FERPA, the federal law that safeguards the privacy of student education records. In accordance with FERPA, parents and eligible students (i.e., students over 18 years of age or attending a postsecondary institution) have the right to inspect and review scholastic records maintained by the school.[73] Students over 18 years of age or attending a post-secondary institution) have the right to inspect and review scholastic records maintained by the school.[74] Furthermore, FCPS may not release personally identifiable information (PII) from these records without prior written consent from the parent or eligible student, except in limited circumstances authorized by law—such as the disclosure of "directory information," which FERPA defines as data that would not generally be considered harmful or an invasion of privacy if disclosed.[75]

Regulation 2701 also establishes strict internal controls over the access and use of student information within FCPS.[76] Personally identifiable data may only be shared with school officials who have a legitimate educational interest and a bona fide need to access the information to perform their professional duties.[77] This provision ensures that access is limited to authorized personnel directly involved in the student's instruction, support, or safety, and that all data handling is consistent with legal and ethical obligations. Beyond those circumstances, no disclosure of student information may occur without appropriate consent or specific statutory authorization.[78]

In addition, Regulation 2701 provides explicit guidance regarding the access and confidentiality of student health records.[79] It authorizes public health nurses, school health aides, and designated school staff to review a student's health information only when necessary to fulfill their official responsibilities in supporting the student's educational and health needs.[80] These access rights are narrowly tailored to ensure that health information—often among the

---

[69] FCPS_CHS_00001577.
[70] FCPS_CHS_00000021.
[71] FCPS_CHS_00000018.
[72] FCPS_CHS_00000169.
[73] *Id.*
[74] *Id.*
[75] FCPS_CHS_00000021; FCPS_CHS_00000169.
[76] FCPS_CHS_00000169.
[77] *Id.*
[78] *Id.*
[79] *Id.*
[80] *Id.*

most sensitive categories of student data—is shared strictly on a need-to-know basis and protected under both FERPA and applicable state health privacy laws.[81]

### *Title IX and Anti-Harassment Protections*

FCPS maintains a comprehensive, multi-tiered framework for the prevention, reporting, and investigation of sexual harassment and misconduct, ensuring that all students and employees learn and work in an environment that is safe, respectful, and free from discrimination.  This framework is defined through Regulation 2118 (Title IX: Sexual Harassment by Students),[82] Regulation 4444 (Prevention of Sexual Misconduct and Abuse),[83] Policy 4950 (Sexual Harassment),[84] and Regulation 4950 (Sexual Harassment by Employees).[85]  Collectively, these regulations establish clear behavioral standards, delineate investigative procedures, and provide robust protections for those who report misconduct.

Together, these provisions ensure that all forms of sexual harassment or misconduct— whether student-to-student, employee-to-student, or employee-to-employee—are addressed promptly and in accordance with federal and state law, including Title IX of the Education Amendments of 1972 and relevant Virginia statutes.  Each regulation mandates immediate reporting of suspected or alleged misconduct to designated officials, followed by a thorough, impartial investigation conducted by trained personnel.  Throughout this process, FCPS requires that all reports and investigative records remain confidential, except to the extent disclosure is necessary to carry out the investigation, protect the parties' rights, or comply with legal obligations.[86]

These regulations further provide explicit anti-retaliation protections, prohibiting any adverse action against employees or students who report sexual harassment, participate in investigations, or otherwise engage in protected activity.[87]  This safeguard aligns with both Title IX and FCPS's broader whistleblower and equity policies, reinforcing the division's commitment to ensuring that complainants and witnesses can come forward without fear of reprisal.

In addition, the regulations include provisions aimed at preserving the integrity of the investigative process.  Employees are expressly prohibited from knowingly making false statements or submitting false information in connection with any report or investigation.[88] Violations of this provision may result in disciplinary action under FCPS policies, underscoring FCPS's expectation that all participants engage truthfully and responsibly in the resolution process.[89]

### C.  FINANCIAL ACCOUNTABILITY AND SAFEGUARDS AGAINST MISUSE

---

[81] *Id.*
[82] FCPS_CHS_00000237.
[83] FCPS_CHS_00000254.
[84] FCPS_CHS_00000023.
[85] FCPS_CHS_00001578.
[86] FCPS_CHS_00000023.
[87] FCPS_CHS_00000023; FCPS_CHS_00000026; FCPS_CHS_00000260.
[88] *Id.*
[89] *Id.*

### *Controls on School Funds*

FCPS has several policies and regulations in place to ensure that all funds under its control—including federal, state, and local funds—are managed, expended, and audited in full compliance with applicable laws and fiscal accountability standards.  These policies collectively reflect FCPS's commitment to transparency, integrity, and responsible stewardship of public resources.

