# EXHIBIT E

**SUPPLEMENTAL STATEMENT IN RESPONSE TO THE RECENT CLAIMS OF
CENTREVILLE HIGH SCHOOL TEACHER ZENAIDA PEREZ**

In a prior Statement provided to the Committee on October 16, 2025,[1] Fairfax County
Public Schools ("FCPS" or "Division") reported the interim conclusions of an ongoing
investigation being conducted by the Division's external counsel probing allegations made in
August 2025 by Centreville High School ("CHS") teacher Mrs. Zenaida Perez, who has claimed
that Mrs. Carolina Diaz, a social worker at CHS, encouraged, facilitated, and paid for student
abortions, without parental/guardian consent or involvement.  The same investigation also
probed Mrs. Perez's related claim that former CHS Principal Chad Lehman engaged in a "cover
up" to suppress information related to these same student abortion allegations.

As the October 16 Statement explained,[2] the facts revealed by FCPS's external
investigation as of that time pointed to the following conclusions:

- CHS social worker Carolina Diaz *did not* encourage, facilitate, or pay for any
  student abortion.

- Former CHS Principal Chad Lehman *did not* "cover up" any such allegations or
  related facts; he promptly investigated Mrs. Perez's allegations in 2022 and
  determined that they lacked factual support.

- Mrs. Perez's claim that Principal Lehman "didn't do anything" to investigate her
  allegations is false and inconsistent with her own contemporaneous written
  communications with Principal Lehman.

- Because Principal Lehman's 2022 investigation showed that Mrs. Perez's
  allegations lacked factual support, there was no need for him to escalate the issue
  to FCPS senior Division leadership.

- FCPS Superintendent Michelle Reid and other senior Division leaders did not
  learn of Mrs. Perez's allegations until after they were made public in August
  2025.

- In 2022, Mrs. Perez knowingly withheld relevant materials then in her possession
  despite being asked during Principal Lehman's 2022 investigation if she had
  additional information to share.

- Mrs. Perez appears to have knowingly procured a false statement from the former
  CHS student (Student B) whom she claims obtained a school-funded abortion in
  2021.

---

[1] *See* October 16, 2025, Letter to Chairman Bill Cassidy, Appendix A: Statement of Known Facts in Response to the
Recent Claims of Centreville High School Teacher Zenaida Perez ("October 16 Statement").
[2] *Id.* at pp. 1-2.

- Contemporaneous documents show that Student B was properly referred by Mrs. Diaz to the public health nurse and that Student B's legal or de facto guardian was "aware" of her pregnancy and abortion.

- Mrs. Perez appears to have manipulated the content of a statement she procured from another student (Student C) whom she claims was pressured by Mrs. Diaz to obtain a late-term abortion.

- Student C reported that she was never pressured by Mrs. Diaz or others to obtain an abortion, and that the public health nurse clearly communicated that parental consent would be required in the event Student C wanted to proceed with an abortion.

- Public statements by Mrs. Perez's lead attorney, Steven Aden, claiming that Mrs. Diaz provided Student B with a "white envelope" full of money to pay for her abortion are not supported by any known facts, or Mrs. Perez's own contentions.

Since FCPS's October 16 Statement was submitted, Mrs. Perez has continued to speak publicly about her allegations. Through her counsel, she has also released audio recordings purportedly procured from certain key witnesses, which FCPS's counsel has carefully studied. On October 27, 2025, Mr. Aden also submitted a response to FCPS's October 16 Statement[3] that largely repeated Mrs. Perez's prior allegations. As discussed below, the additional information Mrs. Perez and her lawyers have shared lends no additional credence to her claims and at most appears to raise new doubts and inconsistencies.

FCPS is providing this Supplemental Statement in part to respond to these more recent comments and submissions by Mrs. Perez and her counsel, as well as to update the Committee on the conclusions reached by FCPS's external investigation, which—barring any new information—is now complete.

The extensive review FCPS has conducted has uncovered no credible evidence supporting Mrs. Perez's allegations of school-facilitated, school-funded student abortions. While FCPS remains open to receiving and reviewing any new, pertinent information that may become available, it does not appear at this time that there is cause for further investigation.

Based on our extensive fact-finding efforts, it appears that much of what has been reported by Mrs. Perez, her lawyers, social media commentators, and others stems from witness statements obtained by Mrs. Perez herself that were misinterpreted, mistranslated, taken out of context, or in some cases knowingly fabricated.

The record that has emerged shows, among other things, that (1) Mrs. Perez first raised her serious allegations of school-facilitated, school-funded student abortions in November 2022, after having commenced efforts to probe these issues on her own and to develop related "evidence"; (2) she then consciously chose to withhold evidence within her possession from Principal Lehman, the senior school administrator who promptly investigated her allegations,

---

[3] *See* October 27, 2025, Americans United for Life: Response to Preliminary Investigative Report by Fairfax County Public Schools Counsel King & Spalding ("October 27 Response").

responding to Mr. Lehman in early December 2022 that she had no further information to report when, in fact, she possessed at that time a signed written statement from Student B and apparently also various audio recordings of conversations with Student B and her uncle; (3) she thereafter continued to pursue her own private investigation into such issues, contacting and gathering statements from both students and adults within the school community, without authority to do so and entirely outside the knowledge of school administrators; and (4) while she has claimed to possess evidence of serious criminal wrongdoing occurring within the school and impacting students from vulnerable backgrounds, Mrs. Perez nonetheless waited nearly three years before surfacing the "evidence" she had privately collected, choosing to do so through a sensational social media story she collaborated in producing, which contained numerous unfounded allegations.

It has also recently come to FCPS's attention—through evidence Mrs. Perez herself has produced—that she not only withheld information from the school's investigation of her claims and proceeded to conceal it for years but also instructed a key witness "*not to speak with the school*" about these issues.[4]

As FCPS previously noted, if Mrs. Perez or others with whom she shared her private concerns between November 2022 and August 2025 had genuinely believed that young girls were at risk of what she and her lawyers have termed "abortion trafficking," presumably steps would have been taken sooner to call public or law enforcement attention to these concerns, or at a minimum to bring such concerns to the attention of senior school division leaders, who instead learned of this issue for the first time through the story posted by Mrs. Perez's social media collaborator, Walter Curt.

While Mrs. Perez may not fully appreciate the consequences of her actions, those consequences are real and severe. With prodding and help from others, she by all appearances has falsely and publicly accused innocent individuals of serious criminal wrongdoing, harming their reputations, interrupting their lives and careers, and causing them untold levels of stress and anxiety. She has also imposed enormous legal burdens and costs on FCPS and the individuals she falsely accused. And she appears to have done all of this with the intent of targeting individuals she has described as her perceived "*offenders*"[5] and "*enem[ies]*."[6]

Mr. Aden's employer, Americans United for Life, and others who have promoted Mrs. Perez's questionable allegations have contributed to the reputational and other harms she has caused—to CHS social worker Carolina Diaz and former CHS Principal Chad Lehman, in particular. Americans United for Life has also gone to great lengths to promote this story for its own benefit. Late last year, the organization posted to its social media a video titled "BLEEDING NONSTOP" with dramatized scenes of a pregnant girl in school, sealed white envelopes being handed over, ambulances, and emergency rooms.[7]

---

[4] FCPS_CHS_00001952 (English translation); FCPS_CHS_00001963 (Spanish transcript) (emphasis added).
[5] FCPS_CHS_00001984 (emphasis added).
[6] FCPS_CHS_00001932 (emphasis added).
[7] Video posted by Americans United for Life (@americansunitedforlife), Instagram, *BLEEDING NONSTOP* (Nov. 13, 2025), https://www.instagram.com/americansunitedforlife/reel/DRA2JNdAskp/ (on file with FCPS).









As these images are being flashed on the screen, the video features Mrs. Perez, shown intermittently on video, narrating her account of what happened to Student B, stating:

"One day, she came home bleeding nonstop.  He took her to the emergency room and that's when they examined her, and they said she's not pregnant anymore.  I became aware when I was teaching my English 9, Level 1 class.  The victim, the student who had the abortion, approached me very quietly.  What happened?  She told me that she got pregnant a few months before and her boyfriend and herself didn't want to have the baby, so she went to the social worker at Centreville High School and asked her for support. She called the clinic, she made the appointment, and she was given an envelope that she kept sealed until she went to the clinic and gave it over there.  The legal guardian never got a phone call or a paper or any kind of documentation to let him know that she was going to have an abortion.  One day, she came home bleeding nonstop.  He took her to the emergency room and that's when they examined her, and they said she's not pregnant anymore.  I asked her, 'How much did you pay?  How much was it?'  She said, 'It was free.'  She was not normal after the abortion took place.  What motivated me was just to bring the truth, honesty, and fight for what is right and get the parents aware of what's going on."[8]

Mrs. Perez told this story as if it was all based on facts about which she had first-hand knowledge.  Yet the recorded conversations that Mrs. Perez and her counsel only recently shared with FCPS suggest that core elements of this narrative are demonstrably untrue.  We have identified no evidence suggesting that CHS social worker Carolina Diaz encouraged, facilitated, or paid for any student abortion.  Based on the facts uncovered by our investigation, it appears that there is no evidence to substantiate the claim of Student B being given a "*white envelope*" full of cash, as Mr. Aden has publicly asserted.[9]  While it appears that Student B likely did undergo an abortion procedure in late 2021, we have seen no conclusive evidence to confirm any details, including the exact location of any abortion.  However, even the facts relied upon by Mrs. Perez appear to strongly contradict her claims that CHS school personnel were involved in facilitating and paying for such a procedure.  We have seen no credible evidence to support such allegations.

Contrary to Mrs. Perez's and Mr. Aden's repeated claims, there is ample evidence that Student B's uncle, with whom she periodically lived and who sought at times to function as a de facto guardian, was *not* in fact her legal guardian.  The uncle himself has repeatedly confirmed that he was never Student B's legal guardian and that Student B was designated as having "*unaccompanied minor*" status—meaning that she had no legal guardian.  The uncle apparently was not aware of the abortion until after the fact, but this was not because CHS personnel concealed it from him; we are aware of no evidence suggesting they were involved in arranging much less paying for any abortion.