Central to this framework is Regulation 5810 (School Activity Funds Management) which establishes detailed procedures for the collection, management, and expenditure of funds generated at the school level.[90] The regulation mandates that all school-based financial activities adhere to transparent accounting practices and are subject to both administrative oversight and audit review.[91]  This ensures that funds collected through student activities, parent organizations, or other local initiatives are used exclusively for authorized educational purposes and properly documented in accordance with established accounting standards.

Complementing this regulation, Policy 1420 (Accountability for Public Funds and Property)[92] and Policy 5410 (Periodic Audits)[93] impose system-wide accountability mechanisms designed to safeguard FCPS's financial integrity.  Policy 1420 affirms that all employees entrusted with public funds are personally responsible for their proper use and custody,[94] while Policy 5410 mandates regular internal and external audits to detect and address potential irregularities.[95]  These periodic reviews provide an essential layer of oversight and help ensure continuous compliance with both federal grant requirements and state fiscal management laws.

Further, Regulation 5810 (School Activity Funds Management) assigns specific responsibility to school principals for the safeguarding, management, and accounting of all school activity funds.[96]  Principals are required to review and approve purchase orders and checks, verify the existence of adequate supporting documentation for all expenditures, and maintain accurate, auditable records of all financial transactions.[97]

In keeping with FCPS's commitment to transparency, all audit reports are publicly available.  As part of this ongoing oversight, the Office of the Auditor General conducted a business process audit at Centreville High School on March 24, 2025.[98]

### *Fraud, Waste, and Abuse Protections*

FCPS has implemented comprehensive safeguards to prevent, detect, and address financial misconduct through Policy 1107 (Fraud, Waste, & Abuse)[99] and Regulation 1410

---

[90] FCPS_CHS_00000213.
[91] *Id.*
[92] FCPS_CHS_00000007.
[93] FCPS_CHS_00000024.
[94] FCPS_CHS_00000007.
[95] FCPS_CHS_00000024.
[96] FCPS_CHS_00000213.
[97] *Id.*
[98] FCPS_CHS_00000274.
[99] FCPS_CHS_00000004.

(Procedures for Reporting and Investigating Embezzlement, Fraud, Waste, or Abuse, and Other Financial Wrongdoing).[100]  Together, these provisions establish clear standards of conduct, outline procedures for internal investigations, and provide protections for employees who report suspected financial irregularities in good faith.

Under Policy 1107, all FCPS employees are explicitly prohibited from engaging in or concealing activities involving embezzlement, fraud, or misuse of school funds or resources.[101]  The policy defines such acts broadly to include any intentional deception, misrepresentation, or unauthorized use of public assets for personal or institutional gain.[102]  It also mandates that any employee who becomes aware of such conduct has a duty to report it through designated reporting channels—such as to a supervisor, the Office of the Auditor General, or other appropriate authority—ensuring that potential violations are promptly reviewed and addressed.[103]

Regulation 1410 operationalizes these standards by establishing a formal reporting and investigative framework for allegations of financial wrongdoing.[104]  The regulation delineates the steps for receiving, documenting, and investigating reports, and assigns responsibility for conducting impartial reviews to qualified personnel.[105]  Importantly, it also reinforces protections against retaliation for employees who report suspected fraud or abuse, aligning with FCPS's broader whistleblower protections under Policy 1106 (Protection Against Retaliation When Engaged in Protected Activity).[106]

### *Reporting Channels for Whistleblowers*

The FCPS Office of the Auditor General (OAG) has established multiple confidential reporting channels to enable employees, students, and community members to report concerns regarding the potential fraud, waste, or abuse of school funds or resources.  The FCPS Office of the Auditor General ("OAG") has established multiple confidential reporting channels to enable employees, students, and community members to report concerns regarding the potential fraud, waste, or abuse of school funds or resources.  These mechanisms are designed to promote transparency, accountability, and stewardship in the management of public resources while ensuring that complainants can come forward safely and without fear of retaliation.

Individuals may report concerns through several options:

- Fraud, Waste, and Abuse Hotline: Complainants may call (571) 423-1333 at any time—24 hours a day, seven days a week—and leave a voicemail detailing their concerns. Callers have the option to remain anonymous, allowing reports to be made confidentially without disclosure of personal identity.[107]

---

[100] FCPS_CHS_00000026.
[101] FCPS_CHS_00000004.
[102] FCPS_CHS_00000004.
[103] *Id.*
[104] FCPS_CHS_00000026.
[105] *Id.*
[106] FCPS_CHS_00000001; FCPS_CHS_00000026.
[107] FCPS_CHS_00000365.