That same uncle has now publicly confirmed his understanding that the abortion, which he learned of after the fact, did not even occur in Virginia, as Mr. Aden and Mrs. Perez have

---

[8] *Id.*

[9] Off the Press, *WATCH: Attorney Confronts VA School Board Over School-Facilitated Abortion Allegations*, at 0:39 (YouTube, Aug. 29, 2025), https://www.youtube.com/watch?v=f5z2liFMbpU (on file with FCPS) (emphasis added).

consistently claimed. According to the uncle, the procedure occurred *in Maryland*, where there is no legal requirement to obtain parental or guardian consent, and even the requirement to give parental/guardian *notice* is waived for minors like Student B who "do[] not live with a parent or guardian."[10]  Thus, in these circumstances, there was no reason to expect that Student B's uncle necessarily would have been contacted prior to the abortion being performed, even if he was Student B's legal guardian (which evidence makes clear he was not).

This Supplemental Statement will shed significant new light on what happened here, and why. And the explanation appears to start with a motive.

Mrs. Perez, by her own admission, desired to bring adverse attention to Mrs. Diaz, whom she regarded as her in-school enemy. The evidence shows that Mrs. Perez in mid-2022 began gathering information in an effort to prove her suspicions that Mrs. Diaz may have been involved in making arrangements for, and even using school funds to pay for, Student B's abortion. Pursuant to these efforts, Mrs. Perez recorded telephone conversations she had with Student B and Student B's uncle. All of these recordings appear to date back to around November 2022.[11]

The recorded conversation between Student B and Mrs. Perez does not include any mention of an envelope. Rather, Student B mentions being given "papers" by the school social worker, who reportedly told Student B to share those papers with her uncle without opening them, so that the uncle could in turn send those papers to "the doctors."[12]  As explained below, the language, context, and surrounding facts make clear that the "papers" Student B was instructed not to open had nothing to do with an abortion procedure. Instead, the papers in question likely concerned a referral made by the social worker, Mrs. Diaz, to mental health professionals to help ensure that Student B was able to access needed behavioral health counseling. This was one of many examples of CHS and FCPS personnel showing great attentiveness to the needs of this student, whose life circumstances were extremely challenging. Mrs. Perez appears to have conflated different events and circumstances and interpreted Student B's comments as evidence that Carolina Diaz paid for Student B's abortion. Mrs. Perez also appears to have inferred from Student B's uncle's statement that he received no prior notice of an abortion procedure that this must mean Mrs. Diaz was guilty of circumventing Virginia law by herself providing signed authorization for the procedure. These conclusions ultimately depend upon Mrs. Perez's speculations, including her assumptions (1) that Student B's uncle was her duly appointed legal guardian (which appears to be untrue); and (2) that the abortion procedure occurred in Virginia where parental/guardian consent is required by law (which also now appears to be incorrect).

Mrs. Perez's apparent desire to prove Mrs. Diaz guilty of a crime, combined with her faulty inferences and assumptions, seem to have led her to become increasingly wedded to the unfounded accusations that Mrs. Diaz engaged in the criminal acts being alleged. As disturbing

---

[10] Md. Code Ann., Health-Gen. § 20-103(c)(1).

[11] These recorded conversations occurred in Spanish. If the Committee does not yet have these audio recordings, FCPS can provide them or they may be obtained through Mrs. Perez's counsel, Mr. Aden, who provided the same recordings to FCPS. However, FCPS has enlisted professional translation assistance to prepare transcripts of the same recordings in both Spanish and English, and both versions of these transcripts are being provided together with this submission and are referenced in detail below.

[12] FCPS_CHS_00001975 (English translation); FCPS_CHS_00001977 (Spanish transcript).

as this is—given both the seriousness of the allegations and the lack of credible evidence supporting them—it is perhaps even more disturbing that Mr. Aden and his employer, Americans United for Life, have embraced this false story and promoted it, going so far as to produce and publicize a video visually depicting scene-by-scene renderings of wholly fictitious events to rally support for the organization and fuel its fundraising efforts.

But Americans United for Life appears to have gone even further still, by actively sponsoring and disseminating accusations against Mrs. Diaz that the organization should know by now to be false and defamatory. As referenced in FCPS's October 16 Statement, Americans United for Life organized and promoted an hour-long webcast held on October 20, where Mrs. Perez was a featured speaker.[13] During that webcast, Mrs. Perez made a critical and unequivocal admission. Despite her prior representations that the written statement she attributed to Student B was written *by the student herself*, Mrs. Perez stated, referring to the same student: "***She didn't write it***."[14] Mrs. Perez went on to admit that she herself had written the statement.

Most troubling of all: sometime after October 20, Americans United for Life appears to have deliberately chosen to excise from the publicly posted video of that same webcast the 48-second segment in which Mrs. Perez made this critical admission. This is not merely discomforting, but suggests a disturbing level of intent and complicity on the part of Americans United for Life in spreading knowingly false and defamatory accusations against an innocent individual, Mrs. Diaz.

As discussed further below, Mrs. Diaz, an FCPS employee who should be commended for the kindness and attention she showed to a vulnerable student facing difficult life circumstances, has instead been publicly shamed and accused of criminal acts—by Mrs. Perez, facilitated by Americans United for Life and its General Counsel, Mr. Aden, all without any sound factual justification. There is an important role to be played by good-faith whistleblowers within the public school system when serious wrongs have occurred and those wrongs are not being properly addressed through standard channels within the school administration. But this is a far cry from that situation. The school administration promptly investigated Mrs. Perez's claims. Mrs. Perez consciously withheld evidence from that investigation. She secretly conducted her own unauthorized private investigation, violating many school rules and possibly also applicable laws in the process. And with aid and assistance from others apparently seeking to capitalize on her story, she has now injured innocent people and imposed enormous burdens and expense on her employer, FCPS, without good cause and seemingly with very little regard to the consequences of her actions.

It is deeply regrettable that an FCPS employee engaged in such behavior, and the Division has an obligation in these circumstances to call attention to the truth of what occurred. We do hope that this highly unfortunate series of events can now be brought to a conclusion for the benefit of all concerned.

---

[13] October 16 Statement, p. 4 (citing FCPS_CHS_00001734).

[14] FCPS_CHS_00001985 at 11:42-11:43; FCPS_CHS_00001908 (emphasis added).

*The October 27 Response leaves most of FCPS's investigative conclusions uncontested.*

In the October 27 Response, Mr. Aden promised to provide comprehensive responses to "the specific allegations contained in FCPS's [October 16] preliminary investigative report."[15] Yet his Response did not take issue with the majority of the facts and conclusions presented in FCPS's October 16 Statement.

FCPS began its factual overview by explaining that Mrs. Perez first raised her school-facilitated, school-funded abortion claims in the context of a broader dispute with Mrs. Diaz, "*the woman*" she believed "*set [her] up*" in connection with an in-school controversy revolving around reports that Mrs. Perez improperly purchased pregnancy tests for a student (Student A) in May 2022.[16] Mr. Aden's Response does not dispute this.

FCPS's October 16 Statement further explained that Mrs. Perez has a documented history of lodging complaints against school staff and administrators, and a history of procuring statements, sometimes under pressure, from students. FCPS then discussed documentary evidence suggesting that Mrs. Perez pressured Student A to issue an untruthful statement denying that Mrs. Perez had purchased pregnancy tests for her.[17] Mrs. Diaz was a witness in the related school investigation and contemporaneously reported what Student A told her, while "crying" and "visibly distraught."[18] FCPS further explained that Mrs. Perez nevertheless succeeded in procuring written statements from Student A purporting to deny that it was Mrs. Perez who provided her with the pregnancy tests.[19] And FCPS explained that Mrs. Perez later denied she had approached Student A to obtain these statements, claiming it was Student A's guardian who approached her; however, Student A's guardian later contradicted this claim.[20] These incidents resulted in Mrs. Perez being admonished by school administrators for unprofessional conduct.[21] Mr. Aden's Response did not dispute these facts.

FCPS then explained that Mrs. Perez has a documented history of failing to respect proper boundaries with students and their families, and that this has been a recurrent concern for school administrators.[22] FCPS recounted a recent episode in which it was discovered that Mrs. Perez purchased car insurance for a student, and agreed to title the student's car in her own name—an incident, no matter how well-intentioned, that was in clear violation of FCPS policies and regulations and for which Mrs. Perez was disciplined by the school.[23] Mr. Aden's Response denied none of this.

FCPS then turned to Mrs. Perez's initial reports within the school concerning her claim that social worker Carolina Diaz had facilitated and funded student abortions without parental knowledge or consent—specifically related to an alleged abortion obtained by Student B. As FCPS explained, Mrs. Perez first raised these issues during an in-person meeting with Principal

---

[15] October 27 Response, p. 7.
[16] October 16 Statement, p. 7 (citing FCPS_CHS_00001830 (rough, autogenerated transcript; emphasis added)).
[17] *Id*. at p. 8 (citing FCPS_CHS_00001657).
[18] FCPS_CHS_00001657.
[19] October 16 Statement, p. 8.
[20] *Id*. at pp. 9-10 (citing FCPS_CHS_00001666).
[21] *Id*. at p. 10.
[22] *Id*.
[23] *Id*. (citing FCPS_CHS_00001698).

Lehman in late November 2022.[24]  Contrary to Mrs. Perez's accusations that Principal Lehman "*didn't do anything*"[25] to follow up on these allegations, FCPS explained that he promptly investigated, after which he reported back to Mrs. Perez that the nurse confirmed the student's guardian was "aware" of the pregnancy and the abortion-related issues.[26]  Mr. Aden's Response did not dispute this sequence of events.