- Email: Concerns may also be submitted directly to the OAG via internalaudit@fcps.edu. This method allows for direct follow-up but does not provide anonymity.[108]

- Online Webform: A secure webform is available through the OAG website for electronic submission of reports, offering another accessible means for individuals to document and transmit information regarding potential misconduct.[109]

- In-Person Reporting: Complainants may also report concerns in person at the Office of the Auditor General, located in the Gatehouse Administration Building, 8115 Gatehouse Road, Suite 5500, Falls Church, Virginia 22042.[110]

Each of these avenues is intended to ensure that reports of potential misuse of public funds or resources are received, documented, and investigated appropriately by independent audit personnel in accordance with FCPS policy and professional auditing standards.

For concerns unrelated to fraud, waste, or abuse, individuals may instead contact the Office of the Ombuds, which functions as an independent and confidential resource for students, families, community members, and employees.[111]  The Ombuds Office assists individuals in resolving concerns, clarifying policies, and facilitating communication within FCPS.[112]  While it does not replace formal grievance or complaint processes, the Office of the Ombuds provides a neutral and informal channel for addressing issues early and constructively, helping promote trust, fairness, and responsiveness across the FCPS community.[113]

### D.  PROFESSIONAL CONDUCT, EMPLOYMENT SAFEGUARDS, AND GRIEVANCES

#### *Grievance Mechanisms*

FCPS has established a series of policies and regulations designed to ensure that employee grievances are handled through a clear, fair, and orderly process.[114]  These procedures are intended to provide employees with a straightforward mechanism for raising workplace concerns, while ensuring timely resolution and maintaining confidence in the division's administrative processes.

Under FCPS's grievance framework—outlined in Regulation 4461 (Grievance Procedure for Contracted/Licensed Personnel) and Regulation 4462 (Grievance Procedure for Operational Employees)—all grievances must be initiated within fifteen (15) days of the event giving rise to the complaint, or within fifteen days of the date on which the employee knew or reasonably should have known of its occurrence.[115]  This time limitation promotes efficiency and ensures that issues are addressed while facts remain recent and documentation accessible.  The process is

---

[108] *Id.*
[109] FCPS_CHS_00000361.
[110] FCPS_CHS_00000365.
[111] FCPS_CHS_00000357.
[112] *Id.*
[113] *Id.*
[114] FCPS_CHS_00000022; FCPS_CHS_00000172; FCPS_CHS_00000193.
[115] FCPS_CHS_00000172; FCPS_CHS_00000193.

structured to encourage early and informal resolution whenever possible, while still preserving the employee's right to formal review and appeal in accordance with applicable policy and law.

The grievance procedures also include specific provisions for cases involving allegations of discrimination or unequal treatment based on a protected class such as race, color, religion, sex, national origin, age, disability, or other legally protected characteristic.[116] In such instances, the grievance must be referred directly to the Office of Equity and Employee Relations, which is responsible for investigating and resolving complaints implicating civil rights protections and ensuring compliance with state, federal, and FCPS nondiscrimination policies.[117]

### *Protection from Retaliation and Nondiscrimination*

In accordance with state and federal law, FCPS has adopted Policy 1106 (Protection Against Retaliation When Engaged in Protected Activity), which expressly prohibits any form of retaliation against employees who report suspected violations of law, regulation, or FCPS policy.[118] The policy reflects a foundational principle of organizational accountability: employees must be able to raise concerns or disclose misconduct in good faith without fear of reprisal, intimidation, or adverse employment action.[119]

Policy 1106 provides a protective mechanism for staff who identify potential legal or policy violations, ensuring that concerns can be reported through appropriate channels—whether internally to supervisors or compliance officials, or externally to governmental authorities—without risk to the reporter's employment status, evaluation, or professional standing.[120] By institutionalizing this protection, FCPS reinforces its broader commitment to transparency, ethical governance, and lawful conduct.[121]

As noted previously, Regulation 4950 (Sexual Harassment by Employees) extends similar anti-retaliation safeguards to employees who report or participate in investigations concerning sex discrimination, sexual harassment, or related misconduct.[122] These provisions mirror federal requirements under Title IX of the Education Amendments of 1972, which prohibit retaliation against individuals for asserting their rights under the statute.