Mr. Aden's October 27 Response instead accuses Principal Lehman of having been a "*One Minute Manager*," claiming the timeline shows that Mr. Lehman's initial 1:05 p.m. email response to Mrs. Perez on November 22 was sent only minutes after the purported 12:30 p.m. meeting with her the same day—an "extremely brief period," according to Mr. Aden, which he suggested is indicative of an inadequate investigation.[27]  Yet as explained in the October 16 Statement, documents confirm that Mrs. Perez's meeting with Principal Lehman happened on November 21, *not* November 22.[28]  Additional contemporaneous documents make clear that the meeting took place at 1:30 p.m., not 12:30 p.m., as Mr. Aden suggests.[29]

While it is true that Mr. Lehman expedited his investigation—understandably, given the seriousness of the concerns being raised—nearly 24 hours elapsed between his 1:30 p.m. meeting with Mrs. Perez on November 21 and the 1:05 p.m. November 22 email he sent to Mrs. Perez reporting on his initial findings.[30]

FCPS's October 16 Statement then drew attention to the fact that Mr. Lehman specifically asked Mrs. Perez in writing on November 22 and again on December 2 if she had any additional information to share.  Mrs. Perez responded on December 2 that she *did not*—notwithstanding that she had within her possession at that time the signed statement purportedly procured from Student B earlier in November.[31]  Mr. Aden's Response denied none of this.  As discussed further below, it appears that Mrs. Perez at this time also possessed several relevant audio recordings, yet she failed to bring any of this to Principal Lehman's attention, instead saying that she "*d[id]n't have anything further to share*."[32]

As relates to Student B's purported signed statement, one point made in FCPS's October 16 Statement was that Mrs. Perez *knew* there was nothing more than speculation to support the claim that Carolina Diaz had paid for Student B's alleged abortion.  Mrs. Perez herself has confirmed that Student B had simply "***guess[ed]***" that "the social worker" must have "paid."[33]  Mrs. Perez similarly told attorney Mary McGowan, "I asked [Student B] did the social worker

---

[24] *Id.* at p. 14 (citing FCPS_CHS_00001649).

[25] FCPS_CHS_00001593 (emphasis added).

[26] October 16 Statement, p. 14 (citing FCPS_CHS_00001649).

[27] October 27 Response, p. 3 (emphasis added).

[28] October 16 Statement, p. 16.

[29] FCPS_CHS_00001674.  Mrs. Perez emailed Principal Lehman's assistant on Sunday, November 20, asking for a meeting at his "earliest convenience," and the assistant responded on Monday, November 21, in turn asking Mrs. Perez if 1:30 p.m. that day was convenient.  Mrs. Perez responded, "[t]hat sounds fine," and the assistant then sent Mrs. Perez a calendar invitation to meet with Mr. Lehman that same day, November 21, at 1:30 p.m., which Mrs. Perez accepted.  *Id.  See also* FCPS_CHS_00001935.

[30] October 16 Statement, p. 15 (citing FCPS_CHS_00001649).

[31] *Id.* at pp. 16-18 (citing FCPS_CHS_00001649) (emphasis added).

[32] *Id.* at p. 18 (citing FCPS_CHS_00001649) (emphasis added).

[33] *Id.* at p. 22 (emphasis added).

pay and she said **I don't know who paid** *but I know I didn't pay it was free*."[34]  Mrs. Perez also wrote in her private notes, dated December 9, 2022—just weeks after purportedly obtaining Student B's written statement and after recording related conversations with Student B and her uncle—that "*evidently*, the social worker **might** *have paid* for the abortion."[35]  Mr. Aden's Response does not dispute these details.  Yet the implication of these uncontested facts is that the written statement Mrs. Perez obtained from Student B, which purported to claim that social worker Diaz "paid the costs of that medical procedure," was knowingly false.  Whether Student B herself actually wrote the November 19, 2022, statement that has been attributed to her is discussed below.

> ### *Aden and Perez now appear to have pulled back on their prior confident assertions that Mrs. Diaz paid for Student B's claimed abortion.*

On August 28, 2025, Mr. Aden appeared before the Fairfax County School Board in a public session and claimed that Student B "*was handed a white envelope*" by Mrs. Diaz, implying that the envelope was full of "money" "to give to the abortion center," which he asserted was "just down the road here in Falls Church."[36]  As noted in FCPS's October 16 Statement, there is no credible evidence to support these claims.  Notably, Mr. Aden's and Mrs. Perez's public narratives have demonstrably shifted since FCPS's October 16 Statement.

In the October 27 Response, Mr. Aden shifted to the far more circumspect, uncertain allegation that Carolina Diaz may have "***perhaps*** pa[id]" for a student abortion.[37]  Mrs. Perez has also pulled back from prior assertions insisting that Carolina Diaz in fact paid for Student B's alleged abortion.  During an October 29, 2025 press conference where she again reiterated her allegations, Mrs. Perez made no mention at all of school personnel allegedly paying for any student abortion.[38]  Over time, her claims have vacillated, but it appears she is now retreating to the position framed by her own private notes in December 2022, that "the social worker *might have paid* for the abortion."[39]

This shift from prior categorical accusations to more contingent and speculative insinuations was also evident during the October 20 Americans United for Life webcast.  The remarks by Mrs. Perez and others during that webcast were calculated to be provocative.  The speakers made references to:

- "*grave concerns*" about the "*scandals* at Centreville High School,"[40]

---

[34] FCPS_CHS_00001830 (rough, autogenerated transcript; emphasis added).
[35] FCPS_CHS_00001684 (emphasis added).
[36] Off the Press, *WATCH: Attorney Confronts VA School Board Over School-Facilitated Abortion Allegations*, at 0:39-0:44 (YouTube, Aug. 29, 2025), https://www.youtube.com/watch?v=f5z2liFMbpU (on file with FCPS) (emphasis added).
[37] October 27 Response, p. 3 (emphasis added).
[38] *See* Americans United for Life, *PRESS CONFERENCE: AUL Files Lawsuit on Behalf of Public School Teacher* (YouTube, Oct. 29, 2025), https://www.youtube.com/watch?v=_RiW2Qo4VHg (on file with FCPS).
[39] FCPS_CHS_00001684 (emphasis added).
[40] Americans United for Life, *Abortion Coercion & the Fight for Parental Rights in Public Schools*, at 1:26, 13:40 (YouTube, October 21, 2025), https://www.youtube.com/watch?v=mDc9X5gyWTU (on file with FCPS); FCPS_CHS_00001985 at 1:40, 14:41; FCPS_CHS_00001908 (emphasis added).

- and the "vulnerable students" who are at risk of "*coercion* in the public schools,"[41]

- through "*abortion traffickers* targeting underserved minors" with "arranged abortions for students without parental knowledge,"[42]

- all of this constituting "*evil*" and "*immoral*" conduct of "exactly" the type that "has come up in Fairfax,"[43]

- where it was claimed school staff "assume that they know better than the parents" and are thus "taking matters into their own hands" by "*transporting girls to abortion clinics without parental consent.*"[44]

The webcast was permeated by such over-the-top claims and accusations, and Americans United for Life has continued to make the "*coerced abortion*" theme a rallying cry for financial donations, as shown below.  But what was most notable about the webcast were four words periodically injected throughout the conversation: ". . . *if this is true.*"[45]

Mrs. Perez and others spent months publicizing these allegations in the lead-up to the closely contested Virginia elections, and in the aftermath of the election they have continued to press the same claims.  But nothing uncovered by FCPS's investigation validates that any of this actually "*is true*."

Given the gravity of what Mrs. Perez has alleged, FCPS naturally has taken these allegations very seriously.  FCPS, through external counsel, has thoroughly investigated these claims in an *effort* to determine whether there is *any* merit to Mrs. Perez's contentions.  However, that extensive external investigation has identified no credible evidence of any CHS employee ever secretly facilitating or paying for any student abortion.

***Aden represented to this Committee that Student B in fact wrote her own Spanish-language statement, yet Mrs. Perez now admits that she wrote the statement herself.***

In asserting that Mrs. Diaz paid for alleged student abortions without parental or guardian consent, Mrs. Perez has relied heavily upon the written statement she claims to have obtained from Student B in November 2022.  As discussed in FCPS's October 16 Statement, that signed

---

[41] Americans United for Life, *Abortion Coercion & the Fight for Parental Rights in Public Schools* at 14:36, 3:47 (YouTube, October 21, 2025), https://www.youtube.com/watch?v=mDc9X5gyWTU (on file with FCPS); FCPS_CHS_00001985 at 15:37, 4:01; FCPS_CHS_00001908 (emphasis added).

[42] Americans United for Life, *Abortion Coercion & the Fight for Parental Rights in Public Schools* at 34:49, 25:36 (YouTube, October 21, 2025), https://www.youtube.com/watch?v=mDc9X5gyWTU (on file with FCPS); FCPS_CHS_00001985 at 35:51, 25:36; FCPS_CHS_00001908 (emphasis added).

[43] Americans United for Life, *Abortion Coercion & the Fight for Parental Rights in Public Schools* at 25:29, 24:40, 32:35 (YouTube, October 21, 2025), https://www.youtube.com/watch?v=mDc9X5gyWTU (on file with FCPS); FCPS_CHS_00001985 at 26:30, 25:41, 33:36; FCPS_CHS_00001908 (emphasis added).

[44] Americans United for Life, *Abortion Coercion & the Fight for Parental Rights in Public Schools*, at 32:11, 32:22, 35:33 (YouTube, Oct. 21, 2025), https://www.youtube.com/watch?v=mDc9X5gyWTU (on file with FCPS); FCPS_CHS_00001985 at 33:15, 33:23, 36:34; FCPS_CHS_00001908 (emphasis added).

[45] *See* Americans United for Life, *Abortion Coercion & the Fight for Parental Rights in Public Schools* (YouTube, October 21, 2025), https://www.youtube.com/watch?v=mDc9X5gyWTU (on file with FCPS); FCPS_CHS_00001985; FCPS_CHS_00001908 (emphasis added).

statement purports to attest that CHS social worker Carolina Diaz "*paid the costs*" of the student's abortion.[46]  Mrs. Perez has repeatedly claimed that the signed Spanish-language written statement she attributes to Student B was written by the student herself.  Mrs. Perez told attorney Mary McGowan that Student B "*wrote that Carolina Diaz facilitated the abortion and the logistics*," and she later reiterated in the same recorded interview that Student B "*wrote* that [statement]."[47]  But the Spanish-language statement Mrs. Perez attributes to Student B is clearly written in Mrs. Perez's own distinctive handwriting, as detailed in FCPS's October 16 submission.