### E. OVERSIGHT OF STUDENT SERVICES AND SOCIAL WORK FUNCTIONS

FCPS Policy 2350 (Social Work Services for Eligible Students) governs the delivery of school social work services and establishes clear expectations for professional conduct, oversight, and accountability.[123] The policy requires that all social work services be provided within defined professional boundaries and under appropriate administrative supervision,

---

[116] *Id.*
[117] FCPS_CHS_00000172; FCPS_CHS_00000193.
[118] FCPS_CHS_00000001.
[119] *Id.*
[120] *Id.*
[121] *Id.*
[122] FCPS_CHS_00001578.
[123] FCPS_CHS_00000017.

ensuring that such interventions are consistent, coordinated, and aligned with both student welfare and institutional standards.[124]

In implementing this policy, FCPS adheres to the National School Social Work Practice Model, a nationally recognized framework developed by the School Social Work Association of America.[125]  This model outlines best practices for ethical conduct, professional competence, and data-informed service delivery, emphasizing collaboration among educators, administrators, families, and community agencies.

By embedding this model into its local policy framework, FCPS reinforces a system of structured accountability that ensures social workers operate as part of a multidisciplinary team rather than as independent actors.  This framework prevents unilateral decision-making by individual social workers and requires that all interventions—whether related to counseling, crisis response, or student support—be conducted in coordination with school administrators and other relevant professionals.

Collectively, these measures safeguard against inconsistent or unsupervised practices, promote ethical and evidence-based service delivery, and ensure that FCPS's social work program functions as an integrated component of the division's broader student support and safety infrastructure.

### F.  GENERAL NOTICE TO PARENTS UNDER THE PPRA

The Fairfax County School Board is committed to protecting student and family privacy and wants all parents to be aware of their rights and the ways that information is treated in relation to:

- Parents' rights to inspect, and to consent or opt out, before their child participates in certain surveys administered to students.

- Parents' rights to inspect instructional materials used as part of the educational curriculum.

- FCPS's maintenance, retention, and disclosure rules regarding student scholastic records including parents and eligible students' rights to inspect such records, to request amendment to such records and to opt out of disclosure of directory information about the student.

- FCPS's disclosure of student information for graduation photographs or other commercial purposes and the right of parents and eligible students to opt out of this disclosure.

- FCPS's disclosure of secondary school students' names, addresses, and telephone numbers to military recruiters and the right of parents and students to opt out of this disclosure.

---

[124] *Id.*
[125] FCPS_CHS_00000380; FCPS_CHS_00001567.

- Parents' right to opt out of any physical examination of their child not required by state law.

- The FCPS school counseling program and parents' right to opt out their child from participation in academic, career, and/or social or emotional counseling.

- Student participation in the Library Equity Access Pass Project, and the rights of parents to refuse participation in the program.

- Parents' rights to opt out of their child's access to VarsityTutors.com.

- Student participation in the Social and Emotional Learning Screener and the rights of parents to opt out of the Screener.

- The process by which parents and students may file complaints if they believe their rights as referenced above have been violated.[126]

These rights are articulated in FCPS Policy 1445 (Trust Policy).[127] In compliance with the PPRA, FCPS also issues an annual notice to parents and guardians outlining their rights under the PPRA. These notices are distributed to all households through the "Annual Notice of Survey, Records, Curriculum, Privacy, and Related Rights and Opt-Out Forms," and the annual Student Rights and Responsibilities handbook. Both the forms and the handbook are made publicly accessible on the FCPS website.[128] In addition, FCPS provides and makes available online a one-page flyer that alerts parents and caregivers of the Annual Notice of Survey, Records, Curriculum, Privacy, and Related Rights and Opt-Out Forms.[129]

The PPRA notice, covered in FCPS Regulation 2601 (Student Rights and Responsibilities Booklet) informs parents of their right to:

- Provide consent before students participate in federally funded surveys that address specified protected topics (e.g., political beliefs, mental health, sexual behavior, religious practices, or income).

- Inspect instructional materials and survey instruments used in the educational program.

- Opt their child out of non-emergency, invasive physical examinations or screenings not required by law.

- Review policies regarding the collection, disclosure, or use of personal information for marketing or sales purposes.[130]

Pursuant to Virginia statutes and the regulations of the Virginia Board of Education, the Fairfax County School Board is responsible for operating FCPS schools through the

---

[126] FCPS_CHS_00000336.
[127] FCPS_CHS_00000008.
[128] FCPS_CHS_00000336; FCPS_CHS_00000384.
[129] FCPS_CHS_00000331.
[130] FCPS_CHS_00000089.

establishment of appropriate policies and guidelines.  The Office of Division Counsel supports this mandate by assisting in the drafting policies, regulations, and legislation, and by ensuring compliance with applicable federal and state laws, including the PPRA.  School Board subcommittees act as liaisons to regional agencies and facilitate community engagement by gathering input on specific issues to inform recommendations, alternatives, or implications for consideration by the full Board.  Additionally, the Office of Community Relations oversees outreach efforts to ensure stakeholder feedback is incorporated.  FCPS may also solicit public comment or stakeholder input on proposed changes prior to formal adoption.