In the October 27 Response, Mr. Aden denied this and sought to persuade the Committee that without professional "handwriting analysis" there is "*no basis*" to support the "bold and damaging" assertion that Mrs. Perez was the one who penned the statement she attributes to Student B.[48]

> Senator Bill Cassidy, M.D.
> October 27, 2025
> Page 8
>
> apparent similarity in handwriting between Mrs. Perez and the former student. Amateur handwriting analysis is no basis for so bold and damaging an assertion. Your committee has already reviewed the statement by the uncle of Doe #1, and there are other audio statements that substantiate what she has said, including audio of Doe #1 and Doe #2 themselves.

But, as noted, Mrs. Perez herself has since admitted that FCPS's assessment was correct.  During the October 20 Americans United for Life webcast, Mrs. Perez, referring to Student B's statement, said this:

> "***She didn't write it***.  She was absolutely not well with the writing.  She cannot write in English or in Spanish.  And she told me I only have 15 minutes for my break when I went to her job.  She was working at a Thai restaurant in Chantilly near my place.  And then I said, OK, you will tell me what you want on the statement, the letter, and ***I will write it***."[49]

And yet a week after this statement Mr. Aden still maintained in a submission to this Committee that there was "*no basis*" to conclude that Mrs. Perez was the author of Student B's statement—a fact that, if true, he recognized would be very "*damaging*" to the credibility of his client's claims.[50]

Mrs. Perez's unqualified admission that ***she wrote*** the statement attributed to Student B is indeed "damaging," for at least two reasons.  First, this admission directly contradicts Mrs.

---

[46] October 16 Statement, p. 22 (citing FCPS_CHS_00001822 (emphasis added)).
[47] FCPS_CHS_00001830 (rough, autogenerated transcript; emphasis added).
[48] October 27 Response, p. 8 (emphasis added).
[49] FCPS_CHS_00001985 at 11:42-12:07; FCPS_CHS_00001908 (emphasis added).
[50] October 27 Response, p. 8 (emphasis added).

Perez's prior repeated claims that Student B "*wrote* that [statement]."[51]  Second, as discussed above, the written statement Mrs. Perez attributes to Student B purports to claim that "*Carolina Diaz . . . paid the costs*" of the abortion.[52]  Mrs. Perez has now admitted that she was the author of those words, but as discussed above, when Mrs. Perez wrote this she knew it was not true.  That is, she *knew* that Student B had no such personal knowledge of Mrs. Diaz paying for her abortion and at most simply "*guess[ed]*" that "the social worker" might have "paid" for the abortion.[53]  Again, the implication is that Mrs. Perez knowingly fabricated evidence.

As Mr. Aden previously stated to this Committee, it would be *damaging* to Mrs. Perez's claims and credibility if it were true that she herself wrote the statement by Student B that she relies upon as key evidence to support her accusations against Mrs. Diaz.  Americans United for Life appears to agree.  After initially streaming online a video of the full October 20 webcast, Americans United for Life replaced that video with a new version in which the organization excised from the video only one 48-second segment: the precise portion where Mrs. Perez admitted (contrary to her prior statements) that *she wrote* Student B's statement, not the student herself.  This action shows the lengths to which Americans United for Life has gone to capitalize upon Mrs. Perez's false and fabricated "coerced abortions" narrative.

If Mrs. Perez and Mr. Aden believed that Student B's November 19, 2022, signed statement stood as reliable evidence of what it purports to say—*i.e.*, that Mrs. Diaz "*paid the costs*" of Student B's alleged abortion—they might have had reason to continue making categorical assertions that the facts demonstrate proof of school-funded abortions.  Instead, both seem to have retreated to the position that Mrs. Diaz "*perhaps* pa[id]"[54] for the alleged abortion.  It is particularly troubling that Mrs. Perez and her attorney remained resolute in claiming that Mrs. Diaz was in fact guilty of such wrongdoing until FCPS's October 16 Statement exposed that the signed written statement attributed to Student B was both false and written by Mrs. Perez herself.

### *Contrary to Perez's and Aden's claims, it appears that Student B's uncle was not in fact her legal guardian.*

Mrs. Perez and Mr. Aden have repeatedly claimed that Student B's uncle was also her "legal guardian."  For example, Mr. Aden's October 27 Response to this Committee stated:[55]

---

[51] FCPS_CHS_00001830 (rough, autogenerated transcript; emphasis added).
[52] FCPS_CHS_00001822 (emphasis added).
[53] October 16 Statement, p. 22.
[54] October 27 Response, p. 3 (emphasis added).
[55] October 27 Response, p. 3.

> On November 22, 2022 at 12:30 pm, Mrs. Perez met with Mr. Lehman and again confronted him with the fact that CHS social worker Carolina Diaz had facilitated an abortion for a minor student and did not tell her uncle, who was her legal guardian. She told Mr. Lehman that Doe #1 actually got the abortion, and that her legal guardian (her uncle) only found out about the abortion when he had to take her to the hospital because the procedure caused extensive blood loss. She also stated that her uncle had no idea that she got the abortion until that night when he rushed her to the hospital because she was excessively bleeding and had serious complications from the abortion. He was very upset that the school social worker facilitated this abortion without consulting him.

As FCPS's October 16 Statement set forth in detail, Student B's uncle repeatedly informed school personnel that he was *not* in fact the student's legal guardian.[56] In a document that records multiple "Interventions" by school personnel to assist Student B and her uncle between October 1 and November 12, 2020, various conversations with Student B's uncle are captured, including an entry from November 9 explaining that he "*clarified that he **isn't her legal guardian***"; rather, her "*cousin is* but no one knows where he is now":[57]



Similarly, in an email to Mrs. Diaz from the school counselor, dated September 21, 2021, the counselor reported on another conversation with the uncle, saying, "In regards [to] the guardian situation, her uncle told me that *he does not have any paperwork that proves that he is the legal guardian* and that is why he believes she is taking advantage of him."[58]

---

[56] October 16 Statement, pp. 24-26 (citing FCPS_CHS_00001719, FCPS_CHS_00001716, FCPS_CHS_00001725).
[57] FCPS_CHS_00001719 (emphasis added).
[58] FCPS_CHS_00001716 (emphasis added).

Carolina,

████████████████████████████████████████████
███████████████████████

In regards the guardian situation, her uncle told me that he does not have any paperwork that proves that he is the legal guardian and that is why he believes she is taking advantage of him.

Please let me know how can I support you. ████████████████████
██

**Saira Villeda,** *M.Ed*
ESOL Counselor
**Centreville High School**

In the same email exchange between Mrs. Diaz and the school counselor, the counselor reported on another conversation with the uncle, saying, "He is really concerned about her. **_He does not have legal custody of her_** and [Student B] is taking this to her advantage and telling him that he has no power on her and he cannot tell her what to do because **_he is not her family nor her legal guardian_**."[59]

Today I talked to the uncle of ████████████████. He is really concerned about her. He does not have a legal custody of her and ████████ is taking this to her advantage and telling him that he has no power on her and he cannot tell her what to do because he is not her family nor her legal guardian.

Another school document from August 2021 shows that Student B had again been approved for "homeless unaccompanied youth status for . . . the 2021-2022 school year."[60]

Hi ██████████,
The FCPS Homeless Liaison's Office has approved homeless unaccompanied youth status for ████████████
██████ at Centreville HS for the 2021-2022 school year.

Please remember that the family/student may be unable to produce proof of residency, birth certificates, immunization and/or physical exam documentation for the student at the time of registration. As a homeless student, we cannot let that prevent them from immediately enrolling/attending school. However, these documents will need to be presented to the school in time. As a reminder, homeless students must be immediately enrolled within a day or two after presenting for enrollment and should be fully participating in all school activities. Homeless students also have the right to remain at their school of origin for the duration of this school year.

The Homeless Office will flag the student as homeless, doubled up and UY in SIS and add them to the free lunch program. Please let me know if you have any questions. Thank you!!

As reflected on FCPS's website, "homeless unaccompanied youth" is a term defined by the McKinney-Vento Homeless Assistance Act,[61] and refers to "school-aged individuals *who are*

---

[59] *Id.* (emphasis added).
[60] FCPS_CHS_00001721.
[61] 42 U.S. Code § 11431, *et seq.*

*not under the physical custody of a parent or legal guardian*."[62]  The website also explains, "The purpose of McKinney-Vento homeless status is to ensure that students in temporary living situations have the resources necessary to obtain a successful education."[63]

These records show that Mrs. Diaz, the school counselor, and others within CHS and FCPS's Homeless Liaison Office had great concern for Student B, were highly attentive to her difficult personal situation, and were actively working with her uncle to provide various forms of aid and assistance.  For instance, the uncle reported that he was having difficulty getting medical care for Student B *because **he does not have her custody**.*"[64]

---

Carolina,

Could you please touch base with ▇▇▇▇▇ uncle?

She had to leave school yesterday because she had some of the COVID symptoms. She is vaccinated. She cannot come back to school unless she brings a negative COVID test. The issue is that they have been telling him that because he does not have her custody, then they cannot take ▇▇▇▇▇

I gave him the paper that you give me of the Fairfax Government Clinics, so I don't understand why is this happening.

I would appreciate if you could connect with them.

Thanks,

**Saira Villeda,** M.Ed
ESOL Counselor
**Centreville High School**

---

In response, Mrs. Diaz and the counselor were seeking to help Student B's uncle with paperwork to provide to the clinic in lieu of proof of guardianship, so that Student B could access medical care despite her lack of a legal guardian.

All of these same documents were cited in FCPS's October 16 Statement and provided to Committee staff.  But additional documents further substantiate that Student B's uncle was not in fact her legal guardian.  The following, for example, is the Emergency Care Information form completed for Student B when she re-enrolled at CHS in November 2022 for the eleventh grade.[65]

---

[62] FCPS_CHS_00001936.
[63] *Id.*
[64] FCPS_CHS_00001725 (emphasis added).
[65] FCPS_CHS_00001974.

The form lists no "Parent/Guardian" contact information.  Rather, Student B in that section of the form lists herself, referring to the uncle only as an emergency contact.

Despite the numerous records showing that Student B's uncle lacked legal guardianship status over her, in Mr. Aden's October 27 Response to this Committee he repeated the same claim that "*her uncle . . . was her legal guardian*," "*her legal guardian*" was "*her uncle*," and that the same individual was both "*her uncle and legal guardian*."[66]

Notably, that same uncle, identified in Mr. Aden's October 27 Response as "Mr. S," was interviewed by Julie Carey, the Northern Virginia Bureau Chief for NBC News4, and in the first

---

[66] October 27 Response, pp. 3-4 (emphasis added).

of two related stories, published October 17, 2025, Mrs. Carey quoted Mr. S as saying that
Student B was an "*unaccompanied minor*" who "*sometimes lived*" with him.[67]

> The uncle of the 17-year-old who had the abortion said his niece came to Fairfax County as an
> unaccompanied minor and sometimes lived with him. But the law firm's report says another relative
> was listed as the guardian in school records and was contacted by the school nurse.

The term "unaccompanied child" or "unaccompanied minor" refers to a minor/child who,
among other things, has "*no parent or legal guardian in the US*."[68]

In the second of Mrs. Carey's two related articles, published October 29, 2025, she
quoted Student B's uncle as making the same point—that is, "He told News4 he was ***not***
[Student B's] legal guardian."[69]

> The girl's uncle, with whom she sometimes lived, spoke to News4 and Telemundo 44 but asked for
> his identity to be concealed for privacy reasons.
>
> He told News4 he was not the teen's legal guardian, but the new lawsuit said he was her guardian and
> was the one who should have been notified.

Mrs. Perez has likewise continued to repeat the false assertion that Student B's uncle was
her duly appointed legal guardian.  During the October 20 Americans United for Life webcast,
Mrs. Perez again alluded to the uncle being Student B's "legal guardian."[70]  Similarly, an
October 23 article based on an interview with Mrs. Perez states that "[a]ccording to Perez, the
girl's *legal guardian, her uncle*, only learned about the abortion after he took her to the
emergency room due to" alleged complications from the procedure.[71]  And, as reflected above,
Perez made similar statements in the video Americans United for Life recently posted to its
social media page.

In a recent lawsuit against FCPS originally filed in a Virginia circuit court on October 29
2025, alleging defamation and retaliation, Mr. Aden on Mrs. Perez's behalf persisted further in
making these same counterfactual claims, telling the court in the filed complaint that Student B's
"*uncle . . . was her legal guardian*."[72]  Those claims were later repeated in an amended

---

[67] FCPS_CHS_00001944 (emphasis added).

[68] *See, e.g.*, 6 U.S.C. § 279(g)(2) (emphasis added).

[69] FCPS_CHS_00001940 (emphasis added).

[70] *See* Americans United for Life, *Abortion Coercion & the Fight for Parental Rights in Public Schools*, (YouTube,
October 21, 2025), https://www.youtube.com/watch?v=mDc9X5gyWTU (on file with FCPS);
FCPS_CHS_00001985; FCPS_CHS_00001908.

[71] FCPS_CHS_00001948 (emphasis added).

[72] Complaint at 4, *Perez v. Fairfax County Public Schools, et al.*, No. CL-2025-0016376, (Va. Cir. Ct. Oct. 29, 2025)
(emphasis added).

complaint filed on November 25, 2025, in the same case, which is now pending in a federal court in the Eastern District of Virginia after removal from the state court.[73]

### *Aden's and Perez's consistent claims that Student B's alleged abortion occurred in Northern Virginia are contradicted by the recent statements of Student B's uncle.*

Mr. Aden and Mrs. Perez have consistently maintained that there is no ambiguity about where Student B's alleged abortion occurred. Mr. Aden told the Fairfax County School Board and others present at a public meeting on August 28, 2025, that it occurred in Northern Virginia, "just down the road here in Falls Church."[74] Mrs. Perez has repeatedly made the same claim, including to Walter Curt, and it was Mr. Curt's August 5, 2025, story claiming that the student had an abortion in Virginia that appears to have prompted Governor Youngkin to direct the Virginia State Police to open a criminal investigation.[75]

This same assertion underpins Mrs. Perez's and Mr. Aden's argument that the alleged conduct they have accused Mrs. Diaz of violated Virginia law. In an October 29 press conference, Mrs. Perez stated "all this is contrary to Virginia law."[76] In the October 27 Response to this Committee, Mr. Aden similarly asserted that the conduct alleged by Mrs. Perez was "in violation of Virginia law."[77] In the recent defamation/retaliation lawsuit against FCPS, Mr. Aden and Mrs. Perez specifically claim that Carolina Diaz violated Virginia criminal law by, without proper authorization, "*knowingly* and *willfully sign[ing]* an authorization statement consenting to an abortion for a minor."[78] Mr. Aden and Mrs. Perez have made this targeted allegation of criminal wrongdoing against Mrs. Diaz despite having no proof whatsoever that Mrs. Diaz ever signed any such authorization statement—and, indeed, no proof that any such form was ever signed by *anyone* or that the alleged abortion actually occurred in Virginia.

These claims are rooted *solely* in Mrs. Perez's speculative and counterfactual assumptions—chiefly, the factually unsupported and wholly speculative assumption that if Student B's uncle did not know of Student B's alleged abortion until after the fact, and therefore could not have authorized it, this must mean that Mrs. Diaz stepped in to provide the needed parent/guardian authorization, as required by Virginia law. In other words, it appears that Mr. Aden and Mrs. Perez have accused Mrs. Diaz of criminal wrongdoing based on nothing more than *a theory*—the theory that, in order for Student B to obtain an abortion in Virginia, Mrs. Diaz must have falsely and without authorization signed a document purporting to give parental/guardian consent to the procedure.

---

[73] First Amended Complaint, *Perez v. Fairfax County School Board*, No. 1:25-cv-02126 (E.D. Va. Nov. 25, 2025).
[74] Off The Press, *WATCH: Attorney Confronts VA School Board Over School-Facilitated Abortion Allegations*, at 0:39 (YouTube, Aug. 29, 2025), https://www.youtube.com/watch?v=f5z2liFMbpU (on file with FCPS).
[75] October 16 Statement, p. 6 (citing Press Release, Governor Glenn Youngkin Directs Virginia State Police to Open Full Criminal Investigation into Alleged School-Funded Abortions in Fairfax County (Aug. 13, 2025), https://www.governor.virginia.gov/newsroom/news-releases/2025/august/name-1054950-en.html).
[76] Americans United for Life, *PRESS CONFERENCE: AUL Files Lawsuit on Behalf of Public School Teacher*, at 15:49 (YouTube, Oct. 29, 2025), https://www.youtube.com/watch?v=_RiW2Qo4VHg (on file with FCPS).
[77] October 27 Response, p. 2.
[78] First Amended Complaint at 7, *Perez v. Fairfax County School Board*, No. 1:25-cv-02126 (E.D. Va. Nov. 25, 2025) (emphasis added).

There are three problems with this theory:

1.  There is no evidence of *anyone* signing *any* such parental authorization form—much less evidence that Carolina Diaz "knowingly" and "willfully" did so without authorization, as Mrs. Perez's new lawsuit falsely claims;

2.  Evidence that Student B's uncle did not know of the abortion until after the fact proves nothing, considering that the uncle has repeatedly confirmed that he was never in fact Student B's legal guardian; and

3.  It now appears that the abortion in question may not have even happened in Virginia, but rather Maryland, where the laws on parental/guardian notice and consent are materially different.

It has been central to Mrs. Perez's narrative from the beginning that Student B's claimed abortion occurred in Virginia where parental consent for an abortion is generally required by law. But there is now a major inconsistency between these claims and the reported statements of Student B's uncle.  In the October 17 NBC News4 story referenced above, Julie Carey reported that "[t]he uncle said the girl's abortion procedure took place at a clinic *in Maryland*."[79]  This is strikingly inconsistent with Mrs. Perez's and Mr. Aden's claims, and yet it comes from a source they have both held out as a key, credible witness.  As discussed below, it is also an inconsistency that has important legal implications.

Before turning to those legal points, it bears noting that this quote attributed to Student B's uncle, Mr. S, was published on October 17, ten days before Mr. Aden's October 27 Response. Given the weight that both Mrs. Perez and Mr. Aden have placed on statements by "Mr. S" as proof of their assertions, one would have expected Mr. Aden, in addressing this Committee, to at least attempt to reconcile his client's claims with this significant inconsistency.  But Mr. Aden's October 27 Response—submitted ten days after the NBC News4 report—made no mention of this at all.  He merely reiterated his client's factually unsupported claims of "illegal activity" "in violation of Virginia law."[80]

> **If Student B's alleged abortion occurred in Maryland, as the uncle states, this negates Aden's and Perez's theory and allegations.**

In Virginia, a minor seeking an abortion must provide notice to the parent or guardian and obtain parental/guardian consent, absent a court order waiving these requirements.[81]  By contrast, in Maryland there is no such consent requirement, and even the requirement to give notice can be waived in certain circumstances—including where "*[t]he minor does not live with a parent or guardian.*"[82]

These and other differences in the laws of Maryland as compared to Virginia and other surrounding states have reportedly led to many patients "crossing state lines" to avail themselves

---

[79] FCPS_CHS_00001944 (emphasis added).
[80] October 27 Response, pp. 1-2, 6.
[81] Va. Code Ann. § 16.1-241(W).
[82] Md. Code Ann., Health-Gen. § 20-103(c)(1) (emphasis added).

of Maryland's more lenient legal standards.[83]  A Maryland Daily Record article from December 2024 reported that "[t]here has been at least a 27 percent increase in out-of-state patients receiving abortion care in Maryland since 2019," and that, "[i]n 2023, about one in five abortion patients in Maryland lived out-of-state."[84]  According to the recently published interview with Student B's uncle, she may have been one of the many out-of-state patients who has traveled to Maryland for an abortion.[85]  And this would likely mean that the Virginia laws Mr. Aden and Mrs. Perez have repeatedly referenced do not apply at all.

If Student B, while still a minor, obtained an abortion in Maryland, as her uncle recently stated, Maryland law would not have required parental or guardian "consent."  Indeed, in these circumstances Maryland law likely would not even have required parental/guardian "notice" given that—as numerous records discussed above show—Student B was a "minor" who "d[id] not live with a parent or guardian," thus qualifying for the statutory exemption to parental notice requirements.[86]

As reported in FCPS's October 16 Statement, we have not been able (despite multiple attempts) to reach Student B or her uncle.[87]  We do not know with any certainty whether Student B in fact had an abortion or if so where, although there is evidence suggesting that she likely did have an abortion in late 2021.  It is unclear how the costs of any such abortion procedure would have been covered.  Yet our extensive investigation has turned up no credible evidence that Carolina Diaz or anyone else at CHS used school funds to pay for any student abortion, as Mrs. Perez and her lawyers have continued to assert, albeit more recently qualifying such allegations with words like "*perhaps*."  As for Mrs. Perez's and Mr. Aden's claims that Carolina Diaz knowingly and willfully signed forms providing false authorization for an abortion in Virginia, FCPS is aware of no evidence to support this serious, targeted, and malicious allegation of criminal wrongdoing by Mrs. Diaz.

Mrs. Perez from the beginning has hinged great significance on two points: (1) the assertion that Student B's uncle was her legal guardian; and (2) the observation that the uncle claims not to have had advance notice of any abortion procedure.  Mrs. Perez and her lawyers have inferred from these two points, in combination (the first one of which seems clearly inaccurate, as discussed above), that some other adult must have signed to provide the needed parental/guardian authorization that Student B would have likely required under Virginia law to obtain a minor abortion.  The analysis above exposes why this logic is flawed, and draws attention to serious concerns raised by the fact that Mrs. Perez, Mr. Aden, and Americans United for Life—relying on this flawed logic, and apparently lacking any other good-faith basis—have made public accusations of criminal wrongdoing against Mrs. Diaz.

---

[83] FCPS_CHS_00001979.
[84] *Id.*
[85] FCPS_CHS_00001944.
[86] Md. Code Ann., Health-Gen. § 20-103(c)(1).
[87] October 16 Statement, p. 24.

***Recorded statements recently released by Mrs. Perez add no persuasive factual support to her claims, but do demonstrate how she sought to shape witness accounts and factual narratives to support her baseless accusations against Mrs. Diaz.***

When interviewed by attorney Mary McGowan in August 2025, Mrs. Perez confirmed that she possessed multiple recordings of conversations she claimed supported her allegations.[88] But Mrs. Perez declined to share these recordings with FCPS at that time, saying she needed approval from her attorneys to do so.[89] Only recently, after submission of FCPS's October 16 Statement, did Mrs. Perez's counsel share these materials with FCPS. The recordings include two purported conversations in Spanish between Mrs. Perez and Student B's uncle, apparently recorded in November 2022, and a shorter conversation between Mrs. Perez and Student B apparently recorded around the same time.

In the first conversation with Student B's uncle (as set forth in the enclosed English translation), Mrs. Perez confronted the uncle with questions and factual assertions looking for him to confirm or corroborate her narrative, which he largely declined to do. Among other things, he said nothing to support her repeated efforts to inject Mrs. Diaz—referred to as "the social worker"—into the center of the abortion story.[90] When Mrs. Perez told the uncle that Student B "had an abortion at a clinic in Fairfax," he responded, "No, . . . that's not true."[91] Mrs. Perez then pressed the uncle to agree with her claims that "*the social worker sent [Student B] to the abortion clinic . . . and gave her a sealed envelope*," but the uncle said nothing to confirm that any of this was true.[92] As of the time of this November 2022 conversation, the uncle appeared uncertain as to whether Student B ever even had an abortion. He told Mrs. Perez, "I don't know if she did that," to which Perez responded, "Yes, she did do it. She . . . had an abortion."[93] Mrs. Perez then proceeded with a rapid-fire series of assertions: "The social worker gave her the paper," "everything was . . . arranged," "[i]t was at a clinic in . . . Fairfax," "[t]he social worker should have informed you," "[b]ecause you're her . . . legal guardian," "[t]he social worker is now guilty of a crime," etc.[94] The uncle did not confirm *any* of these statements and reiterated only that if there had been an abortion he "*[didn't] know anything about that.*"[95]

This largely one-sided recorded conversation adds nothing material to the overall factual landscape and no further support to Mrs. Perez's claims. Nor does the second recorded conversation between Mrs. Perez and Student B's uncle, which seems to have occurred soon in time after the first. In the second recorded conversation (again as shown through the attached English translation), the uncle once again expressed uncertainty about whether Student B in fact had an abortion, saying "I never found out" and "*I don't know anything.*"[96] Mrs. Perez continued to seed the conversation with accusations of wrongdoing by Mrs. Diaz, but the uncle again declined to support such claims. He merely repeated back to Perez what she tried to persuade

---

[88] FCPS_CHS_00001830 (rough, autogenerated transcript).

[89] *Id.*

[90] *See* FCPS_CHS_00001918 (English translation); FCPS_CHS_00001925 (Spanish transcript).

[91] *Id.*

[92] *Id.* (emphasis added).

[93] *Id.*

[94] *Id.*

[95] *Id.*

[96] FCPS_CHS_00001952 (English translation); FCPS_CHS_00001963 (Spanish transcript; emphasis added).

him was true, saying, "Well, maybe they helped her then, like you said, through the social worker . . . [s]o I didn't find out anything."[97]

The uncle acknowledged that he had received a call from Mrs. Diaz, "the social worker," about Student B, but not related to her being pregnant or having an abortion.[98]  He also said that the nurse did not contact him, and that he did not receive any request to approve an abortion.[99]  Later in the conversation, the uncle explained that he had confronted Student B with questions, asking her—likely prompted from Mrs. Perez's prior call to him—"[d]id you have an abortion?" and "[d]id the social worker help you at school?"[100]  But, as he explained, Student B declined to respond, while also making the vague statement, "I'll get people in trouble."[101]  The uncle said nothing to indicate that he understood this comment to refer to the nurse, the social worker, the "boyfriend" who may have driven Student B to the abortion clinic in Maryland, or anyone else in particular.  One thing that the conversation did reveal is that Student B's uncle was directly involved in escorting her to the "emergency room" after she complained of "stomach" pains and "bleeding," and it appears that he processed the paperwork from that ER visit and also received the "bills."[102]

Throughout the conversation, Mrs. Perez appeared intent upon persuading the uncle that school personnel were guilty of "*very serious crime[s]*" and "*felon[ies]*," specifically charging that Mrs. Diaz "*committed a felony, because [she] . . . paid for [Student B's] abortion with school funds*."[103]  Mrs. Perez cited no proof of any of this, but after making a series of accusations she then enlisted his help, asking if he would join her in "fight[ing] for justice to be done."[104]  Notably, she then ended the call with this admonition: "***Try not to speak with the school people, and make sure [Student B] doesn't speak with them either***."[105]

The shorter recorded conversation between Mrs. Perez and Student B reflects similar dynamics.  Mrs. Perez (again as shown through the attached English translation) makes several declarative statements to Student B about the supposed facts, such as: "you had the abortion, which Ms. Carolina Diaz paid for," "she made the appointment for you, scheduled your visit with the abortion clinic," "she paid the deposit," "your life was . . . put at risk by an abortion," etc.[106]  Student B did not confirm these statements.  What little Student B did confirm during this call was ambiguous.  While being questioned extensively by Mrs. Perez, Student B referred to "papers" she received from Mrs. Diaz, but the "paper" or "papers" she referred to were something later "sent . . . to the doctors" by her "uncle."[107]  "My uncle sent it," she said.[108]

---

[97] *Id.*
[98] *Id.*
[99] *Id.*
[100] *Id.*
[101] *Id.*
[102] *Id.*
[103] *Id.*
[104] *Id.*
[105] *Id*. (emphasis added).
[106] FCPS_CHS_00001975 (English translation); FCPS_CHS_00001977 (Spanish transcript).
[107] *Id.*
[108] *Id.*

Then, referring to "the papers they . . . gave [her] at the hospital," Student B said, "I think my uncle saved them"; "he was in charge of that."[109]

Mrs. Perez and her lawyers have suggested that this refers to papers involving an abortion procedure, but that interpretation directly contradicts other evidence and the spoken words used by Student B herself in the recording. The uncle, in the conversations Mrs. Perez recorded, makes it clear that he had no knowledge of, much less involvement in, any abortion procedure. What he did have involvement in was Student B's visit to the ER; he was "in charge of that."[110] As for the comment about Mrs. Diaz providing "papers" that were "sent . . . to the doctors," this presumably refers to forms Mrs. Diaz provided to Student B's uncle in February 2022 to assist with efforts in obtaining needed mental health care for Student B.[111]

Working with the uncle, Mrs. Diaz completed two forms, both dated in February 2022. The first of these forms was a one-page document titled "Consent to Exchange Confidential Information," which provided consent for FCPS to share confidential student information relating to Student B with the "individuals or agencies designated on th[e] form."[112] The two service providers that were designated were "Healthy Minds Fairfax" and "Trauma & Hope," and for both service providers an individual staff contact name was provided. Through this form, signed on February 15, 2022, Student B's uncle—stepping in for these purposes as her next of kin and de facto guardian—was authorizing Mrs. Diaz to share otherwise restricted and confidential information regarding Student B with outside mental health care providers.

Mrs. Diaz thereafter completed another form, titled "Short Term Behavioral Health Service for Youth Referral Form," dated February 28, 2022.[113] This form specifically authorized Healthy Minds Fairfax to conduct a virtual telehealth visit with Student B to address certain identified concerns, which Mrs. Diaz confidentially outlined on the form. As described in FCPS's October 16 Statement, this form disclosed sensitive details to the mental health care provider about Student B's background and circumstances.[114] Although it appears that Healthy Minds Fairfax was ultimately unable to reach Student B to follow through with the virtual consultation, the record makes clear that Mrs. Diaz worked closely with Student B's uncle in an effort to help Student B obtain access to behavioral health counseling at a critical time.

When Student B later refers again to "papers" received from Mrs. Diaz in the recorded conversation with Mrs. Perez, she alludes to Mrs. Diaz telling her that these papers, which she was "not going to open," were intended "for [her] uncle,"[115] which again suggests that the "papers" Student B was referring to related to the February 2022 mental health referral. It obviously would *not* fit Mrs. Perez's own narrative if the papers in question, which Student B was purportedly told by Mrs. Diaz to give to her "uncle" without "open[ing]," were papers related to an abortion procedure he knew nothing about and that Mrs. Perez has argued (without factual support) Mrs. Diaz sought to facilitate without his knowledge or consent. On the other

---

[109] *Id.*

[110] *Id.*

[111] FCPS_CHS_00001729.

[112] FCPS_CHS_00001934.

[113] FCPS_CHS_00001729.

[114] *Id.*

[115] FCPS_CHS_00001975 (English translation); FCPS_CHS_00001977 (Spanish transcript).

hand, given the sensitivity of what Mrs. Diaz confidentially conveyed in writing about Student B and her circumstances in connection with the mental health referral, it is entirely understandable that she may have preferred to share this information only with health professionals and an adult relative, not with Student B herself, explaining why she would have told Student B "not . . . to open" the papers and to "give them to [her] uncle."[116]

Once again, Mrs. Perez recently set forth her narrative of what happened to Student B in the video produced and posted online by Americans United for Life. And, as relevant here, this is what she said:

> "One day, she came home bleeding nonstop. He took her to the emergency room and that's when they examined her, and they said she's not pregnant anymore. I became aware when I was teaching my English 9, Level 1 class. The victim, the student who had the abortion, approached me very quietly. What happened? She told me that she got pregnant a few months before and her boyfriend and herself didn't want to have the baby, so she went to the social worker at Centreville High School and asked her for support. She called the clinic, she made the appointment, *and she was given an envelope that she kept sealed until she went to the clinic and gave it over there.* The legal guardian never got a phone call or a paper or any kind of documentation to let him know that she was going to have an abortion. . . ."[117]

Notably, Mrs. Perez here is claiming that Student B was "given an envelope that she kept sealed *until she went to the clinic and gave it over there.*" But the recorded conversation between Mrs. Perez and Student B says nothing to support this account. In that conversation, the "papers" Student B says she received from Mrs. Diaz that she was "not going to open" were "papers" she was "going to give . . . to [her] uncle" and that *her uncle* "sent . . . to the doctors" relating to matters he was "in charge of."[118]

The disturbing reality—made clear from the very evidence Mrs. Perez has produced in support of her claims—is that her supposed "proof" that Mrs. Diaz provided Student B with a sealed envelope to facilitate her abortion does not support this claim at all. On the contrary, the most critical proof in this entire matter *directly contradicts* Mrs. Perez's accusations. Student B *does* claim to have been given papers by Mrs. Diaz that she was not meant to "open," but those papers cannot possibly have related to an abortion, and they were not papers Student B "*gave . . . over*" to any clinic, as Mrs. Perez and Americans United for Life recently claimed. They were papers that Student B gave to her uncle, which he in turn was meant to share with "doctors" concerning other medical matters, *not* an abortion.

The recorded conversation between Mrs. Perez and Student B is at times difficult to follow, in part because of the apparent conflation of events being discussed. Student B at one point responds "Mm-hmm" to Mrs. Perez's question, "And she paid the deposit, right? The $500 deposit?"[119] Immediately after that, Student B adds, "I think so, because she gave me the paper.

---

[116] *Id.*

[117] Video posted by Americans United for Life (@americansunitedforlife), Instagram, *BLEEDING NONSTOP* (Nov. 13, 2025), https://www.instagram.com/americansunitedforlife/reel/DRA2JNdAskp/ (on file with FCPS).

[118] FCPS_CHS_00001975 (English translation); FCPS_CHS_00001977 (Spanish transcript).

[119] *Id.*

But . . . she told me you're not going to open the papers and you're going to give them to your uncle."[120]  As noted, it makes no sense that Mrs. Diaz gave Student B papers for her uncle that she was not "to open" if those papers concerned an abortion the uncle had no involvement in.[121]  The only interpretation of these comments that fits with the facts and contemporaneous events is that the papers in question concerned another medical matter the uncle *was* involved in, and all facts point to this likely being the mental health referral by Mrs. Diaz, which is independently documented.  Hence, nothing about this interchange between Mrs. Diaz and Student B can be read to suggest that Student B had knowledge of Mrs. Diaz paying a "deposit" for an abortion procedure.  Moreover, as discussed above, Mrs. Perez has repeatedly confirmed that Student B never purported to have knowledge of Mrs. Diaz paying for her abortion.  The most that Student B could say was that it "was free."[122]

While these recorded conversations—for the reasons explained above—do not substantiate Mrs. Perez's claims, they do shed significant light on this overall situation and help explain how it is that Mrs. Perez came to be making such serious accusations against Carolina Diaz with no apparent factual support.

First, it is important to observe that these recordings appear to have been in Mrs. Perez's possession in early December 2022 when Principal Lehman asked (for a second time) if she had any further information to share regarding her abortion-related allegations, and she responded that she did not.  Thus, these recordings are yet additional information (added to the written statement attributed to Student B) that Mrs. Perez consciously withheld from the school's investigation into her claims in late November and early December 2022.[123]

Second, as noted in FCPS's October 16 Statement, we have been unable to make contact with Student B or her uncle, despite multiple attempts.[124]  These recordings may help explain their reluctance to speak with FCPS's counsel, given Mrs. Perez's direction to Student B's uncle "*not to speak with the school people*," and her further direction that the uncle "*make sure [Student B] doesn't speak with them either*."[125]

Third, these recordings further corroborate what is readily apparent from other evidence—namely, that Mrs. Perez has actively attempted to insinuate that Mrs. Diaz was at the center of a supposed "criminal" plot to coerce, facilitate, and pay for student abortions, without parental or guardian knowledge or consent.  It is not surprising, in light of these recordings and what they show about Mrs. Perez's mindset, that in this same time period she prepared a statement for Student B's signature falsely claiming that Mrs. Diaz "paid the costs" for her alleged abortion.

---

[120] *Id.*
[121] *Id.*
[122] FCPS_CHS_00001830 (rough, autogenerated transcript).
[123] We further note that the recording with Student B appears to have been made during the school day on school premises.  The recording features youthful voices in the background as well as what appears to be a loud intercom tone, likely marking the beginning or end of a class period.  That Mrs. Perez would make such a recording on school property, during the school day, and then still not share that recording with Principal Lehman when requested to provide all relevant information within her possession raises concerns on multiple levels.
[124] October 16 Statement, p. 24.
[125] FCPS_CHS_00001952 (English translation); FCPS_CHS_00001963 (Spanish transcript).

Finally, the recorded conversation between Mrs. Perez and Student B seems to reveal the origins of the false claim that Mrs. Diaz gave Student B a "sealed envelope" to facilitate and cover the costs of her claimed abortion. As explained in FCPS's October 16 Statement, Mr. Aden went far beyond any known facts when he publicly told the Fairfax County School Board in August 2025 that Diaz provided Student B with a "white envelope" full of "money."[126] In attempting to defend himself, Mr. Aden's October 27 Response to the Committee argued that this critique "ignores *the student's own report* that 'an envelope' was given to her for the abortion clinic and that she did not have to pay for the procedure."[127] But Student B never "reported" any such thing. The following is what Student B's written statement (written by Mrs. Perez) says:[128]



There is no mention here of an envelope, much less a "white envelope" full of "money," as Mr. Aden claimed in the October 27 Response.

The only other "report" from Student B is the recorded conversation with Mrs. Perez. Student B's statements in that recorded conversation similarly make no reference to any "envelope." What the recording appears to show is that Student B recalled Mrs. Diaz giving her "papers" for her "uncle" to share with "the doctors" that Student B understood she was "not going to open."[129] Student B separately refers to "papers" that "they . . . gave [her] at the hospital" that she could not "find" but that she believed her uncle "saved."[130] There are clearly two different sets of papers being referenced here. The latter "papers" that "*they*" (apparently meaning hospital staff) "gave [her] at the hospital" appear to refer to the ER visit, where her uncle accompanied her and processed the forms. This would explain why he "saved" those papers. The former "papers" apparently given to Student B by Mrs. Diaz, which Diaz reportedly

---

[126] Off The Press, *WATCH: Attorney Confronts VA School Board Over School-Facilitated Abortion Allegations*, at 0:39-44 (YouTube, Aug. 29, 2025), https://www.youtube.com/watch?v=f5z2liFMbpU (on file with FCPS) (emphasis added).

[127] October 27 Response, p. 8 (emphasis added).

[128] FCPS_CHS_00001604.

[129] FCPS_CHS_00001975 (English translation); FCPS_CHS_00001977 (Spanish transcript).

[130] *Id.*

instructed Student B "not . . . to open" but to provide to her "uncle," likely relate to the mental health referral, where we know from other facts Mrs. Diaz was seeking to provide help to ensure Student B received access to needed care.

If we were able to speak directly with Student B or her uncle, these issues could possibly be further clarified. But Mrs. Perez seems to have done her best to ensure that FCPS ("the school people") lacks access to these witnesses.

Reflecting on the accumulated facts and these recordings in particular, the picture that has emerged is extremely troubling. The evidence shows that, beginning in November 2022, Mrs. Perez commenced her own private investigation, motivated by an apparent desire to pin social worker Carolina Diaz with proof of criminal acts. In pursuit of this goal, Mrs. Perez actively sought to influence the views of key witnesses, asserting knowledge of unproven facts, advancing claims of criminal wrongdoing, and attributing (with no factual support) wrongful intent to the school and to Mrs. Diaz in particular. It appears that Mrs. Perez heard in the conversations she recorded what she *wanted* to hear—that is, evidence to confirm her predetermined narrative. While the recorded words suggest otherwise and no objective listener could have reached such conclusions, Mrs. Perez seems to have heard Student B to refer to secret sealed "envelopes" meant to facilitate and pay for her alleged abortion.

Mr. Aden seems to have similarly heard in these recordings what he and Americans United for Life wanted to hear—that school officials were handing "white envelopes" full of "money" to vulnerable young pregnant students, pressuring them to get secret abortions in direct violation of Virginia criminal laws. It was a narrative that aligned with his organization's mission, and the story was timed to coincide with a close local election and, it appears, served as a useful vehicle for Americans United for Life fundraising. Walter Curt, Asra Nomani, and others, it appears, were similarly quick to accept this counterfactual narrative at face value, without bothering to scrutinize the highly questionable evidence and flawed theories being advanced as support for Mrs. Perez's extreme claims.

The truth is now finally coming out, but this was not a victimless endeavor on the part of Mrs. Perez and those who rallied around her. Carolina Diaz appears to have been falsely and publicly accused of criminal conduct with no basis in fact. Former CHS Principal Chad Lehman is similarly the victim of what appears to be maliciously false claims. Both have seen their careers interrupted by these allegations and to this day remain on administrative leave, as does CHS Assistant Principal Mike Parker. The Centreville High School community as a whole has also been adversely impacted. And significant burdens and costs have been imposed on FCPS as well, all stemming from false allegations perpetuated by Mrs. Perez and her promoters.

### *Aden and Perez continue to misrepresent the content of Student C's written statement in an effort to perpetuate the narrative of "coerced abortions."*

As addressed in FCPS's October 16 Statement, Walter Curt's August 5 social media story, echoing Mrs. Perez's claims, referred to "a second Centreville minor, five months pregnant," who allegedly was told by Carolina Diaz "that she 'had no other choice'" but to get an

abortion.[131]  According to Mr. Curt, "The girl, terrified, ultimately bolted from the clinic rather than go through with the procedure."[132]  This story—which was embellished to add sensational details that far exceeded even Mrs. Perez's own accusations—led to a series of other stories about what Asra Nomani termed "coerced abortions."[133]  Americans United for Life then seized on the "*coerced abortions*" phrasing, using "Abortion Coercion" as part of the tagline for the organization's October 20 webcast featuring Mrs. Perez, Congressman John McGuire, and others.[134]



Similar to the unfounded "*white envelope*" story, the "coerced abortion" narrative can be traced back to an ambiguous and, as translated into English (by Mrs. Perez), clearly *false* written statement that Mrs. Perez procured from another CHS student, Student C.  Commenting on that written statement, FCPS's October 16 Statement to the Committee explained that Mrs. Perez's influence over the content of the student's statement can be seen in part through the idiosyncratic use of the word "chasing."[135]  Of greater significance, FCPS explained that Mrs. Perez's English translation of the note purportedly written by Student C in Spanish added, in English, words that nowhere appeared in the original Spanish version.  Specifically, Mrs. Perez inserted the words "*and the social worker*" into the English translation of Student C's statement, resulting in: "That was the option that the school nurse **and the social worker** gave me when I was already five months pregnant."[136]  This alteration implied that both the school nurse and the social worker may have offered Student C an abortion as a first option, even though the original Spanish note never mentioned "the social worker."[137]

---

[131] October 16 Statement, p. 27 (citing FCPS_CHS_00001822).
[132] *Id.*
[133] FCPS_CHS_00001601.
[134] *See* Americans United for Life, *Abortion Coercion & the Fight for Parental Rights in Public Schools* (YouTube, Oct. 21, 2025), https://www.youtube.com/watch?v=mDc9X5gyWTU (on file with FCPS); FCPS_CHS_00001985 (emphasis added).
[135] October 16 Statement, p. 30.
[136] *Id.* (citing FCPS_CHS_00001810, FCPS_CHS_00001812) (emphasis added).
[137] *Id.*

On its face, and even as altered by Mrs. Perez, this statement does not support the *"coerced abortion"* narrative that Mrs. Perez, Mr. Aden, Mr. Curt, Ms. Nomani, and Americans United for Life have collectively promulgated. If this statement were to be believed, the original Spanish version only suggests that in a conversation with "the school nurse" (*not* the social worker) pregnancy options were discussed with Student C, and the "first option" discussed was "an abortion."[138] Student C's statement says nothing about pressure or coercion. As also explained in FCPS's October 16 Statement, FCPS counsel was able to speak live with Student C in early October and she specifically denied having been pressured to get an abortion.[139] She also confirmed that the school nurse told her that parental consent would be required if she desired to proceed with an abortion.[140] There is nothing remarkable about that conversation, as reported by Student C, much less anything remotely unlawful. And Student C clearly confirmed that the conversation with the nurse she referenced involved only the nurse and *not* Carolina Diaz, whom Student C confirmed she never spoke with at all about pregnancy options.[141]

Notwithstanding all this, Mr. Aden's October 27 Response repeated the allegation that "Carolina Diaz" somehow pressured Student C to get an abortion.[142] Mr. Aden gave no explanation for why Mrs. Perez's English translation of Student C's note inexplicably inserted the words "*and the social worker*" (words not appearing in the Spanish-language original). Adding further confusion, Mr. Aden re-quoted Mrs. Perez's errant English translation, which refers to the potential of an "abortion" being "offer[ed] . . . as a first option," yet in introducing that same quote Mr. Aden distorted the record by erroneously suggesting this evidence shows that Mrs. Diaz "and perhaps other[]" CHS personnel "were seeking to arrange abortions for students and ***insisting*** it was their **'only option.'**"[143] The only evidence Mr. Aden points to— Student C's written statement—says nothing of the sort. As he did when referring to a "*white envelope*" full of "*money*" (allegations for which there is no factual support), Mr. Aden here was manipulating the actual facts to falsely suggest to this Committee that Mrs. Diaz "*insist[ed]*" Student C get an abortion as her "*only option*."[144] This appears to be yet another case of Mrs. Perez and her allies hearing only what they want to hear, in this case taken to the extreme by Mr. Aden fabricating statements to achieve messaging that suits their purposes.

Mr. Aden's October 27 Response also refers to "an audio recording of an interview" with Student C,[145] but no such recording has been shared with FCPS by Mrs. Perez's counsel. Even so, Mr. Aden's limited quotations from that claimed audio recording lend no credence to the demonstrably false "coerced abortion" narrative.

---

[138] FCPS_CHS_00001812.
[139] October 16 Statement, p. 28.
[140] *Id.*
[141] *Id.*
[142] October 27 Response, p. 4.
[143] *Id.* (emphasis added).
[144] *Id.* (emphasis added).
[145] *Id.*

***It is untrue that Mrs. Perez has "fully cooperated" with FCPS's efforts to investigate her claims.***

Finally, Mr. Aden's assertions to this Committee that "Mrs. Perez has fully cooperated with FCPS throughout this process" and "has not withheld relevant information"[146] are inaccurate. As documented above, Mrs. Perez withheld information from Principal Lehman when he sought to promptly investigate her concerns in late 2022. It now appears that she had in her possession at that time not only the signed written statement attributed to Student B, but likely also recordings of conversations with Student B and Student B's uncle. Had she been forthcoming when Principal Lehman invited her twice (on November 22 and December 2, 2022) to provide any "further information"[147] relevant to her claims, a great deal of unpleasantness, confusion, and expense likely could have been avoided. But Mrs. Perez chose not to fully cooperate with the school's investigation at that point in time. And we now have seen that she encouraged Student B's uncle to also not cooperate with the school and urged him to persuade Student B not to "speak with [the school]" either.[148]

That same lack of cooperation by Mrs. Perez has been exhibited for years. As discussed in FCPS's October 16 Statement, Mrs. Perez appears to have shared details relating to her private investigation with Julie Perry, another CHS teacher and Mrs. Perez's close confidant, and others between November 2022 and August 2025, spawning some limited social media commentary on her student abortion allegations.[149] But she never brought any of the "evidence" she had compiled directly to the attention of school leaders, choosing instead to wait until August of this past year to make her concerns publicly known through her social media collaborator, Walter Curt.[150]

Mr. Curt's story prompted multiple investigations, including FCPS's own external counsel investigation, the detailed results of which have now been shared with this Committee. It is not true that Mrs. Perez "fully cooperated with FCPS throughout this process."[151] She did sit for an interview with attorney Mary McGowan on August 11, 2025, but when asked by Mrs. McGowan to share documents and recordings in her possession, Mrs. Perez declined.[152] It was months later before Mrs. Perez's attorneys shared this information with FCPS,[153] and she still has not shared certain information, including a purported recording of an interview Mrs. Perez conducted with Student C that was quoted in Mr. Aden's October 27 Response.[154]

While Mrs. Perez agreed to be interviewed by Mrs. McGowan, that interview was conducted as part of FCPS's preliminary fact gathering in the days immediately following Walter Curt's August 5 social media story, before any meaningful document collection had occurred and before FCPS retained external investigation counsel. That early interview did not obviate Mrs.

---

[146] October 27 Response, p. 7.
[147] October 16 Statement, p. 17 (citing FCPS_CHS_00001649).
[148] FCPS_CHS_00001952 (English translation); FCPS_CHS_00001963 (Spanish transcript).
[149] October 27 Response, pp. 31-34, 36-39.
[150] October 16 Statement, p. 18.
[151] October 27 Response, p. 7.
[152] October 16 Statement, p. 24.
[153] *Id.* at 25.
[154] October 27 Response, p. 4.

Perez's obligations, as a continuing FCPS employee, to cooperate with FCPS's ongoing investigative efforts.  After initially agreeing through counsel to meet with FCPS's attorneys in October, Mrs. Perez's counsel abruptly cancelled that meeting,[155] and Mr. Aden on Mrs. Perez's behalf has continued to refuse to make his client available for further questioning.

---

[155] October 16 Statement, p. 24.